UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LYNN STARKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CAUSE NO.:  1:19-cv-03153-RLY-TAB |
| ROMAN CATHOLIC ARCHDIOCESE | ) | |
| OF INDIANAPOLIS, INC. AND | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF LYNN STARKEY'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Dkt. 58)**

Plaintiff Lynn Starkey ("Starkey"), by counsel, respectfully files her Response in
Opposition to Defendants Roman Catholic Archdiocese of Indianapolis, Inc. ("Archdiocese")
and Roncalli High School, Inc's ("Roncalli") Motion for Judgment on the Pleadings (Dkt. 58).

## INTRODUCTION

Starkey is a former guidance counselor at Roncalli, an Archdiocesan high school. She
worked at Roncalli for 39 years, including the last 21 years as a guidance counselor and/or co-
Director of Guidance. She has been in a same-sex civil union since 2015. Roncalli's Principal
and other Roncalli administrators have been aware of Starkey's sexual orientation and female
partner for many years, yet continued to renew her annual contract each spring. That changed in
May 2019, when Defendants informed Starkey that they were not renewing her employment
contract because of her same-sex civil union.

Starkey filed this lawsuit on July 29, 2019, and Defendants answered her complaint on
September 27, 2019. Dkt. 1; Dkt. 20. For the past six months, Defendants have argued that a
"threshold" question in this litigation is whether Starkey was a "minister" for purposes of the

ministerial exception recognized in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). Defendants filed a Motion to Bifurcate Discovery, arguing that initial discovery in this case should be limited to their ministerial exception affirmative defense. Dkt. 25; Dkt. 26; Dkt. 27. The Court denied Defendants' Motion to Bifurcate. Dkt. 40.

In their Motion for Judgment on the Pleadings, Defendants now argue that they should prevail in this case even in the absence of the ministerial exception. Defendants seek religious immunity for religious employers from employment discrimination or retaliation claims, or state law tort claims, even when brought by secular employees, for engaging in conduct in their private lives (rather than their professional or public lives) that they claim violates Church teachings. If accepted, Defendants' arguments would have drastic and far-reaching consequences on employees of religious organizations, as it would eliminate significant Federal statutory protections enjoyed by them now. Catholic organizations, such as hospitals and schools, collectively employ hundreds of thousands of "lay" employees in the United States. *See* "Catholic Health Care in the United States (Jan. 2013)," Catholic Health Association of the United States, *available at* https://www.chausa.org/docs/default-source/general-files/mini_profile-pdf.pdf?sfvrsn=0 (last visited Apr. 15, 2020) (identifying 533,152 full-time employees and 232,591 part-time employees of Catholic hospitals); "Catholic School Data," National Catholic Educational Association, *available at* https://www.ncea.org/NCEA/Proclaim/Catholic_School_Data/Catholic_School_Data.aspx (last visited Apr. 15, 2020) (identifying 146,367 full time employees, 97.1% of which are considered "lay" employees).

Defendants argue that Starkey cannot try her claims in this case without attacking Catholic doctrine on same-sex marriage. Starkey disagrees. The same analytical framework that

is commonly used to evaluate employment discrimination and retaliation claims can be used here, without requiring a Court or jury to make any judgments on the reasonableness or fairness of any religious belief. A factfinder could be permitted to determine whether Defendants enforce violations of Church teachings equally against homosexual and heterosexual employees, or whether Defendants would have made the same decision if Starkey's sex or sexual orientation had been different and all other facts were the same. The Court should deny Defendants' Motion in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

Starkey was a co-Director of Guidance for Roncalli. Dkt. 1 at 3. "Roncalli is an archdiocesan high school of which the Archbishop of the Archdiocese of Indianapolis is the sole corporate member." Dkt. 20 at 5. The Archdiocese employed Starkey beginning in 1978, and provided her with employee-related benefits during her employment. Dkt. 1 at 2; Dkt. 20 at 5. Roncalli employed Starkey from 2009 to 2019. Dkt. 20 at 5. Defendants employed Starkey as a guidance counselor from 1998 to 2007, and as co-Director of Guidance from 2007 to 2019. *Id.* Starkey was employed pursuant to a written contract that was renewed on an annual basis for 39 years. Dkt. 1 at 4; Dkt. 20 at 7.

Starkey is a homosexual female, and has a female spouse, to whom she has been married since 2015. Dkt. 20 at 8. Roncalli's Principal, Chuck Weisenbach, and other Roncalli administrators, were aware of Starkey's sexual orientation and female partner well before August of 2018. Dkt. 1 at 5.

Prior to August 2018, Starkey's counterpart as co-Director of Guidance was Shelly Fitzgerald. *Id.* Fitzgerald is also a homosexual female and married to a female spouse. Dkt. 1 at 5. On August 12, 2018, within two days after learning of her same-sex marriage, Roncalli placed

Fitzgerald on paid administrative leave "and requested that she not return to the campus without the permission of the school administrators." Dkt. 20 at 8-9.

On August 13, 2018, Starkey attended a meeting with Archbishop Charles Thompson, Superintendent of Archdiocesan Schools Gina Fleming, a priest specializing in canon law, Roncalli President Joseph Hollowell, Principal Weisenbach, the Roncalli Administrative Council, and the Roncalli Board of Directors. Dkt. 20 at 10. During the meeting, the canon law specialist "described the nature and purposes of Catholic marriage." *Id*. Starkey asked why gay marriage was such a hot button issue, compared with other sins. *Id*. On the next day, August 14, 2018, Starkey had a conversation with Principal Weisenbach about sharing prepared remarks with the Administrative Council. Dkt. 1 at 6. During that conversation, Principal Weisenbach asked Starkey whether she had a civil union. *Id*. Starkey asked him whether he really wanted to ask her that question. *Id*. Principal Weisenbach said "yes." *Id*. Starkey answered, "yes." *Id*.

On August 21, 2018, Archbishop Thompson published a letter condemning Fitzgerald's marriage, sparking protests at Roncalli from students, teachers, and parents. Dkt. 1 at 6. Once Fitzgerald went on administrative leave, Starkey was required to assume many of Fitzgerald's work responsibilities, in addition to her own, substantially adding to her workload in the Fall 2018 semester. *Id*. On November 16, 2018, Starkey filed Charges of Discrimination with the EEOC against the Archdiocese and Roncalli. Dkt. 20 at 11-12. Starkey later amended her EEOC Charges on March 25, 2019, and May 9, 2019. Dkt. 20 at 3-4.

In March 2019, Starkey learned that her contract would not be renewed for the 2019-2020 academic year. Dkt. 1 at 6. On May 1, 2019, Starkey received a letter from Principal Weisenbach officially notifying her that she would not be offered a contract for the 2019-2020 school year. Dkt. 20 at 12. The letter stated that Starkey's "civil union is a violation [her]

4

contract and contrary to the teaching of the Catholic Church." *Id.* Starkey's contract expired on August 31, 2019. *Id.*

Starkey's contract stated that "[r]elationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church" are prohibited. Dkt. 59-2 at 3. Other than Fitzgerald and Starkey, neither the Archdiocese nor Roncalli has terminated or non-renewed any teacher or employee for being legally married to an opposite sex spouse, even when opposite sex marriages violate Church teachings. Dkt. 1 at 7.

Starkey filed her Complaint against the Archdiocese and Roncalli on July 29, 2019, asserting claims for Title VII discrimination, Title VII retaliation, Title VII hostile work environment, Title IX retaliation, tortious interference with contract, and tortious interference with employment relationship. Dkt. 1 at 7-12. On September 9, 2019, Defendants requested a stay of this case until after the U.S. Supreme Court decides two cases relating to the applicability of Title VII to claims for sexual orientation discrimination. Dkt. 12. The Court denied the stay. Dkt. 21. Defendants answered the Complaint on September 27, 2019. Dkt. 20.

Defendants next filed a Motion to Bifurcate Discovery, arguing that initial discovery in this case should be limited to their ministerial exception affirmative defense. Dkt. 25-27. The Court denied Defendants' Motion to Bifurcate. Dkt. 40. Defendants immediately appealed this Order to the District Court Judge under Rule 72(a), and moved for a stay of the Order denying bifurcation. Dkt. 42-45. The Court granted the stay. Dkt. 52. Starkey filed her Response in Opposition to Defendants' Rule 72(a) Motion on January 6, 2020, and Defendants filed their Reply on January 16, 2020. Dkt. 46; Dkt. 54.

## STANDARD OF REVIEW

Rule 12(c) "allows a party to move for judgment after the pleadings are closed but early enough not to delay trial." *Steak n Shake Enters. v. Varnson Group*, No. 1:09-cv-404-SEB-TAB, 2011 U.S. Dist. LEXIS 127411, *6 (S.D. Ind. Oct. 24, 2011) (internal citation omitted). "A motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under [Rule 12(b)(6)]." *Id*. The Court must "treat all well-pleaded allegations" in the complaint as true, and "draw all inferences" in Plaintiff's favor. *Harrison v. Deere & Co.*, 533 Fed. Appx. 644, 647 (7th Cir. 2013).

## ARGUMENT

### I.  Starkey Plead Valid Title VII and Title IX claims.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to "discharge any individual, or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's…sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits retaliation. 42 U.S.C. § 2000e-3(a). Similarly, under Title IX of the Education Amendments of 1972, "[n]o person shall, on the basis of sex…be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).

Defendants argue that Starkey has no claims under either Title VII or Title IX for the following reasons: (1) Title VII's statutory exemptions for religious employers bar Starkey's Title VII claims; (2) Starkey's alleged breach of contract was a legitimate, nondiscriminatory reason for her discharge; (3) Defendants' decision was motivated by "Church teachings," rather than sexual orientation; (4) Starkey's Title IX claim is preempted by Title VII; (5) Starkey's Title IX claim is barred by its religious exemption; and (6) sexual orientation is not a protected

class under Title VII or Title IX. Dkt. 59 at 16-27.  Some of these arguments are wrong legally.

Others have yet to be developed factually, and are not appropriate for resolution on a motion for

judgment on the pleadings.

### A.  Title VII's Statutory Exemptions Do Not Apply Here Because Plaintiff Has Not Brought a Religious Discrimination Claim.

Defendants incorrectly rely on the exemptions found in Title VII at 42 U.S.C. §§ 2000e-

1(a) and e-2(e)(2).  Those read in their entirety as follows:

> This title [42 USCS §§ 2000e et seq.] shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals *of a particular religion* to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a) (emphasis added).

> [I]t shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees *of a particular religion* if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

42 U.S.C. § 2000e-2(e)(2) (emphasis added). These exemptions apply to bar religious

discrimination claims brought against a religious employer. However, they do not "give religious

organizations freedom to make discriminatory decisions based on race, sex, or national origin."

*Herx v. Diocese of Ft. Waye-South Bend Inc*., 48 F.Supp. 3d 1168, 1175 (N.D. Ind. 2014),

*appeal dismissed*, 772 F.3d 1085 (7th Cir. 2014).

In *Herx*, Judge Robert L. Miller, Jr. of the Northern District of Indiana rejected almost

the same exact argument that Defendants make here. In that case, the Diocese declined to renew

a teacher's contract after learning that she had engaged in in vitro fertilization ("IVF") in an

effort to get pregnant. *Id*. at 1170. Herx sued the Diocese, asserting claims for sex discrimination and disability discrimination.  *Id*. at 1170-71. The Diocese argued that "the religious employer exemptions in Title VII apply, and no further inquiry should be allowed, because its decision to not renew Mrs. Herx's contract was religiously based." *Id*. at 1175. The Court disagreed, holding that "Title VII's exemptions are limited specifically to claims of discrimination premised on religious preferences, and Mrs. Herx isn't complaining about religious preferences." *Id*.

The Diocese attempted to immediately appeal the Court's decision under the collateral order doctrine. *Herx*, 772 F.3d 1085, 1088 (7th Cir. 2014). The Seventh Circuit dismissed the appeal for lack of jurisdiction, holding that the collateral order doctrine was inapplicable. *Id.* at 1091-1092. It said that the District Court's rejection of the defense based on Title VII's exemptions was not a collateral order, and that there was no authority "for the proposition that the exemptions provide an immunity from the burdens of trial rather than an ordinary defense to liability." *Id*. at 1091.

Likewise, Starkey is not complaining about religious preferences, and has not asserted a claim for religious discrimination. Dkt. 1. Her Title VII claims are based on sexual orientation discrimination, retaliation, and hostile work environment. *Id*. Thus, the Title VII exemptions do not apply. *Herx*, 48 F. Supp. 3d at 1176.

Many Circuit Courts of Appeal have limited the exemptions to religious discrimination claim. *See Herx*, 48 F. Supp. 3d at 1175-76 (*citing*, *inter alia*, *Petruska v. Gannon Univ.*, 462 F.3d 294, 303 (3d Cir. 2006); *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985); *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996); *EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1279 (9th Cir. 1982)).

Defendants argue that the Title VII exemptions are applicable to "employment decisions based on an employee's '*conduct*,' not just her beliefs or formal religious affiliation." Dkt. 59 at 18. But the majority of cases they rely upon involved religious discrimination claims, rather than another form of discrimination protected under Title VII. *See Kennedy*, 657 F.3d at 196 (reversing denial of motion for summary judgment in favor of employer on religious discrimination claims); *Little v. Wuerhl*, 929 F.2d 944, 945 (3d Cir. 1991) (affirming summary judgment in favor of employer on religious discrimination claim); *Hall v. Baptist Memorial Health Care Corp*., 215 F.3d 618, 621 (6th Cir. 2000) (same); *Killinger v. Samford Univ.*, 113 F.3d 196, 197 (11th Cir. 1997) (same).

Defendants also cite cases that did involve sex discrimination claims. *Curay-Cramer v. Ursuline Acad. of Wilmington Del., Inc.*, 450 F.3d 130 (3d Cir. 2006); *EEOC v. Miss. College*, 626 F.2d 477 (5th Cir. 1980); *Maguire v. Marquette Univ.*, 627 F. Supp. 1499 (E.D. Wisc. 1986). However, these cases did not definitively apply the Title VII exemptions to sex discrimination claims, and even if they did, they represent the minority viewpoint. In *Curay-Cramer*, the Court's discussions of the application of the Title VII exemptions to a sex discrimination claim are best understood as dicta. 450 F.3d at 141. The Court held, "we will not apply Title VII to Curay-Cramer's claim because Congress has not demonstrated a clear expression of an affirmative intention that we do so in situations where it is impossible to avoid inquiry into a religious employer's religious mission or the plausibility of its religious justification for an employment decision." *Id*. (internal citations omitted). *Curay-Cramer* based its holding on the First Amendment and constitutional avoidance, rather than the Title VII exemptions. *Id*. at 138.

In *Miss. College*, the Court concluded that "if a religious institution…presents convincing evidence that the challenged employment practice resulted from discrimination on the basis of

religion, [the statutory exemption] deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination." 626 F.2d at 485. This does not apply to Starkey's claims.  Defendants do not claim to have discriminated against her on the basis of religion. Moreover, *Miss. College*'s holding has been called into question even within its own Circuit. *See Smith v. Angel Food Ministries, Inc.*, 611 F. Supp. 2d 1346, 1347-1351 (M.D. Ga. 2009) (stating that *Miss. College*'s "drive-by jurisdictional ruling" had "no precedential effect" and denied motion to dismiss on plaintiff's religious discrimination claim).

Finally, in *Maguire*, the district court decided the plaintiff's claim of sex discrimination in part based on the Title VII exemptions. 627 F. Supp. at 1502-1504. However, the court's analysis was significantly impacted by the fact that the plaintiff was seeking a position in the university's theology department. *Id*. at 1504 ("There is probably no teaching position at Marquette University which is more closely tied to the University's religious character than that of theology professor. Plaintiff has not applied for a position in one of the more secular departments….") (internal citations omitted). On appeal, the Seventh Circuit declined to adopt the district court's ruling on the applicability of the Title VII exemptions.  *Maguire*, 814 F.2d 1213, 1216 (7th Cir. 1987) ("[W]e need not determine whether Marquette qualifies as a religious employer under the terms of the exemption and if so whether the exemption covers the type of hiring decision involved here, for this case can be resolved on a much narrower ground."). Thus, the district court's decision in *Maguire* has no precedential effect.

This Court should conclude that the Title VII statutory exemptions do not bar Starkey's Title VII claims, which are based on sexual orientation discrimination, not religious discrimination.

**B. Defendants Had No Legitimate, Nondiscriminatory Reason to Fire Starkey.**

Defendants next argue that the breach of Starkey's "morals clause" constitutes a "legitimate, nondiscriminatory justification for [their] nonrenewal decision, warranting dismissal of her Title VII claims. This argument is premature at this stage of the case, since it must be resolved by the fact-finder following completion of discovery or trial. Defendants had no legitimate, nondiscriminatory reason for not renewing Ms. Starkey's contract. Even if they did, Ms. Starkey may still prevail if she can establish pretext.

"In order to succeed in a Title VII lawsuit, a plaintiff must show that [she] is a member of a class protected by the statute, that [she] has been the subject of some form of adverse employment action…, and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). A plaintiff may rely on the *McDonnell Douglas* burden shifting method by showing that: (1) she is a member of a protected class, (2) she met her legitimate job expectations, (3) she suffered an adverse action, and (4) "similarly situated employees outside of the protected class received more favorable treatment." *Morgan*, 724 F.3d at 996 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)). "If plaintiff meets all four of these criteria, the burden shifts to the defendant to offer a non-discriminatory reason for the adverse employment action." *Morgan*, 724 at 996. "If the employer does so, the burden shifts back to the plaintiff to present evidence that, if believed by the trier of fact, would show that the real explanation for the action is discrimination." *Id*.

The Seventh Circuit recently eliminated the dichotomy between "direct" and "indirect" evidence in discrimination cases, and held that all evidence (direct and indirect) "must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-766 (7th Cir. 2016). The

ultimate question for the Court is whether a reasonable juror could conclude that the Defendant would have taken the same adverse action if the Plaintiff had been not been a member of the protected class, but everything else had been the same. *Id*. at 764.

Defendants cite to *Cline v. Catholic Diocese of Toledo*, where a teacher sued the Diocese for pregnancy discrimination when it did not renew her contract after learning that she had become pregnant and had engaged in premarital sex. 206 F.3d 651, 656-657 (6th Cir. 1999).[1] *Cline* supports Starkey's position, because the Court determined that the Diocese was not entitled to summary judgment on the plaintiff's Title VII claims. *Id*. at 669. In *Cline*, the Court recognized that the defendant had "successfully articulated a nondiscriminatory reason for its actions." *Id*. at 666. But the Court permitted the plaintiff to show that the "proffered reason was not the true reason for the decision." *Id*. In other words, the plaintiff needed to show that she was terminated for becoming pregnant, rather than for "violating the school's moral code." *Id*. at 666-667. The Court stated that she could make this showing in a variety of ways, including by showing that the defendant had "enforced its premarital sex policy in a discriminatory manner – against only pregnant women, or against only women." *Id*. at 667. The Court admonished the district court for siding with the defendant "far too hastily" on a summary judgment motion, and concluded that the evidence, when viewed in a light most favorable to the plaintiff, warranted a trial. *Id*. at 667-668.

Similarly, in *Herx*, the court ruled that the "triable issue is whether Mrs. Herx was nonrenewed because of her sex, or because of a sincere belief about the morality of in vitro fertilization." 48 F. Supp. 3d at 1179. The court stated that the jury "might well agree" with the Diocese that "an employer with so strong a view of this particular infertility treatment would

---

[1] The teacher married her husband, the father of her child, before giving birth, but had become "visibly pregnant" within two months after her wedding date. *Id*. at 656.

discharge anyone involved with it, male or female." *Id*. at 1178. But the court said that "a jury wouldn't be compelled to accept that avowed gender-neutrality," since it had not terminated any men for participating in IVF treatment. *Id*. Following trial, the jury rendered a verdict in the Plaintiff's favor. *See Herx*, No. 1:12-cv-122-RLM, 2015 U.S. Dist. LEXIS 28224, *1 (N.D. Ind. Mar. 9, 2015) (denying Defendant's post-trial motion for judgment as a matter of law).

Starkey's case can be litigated and tried similarly to *Cline* and *Herx*. Starkey claims that Defendants discriminated against her on the basis of her sexual orientation, which is a protected form of sex discrimination. *Hively v. Ivy Tech Cmty. College of Ind.*, 853 F.3d 339, 341 (7th Cir. 2017). Defendants claim that Starkey's "civil union is a violation of [her] contract and the teachings of the Roman Catholic Church." Dkt. 20 at 12. Starkey has not admitted Defendants' proffered reason as the true reason for her nonrewal, and she may rebut this reason without challenging religious doctrine. She deserves a "'full and fair opportunity' to make this showing…[and] pursue several avenues of discovery." *Cline*, 206 F.3d at 667 (internal citation omitted).

Starkey claims that Defendants have treated similarly situated heterosexual employees more favorably than they have treated her. Dkt. 1 at 8. Starkey's 2018-19 contract prohibits "[r]elationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church." Dkt. 59-2 at 3. Aside from same-sex marriages and civil unions, there are other marriages or relationships that the Catholic Church does not recognize as "valid." These include a re-marriage following a divorce, without an annulment, cohabitational relationships, marriage without the sacrament, and other practices. Thus, certain opposite-sex marriages or relationships may not be "valid marriages," under Church teachings. So, if Defendants have taken adverse action against homosexual employees for being in "invalid marriages," but have not taken

adverse action (or taken less severe action) against heterosexual employees for being in "invalid marriages," that would support Starkey's claims that her sexual orientation was Defendants' true motivation. Starkey has alleged that Defendants have not "terminated or non-renewed any teacher for being legally married to an opposite sex spouse, even when the opposite sex marriage violates Church teachings." Dkt. 1 at 7. She has further alleged that Defendants "employ heterosexual teachers who are in legally valid, opposite sex marriages that violate Church teachings." Dkt. 1 at 8. At this stage of the case, the Court must accept Starkey's allegations as true, and draw all reasonable inferences in her favor. *Iowa Physicians' Clinic Med. Foundation v. Physicians' Ins. Co.*, 547 F.3d 810, 811 (7th Cir. 2008).

Defendants argue that the Court cannot weigh the severity of violations of Church doctrine without violating the First Amendment. Dkt. 59 at 35-36 (citing *Curay-Cramer*, 450 F.3d at 132, and *Hall*, 215 F.3d at 626-627). In *Curay-Cramer*, the Court recognized that it could perform such an analysis if "a plaintiff avers that truly comparable employees were treated differently following substantially similar conduct." 450 F.3d at 141. The court in that case did not allow the plaintiff to pursue her gender discrimination claim because she had identified no males who had not been terminated for engaging in pro-choice advocacy, only males who had allegedly violated unrelated Church teachings. *Id*. at 139 n.7. Defendants argue that this would require the court to determine whether the types of violations are "morally and theologically equivalent," but Defendants' own contractual terms make no distinctions on the grounds of sexual orientation – it covers all "relationships" outside a "valid marriage." Dkt. 59-1 at 3. Any violation of this contractual term amounts to "substantially similar conduct." *Curay-Cramer*, 450 F.3d at 141.

The same Title VII analysis applies to Starkey's retaliation claim. Once Defendants articulate a legitimate, non-retaliatory reason for the adverse employment decision, Starkey may rebut this by showing pretext. Starkey entered into her same-sex civil union in 2015. Dkt. 1 at 4. She has alleged that Defendants were aware of her sexual orientation and same-sex partner before August 2018, yet took no adverse actions against her prior to that time. Dkt. 1 at 5. Defendants renewed her annual contract each year through May 2018. Dkt. 1 at 4. However, Defendants ended Starkey's employment after she engaged in Title VII protected activity, including opposing Defendants' discriminatory practices against homosexual employees, and filing Charges of Discrimination with the EEOC. Dkt. 1 at 6-7.

The Court should deny Defendants' Motion for Judgment on the Pleadings.

**C. Starkey Properly Alleged Sexual Orientation Discrimination.**

Defendants next argue that they ended Starkey's employment not for her sexual orientation, but for "her conduct in entering a same-sex union and rejecting Church teaching." Dkt. 59 at 22. Starkey has properly alleged claims of sexual orientation discrimination and retaliation. *See* Dkt. 1 at 8 ("There is a causal connection between Starkey's sexual orientation…and Defendants' adverse employment actions towards her."). Her allegations plausibly support her claims for relief. Dkt. 1.

Defendants attempt to distinguish a decision based on a person's legally protected status, and person's actions or conduct which may be consistent with that conduct. Dkt. 59 at 23-24. Courts do not recognize such a distinction. "[W]hen homosexual conduct" is prohibited, that "is an invitation to subject homosexual persons to discrimination." *Lawrence v. Texas*, 539 U.S. 558, 575 (2003); *see also Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 689 (2010) ("CLS contends that it does not exclude individuals because of sexual

orientation, but rather 'on the basis of…conduct…[.]' Our decisions have declined to distinguish between status and conduct in this context.") (internal citations omitted).

Setting *Lawrence* and *Martinez* aside, the supposed distinction between orientation and conduct illustrates precisely why the Court can decide this case *without* deciding questions of church doctrine or religious beliefs. *Cline* and *Herx* provide a roadmap for how to do this under Title VII. *Cline*, 206 F.3d at 666-667; *Herx*, 48 F. Supp. 3d at 1178-79, 1182-83. Defendants will have the opportunity to argue that they did not discriminate on the basis of sexual orientation or retaliate. But it would be premature at this stage of the case, before discovery has concluded, for the Court to decide Starkey's Title VII claims as a matter of law.

**D.  Title VII Does Not Preempt Starkey's Title IX Retaliation Claim.**

Starkey also alleges that Defendants retaliated against her in violation of Title IX. Dkt. 1 at 10. Defendants argue that this claim is preempted by Title VII. Dkt. 59 at 24-25. Although the Seventh Circuit has ruled that Title IX *discrimination* claims are preempted by Title VII in the employment context, it has not ruled that Title IX *retaliation* claims are preempted. Defendants' preemption argument fails.

In *Waid v. Merrill Area Pub. Schs.*, the Seventh Circuit held that Title VII preempted the plaintiff's claim for discrimination under Title IX. 91 F.3d 857, 862 (7th Cir. 1996). After *Waid* was decided, the Supreme Court held that "Title IX's private right of action encompasses [suits for] retaliation." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 178 (2005). After the Supreme Court's decision in *Jackson*, at least one court within the Seventh Circuit has held that claims for retaliation under Title IX are not preempted. *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 171 F. Supp. 3d 830, 839-840 (W.D. Dist. Wis. 2016), *affirmed*, 851 F.3d 690, 695 (7th Cir. 2017); *See also Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 563 (3d Cir. 2017)

(noting that *Waid* was decided "a decade before *Jackson*," and questioning "the continued viability of *Waid*.").

Since Starkey brings only a Title IX retaliation claim, but not a discrimination claim, there is no Title VII preemption.

### E. Applying Title IX would Be Consistent with Defendants' "Religious Tenets."

Defendants next argue that application of Title IX would violate the statute's exception for "religious organizations with contrary religious tenets," which reads: "this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). But, as with Starkey's Title VII claims, the Court can decide the merits of Starkey's Title IX claim without infringing on Church teachings or matters of Church doctrine.

The elements of a retaliation claim are the same under Title VII and Title IX. *Burton,* 851 F.3d at 695 (7th Cir. 2017). Those elements are: "(1) she engaged in a statutorily protected activity; (2) the [Defendants] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Id*. It would be consistent with Defendants' "religious tenets" to apply this analysis to Starkey's retaliation claims under both Title VII and Title IX. A factfinder may decide whether Defendants' religious-based justification was the reason for the adverse actions, or because of Starkey's good-faith opposition to Defendants' practices (including her opposition to the treatment of Fitzgerald, and filing of EEOC Charges).

In August 2018, Principal Weisenbach asked Starkey about her relationship status immediately after Starkey raised objections to Roncalli and the Archdiocese's treatment of her colleague, Shelly Fitzgerald (who was in a same-sex marriage). Dkt. 1 at 6. Starkey answered his

question truthfully. *Id*. The timing of Principal Weisenbach's question suggests that he was not motivated by a desire to determine whether Starkey was in violation of Church teachings, but because she had complained. Starkey immediately had to assume Ms. Fitzgerald's workload, in addition to her own, for the rest of the semester. *Id*. Starkey filed Charges of Discrimination with the EEOC in November 2018. *Id.* Then, in March 2019, Defendants informed Starkey that they would not renew her contract at the end of the school year.  *Id*. This fact pattern, and the inferences derived therefrom, strongly supports retaliation.

This claim is not barred by Title IX's religious exemption because there is nothing in the tenets of the Catholic Church condoning retaliation. *See Goodman v. Archbishop Curley High Sch., Inc.*, 149 F. Supp. 3d 577, 586 (D. Md. 2016) ("The United States Supreme Court has recognized the importance of retaliation claims in Title IX enforcement, and no court has since held that Title IX's religious organizations exemption precludes a Plaintiff from raising a Title IX retaliation claim simply because the employer has proposed a religious reason for her termination. On the contrary, courts have recognized that simply allowing an employment discrimination or retaliation claim to proceed under the *McDonnell Douglas* scheme does not threaten a Defendant's religious interests or freedoms.") (citations omitted).

As with Starkey's Title VII claims, the Court should deny Defendants' Motion for Judgment on the Pleadings on her Title IX claim.

### F.  Sexual Orientation Is a Protected Class.

In *Hively v. Ivy Tech Community College*, the Seventh Circuit held that "discrimination on the basis of sexual orientation is a form of sex discrimination." 853 F.3d 339, 341 (7th Cir. 2017). Defendants seek to "preserve" the argument that sexual orientation is not a protected class under Title VII or Title IX, but concede that *Hively* states the opposite. Should future U.S.

18

Supreme Court decisions impact *Hively*, Starkey reserves the right to file a supplemental brief addressing any such decisions.

## II.     The First Amendment Does Not Bar Starkey's Claims.

Defendants next seek constitutional protection under the First Amendment from all of Starkey's claims. They argue that the following related and overlapping constitutional doctrines bar Starkey's claims: (1) "religious autonomy;" (2) excessive entanglement into deciding religious questions; (3) freedom of association; and (4) constitutional avoidance.

Religious employers, schools, or other organizations are not above the law. The First Amendment does not provide absolute, blanket protection for religious organizations from Court oversight. Courts have long resolved church disputes using neutral principles of law and have enforced laws of general and neutral applicability against religious people or organizations. That is all Starkey asks the Court to do here.

### A.   "Religious Autonomy" Does Not Bar Starkey's Claims.

Defendants assert that they, as religious organizations, have the "autonomy to shape their own missions, conduct their own ministries, and generally govern themselves in accordance with their own doctrines as religious institutions." Dkt. 59 at 28 (citing *Korte v. Sebelius*, 735 F.3d 654, 677-79 (7th Cir. 2013)). This includes "the right of churches to choose their own ministers[.]" *Korte*, 735 F.3d at 677 (*citing Hosanna-Tabor*, 565 U.S. at 188 (2012)). It also includes cases related to church property disputes. *Id.* (internal citations omitted). This doctrine does not bar Starkey's Federal or state law claims.

#### 1.   Starkey's Federal Claims.

For purposes of their Rule 12(c) Motion, Defendants are *not* arguing that Starkey was a minister. Instead, Defendants argue that, even if the Court assumes that Starkey was a non-

ministerial employee, her Title VII and Title IX claims are *still* barred by "religious autonomy." They claim that religious institutions may not be held liable for any personnel decision, when that decision is allegedly "based on religious doctrine," *even if* the adversely affected employee had a secular title and role. Dkt. 59 at 29. Defendants invite this Court to dramatically expand First Amendment law and afford them much broader protection from employment discrimination or retaliation claims than previously recognized. Religious employers would have unlimited license to enforce their teachings towards the private lives (rather than the public, or professional lives) of their secular employees. The Court should reject this invitation. To Starkey's knowledge, since *Hosanna-Tabor* was decided, neither the U.S. Supreme Court nor the Seventh Circuit Court of Appeals has reached such a holding in a Title VII or Title IX case, and Defendants cite no such cases.

In support of their expansive argument, Defendants rely primarily on a Tenth Circuit Court of Appeals decision from eighteen years ago, and two Northern District of Illinois cases. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F. 3d 648 (10th Cir. 2002); *Demkovich v. St. Andrew the Apostle Parish*, 343 F. Supp. 3d 772 (N.D. Ill. 2018); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859 (N.D. Ill. 2019). These cases are not persuasive.

In *Bryce*, the plaintiff was a homosexual female who had a "civil commitment ceremony" with her female partner. 289 F.3d at 651. After learning about this, the Church informed her that it was terminating her employment. *Id.* at 652. However, the plaintiff based her Title VII claim not on her firing, but on "sexual harassment," due to Church leaders and parishioner's anti-gay and anti-same sex marriage communications and writings. *Id.* at 652-653. Therefore, any relevance of *Bryce* is limited to Starkey's hostile work environment claim under Title VII. *Bryce* is further limited because it precedes any Court decision prohibiting sexual orientation

discrimination under Title VII, or before the Supreme Court legalized same-sex marriage nationwide. *See Hively*, 853 F.3d at 341-342 (collecting cases); *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). It also preceded *Hosanna-Tabor* by ten years, when the Supreme Court officially recognized the ministerial exception and clarified its scope. 565 U.S. at 188.

The plaintiff in *Bryce* held the title of "Youth Minister," but the Court found it unnecessary to decide whether she was a "minister," for purposes of the exception, because her claims were "based solely on communications that are protected under the First Amendment[.]" 289 F.3d at 658 n.2. Unlike *Bryce*, Starkey's Title VII claims are not based "solely on communications," but on Defendants' actions. These include placing Starkey's colleague, Fitzgerald, on administrative leave, significantly increasing Starkey's workload after placing Fitzgerald on administrative leave, subjecting Starkey to a hostile work environment, and not renewing Starkey's contract. Dkt. 1 at 5-7.

In *Demkovich*, the plaintiff conceded that, under the Court's prior ruling, he was a "minister" under the ministerial exception, but nevertheless pursued a Title VII hostile work environment claim based on the "allegedly discriminatory remarks and insults of Reverend Dada." 343 F. Supp. 3d at 777-778. The Court said that the ministerial exception alone did *not* bar his Title VII hostile work environment claims, but ultimately concluded that "litigation over…[the] alleged harassment…would excessively entangle the government in religion." *Id*. at 786. The Court reached this conclusion, at least in part, because it had already decided that the plaintiff was a minister. *Id*. (stating "the fact that a *minister*, rather than a lay employee, is bringing the claim is relevant to deciding whether the lawsuit poses too great a danger of excessive entanglement" and that plaintiff's "status as a minister weighs in favor of more protection for the Church under the First Amendment."). In Starkey's case, the applicability of

the ministerial exception is "hotly contested and rests on disputed facts," and the Court has not decided whether it applies. Dkt. 40 at 7.[2] Moreover, Starkey's case is based on more than just "remarks and insults," but on actions. Dkt. 1 at 5-7.

In *Moody Bible*, the court dismissed the plaintiff's Title VII claims for discrimination, retaliation, and hostile work environment, but did so *without prejudice*, recognizing that the plaintiff could pursue claims that were "not tied to Moody's religious beliefs." 412 F. Supp. 3d at 872. The court granted leave for the plaintiff to amend her Title VII claims, stating that she could pursue claims based on "antagonistic treatment by male colleagues and inconsistent treatment of male and female faculty members" if they were "untethered with her disagreements with Moody's religious views." *Id*.

Setting aside the differences between these cases and Starkey's case, the Court should not follow them. Federal courts have applied Title VII to religious employers for decades, even when the employer defends the claim by asserting a religious reason for the decision. *See, e.g.*, *Herx*, 48 F. Supp. 3d at 1182-83; *Cline*, 206 F.3d at 667; *E.E.O.C. v. Fremont Christian School*, 781 F.2d 1362 (9th Cir. 1985) (affirming partial summary judgment for EEOC on claim for violation of Title VII based on school's policy that it only provided health insurance to male heads of households); *EEOC v. First Baptist Church*, No. S91-179M, 1992 U.S. Dist. LEXIS 14479, *19 (N.D. Ind. June 8, 1992) ("The Free Exercise Clause does not act as an absolute bar to governmental regulation of religious enterprises. Government regulation should not be held unconstitutional simply because it may in some way affect the otherwise unfettered operation of a religious institution."); *Dias v. Archdiocese of Cincinnati*, No. 1:11-cv-00251, 2013 U.S. Dist. LEXIS 12417 (S.D. Ohio Jan. 30, 2013) (denying parties' cross-motions for summary judgment

---

[2] In May 2016, the Archdiocese sent an email to Roncalli, advising that, according to their own legal counsel, "[s]chool counselors and social workers do not meet the definition for the ministerial exemption." Dkt. 34-1 at 3.

and setting matter for trial); *Redhead v. Conference of Seventh Day Adventists*, 566 F. Supp. 2d 125 (E.D. N.Y. 2008) (denying employer's renewed summary judgment motion on pregnant teacher's Title VII claim); *Dolter v. Wahlert High School*, 483 F. Supp. 266, 270 (N.D. Iowa 1980) (denying school's motion to dismiss or alternative motion for summary judgment on pregnant teacher's Title VII clam).

As demonstrated above, the Court need not, and should not, decide questions of Church governance or doctrine in order to decide this case. Starkey has claimed that she is the victim of sexual orientation discrimination and retaliation. Dkt. 1 at 7-10. Defendants have argued that her civil union is not a "valid marriage," and therefore violates Church teachings. Dkt. 59 at 21. But, as Starkey has alleged, it is possible for heterosexual employees to be in relationships that are also not "valid marriages" under Church teachings. Dkt. 1 at 7. Defendants are free to argue that they apply Church teachings equally to all employees, but neither the Court nor a jury would be compelled to accept their "avowed…neutrality" as true, especially if there were evidence to the contrary. *Herx*, 48 F. Supp. 3d at 1178.

The "religious autonomy" doctrine does not bar Starkey's Title VII or Title IX claims.

## 2.  Starkey's State Law Claims.

Starkey brings two claims arising under Indiana business tort law against the Archdiocese: intentional interference with contractual relationship, and intentional interference with employment relationship. Dkt. 1 at 11-12.[3] These claims are closely related, and have the same elements: "(i) existence of a valid and enforceable contract [or employment relationship]; (ii) defendant's knowledge of the existence of the contract; (iii) defendant's intentional

---

[3] The Archdiocese has denied that it was Starkey's "employer," for Title VII purposes, after 2009. Dkt. 20 at 2. Starkey disagrees, because the Archdiocese continued to provide her benefits from 2009 to 2019. Dkt. 1 at 2. Starkey has plead her Indiana business tort claims against the Archdiocese in the alternative, in the event that it is later determined that the Archdiocese was not her "employer."

23

inducement of breach of the contract; (iv) the absence of justification; and (v) damages resulting from defendant's wrongful inducement of the breach." *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994). In *Winkler*, the Court considered seven factors to determine whether the conduct was "justified." *Id*. These claims often involve a "highly fact sensitive inquiry" not easily resolved through dispositive motions. *Guinn v. Applied Composites Eng'g, Inc.*, 994 N.E.2d 1256, 1275 (Ind. Ct. App. 2013).

As with Starkey's federal claims, the Archdiocese argues that "religious autonomy" bars these claims under Indiana law. Although the First Amendment "requires civil courts to refrain from interfering in matters of church discipline, faith, practice, and religious law," it "does not entirely prohibit courts from deciding issues related to religious organizations." *Christian Methodist Episcopal Church v. Grimes*, No. 18A-PL-2346, 2019 Ind. App. Unpub. LEXIS 1097, *15 (Ind. Ct. App. Aug. 26, 2019) (internal citations omitted). "Instead, courts can apply neutral principles of law to churches without violating the First Amendment." *Id*. (internal citations omitted); *see also Brauzauskaus v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 293 (Ind. 2003) ("The Supreme Court…[held] that the Free Exercise Clause does not exempt religiously motivated action from neutral laws of general applicability.") (citing *Employment Div. v. Smith*, 494 U.S. 872, 881-82, 890 (1990)). "The First Amendment does not immunize every legal claim against a religious institution and its members." *Ind. Area Found. of the United Methodist Church, Inc. v. Snyder*, 953 N.E.2d 1174, 1178 (Ind. Ct. App. 2011) (quoting *Brazauskas*, 796 N.E.2d at 293-94). "The analysis in each case is fact-sensitive and claim specific, requiring an assessment of every issue raised in terms of doctrinal and administrative intrusion and entanglement." *Id*.

24

Starkey's claims may be, and should be, decided by applying neutral principles of law. Starkey's intentional interference claims are based on legal elements of neutral and general applicability. *See, e.g., Brazauskas*, 796 N.E.2d at 296 (Sullivan, J., dissenting) (noting that the "tort of interference with a prospective advantage" was "religiously neutral and generally applicable."). If Church teachings on marriage are the basis for the action, one would expect the Archdiocese to enforce rules relating to those teachings equally to heterosexuals and homosexuals alike. Discovery is necessary with respect to other employees of the Archdiocese (and Roncalli) to determine whether the Archdiocese has instructed schools to terminate teachers or guidance counselors who allegedly violated Church teachings, such as divorce and re-marriage without annulment, unmarried co-habitation, marriage without the sacrament, or other practices. Such evidence would bear on whether the Archdiocese was truthfully motivated to enforce Church teachings consistently against all employees or instead targeted specifically towards homosexuals. Such an inquiry does not require the Court to decide questions of Church doctrine. As demonstrated above, in employment discrimination cases, Courts routinely evaluate the honesty of an employer's stated reasons for termination whether the employer is religious or not. *E.g.*, *Herx*, 48 F. Supp.3d at 1182 ("The Diocese is understandably concerned about the possibility of a judge or jury conducting its own secular analysis of Roman Catholic doctrine[.] That shouldn't happen."). The same principle can be applied to Starkey's intentional interference claims. If a Court or jury found that the Archdiocese's actions unfavorably treated homosexual employees, as compared to heterosexual employees who violated similar Church teachings, it would support a claim that the interference was unjustified.

The Archdiocese relies on *McEnroy v. St. Meinrad School of Theology*, but the facts of that case are readily distinguishable. 713 N.E.2d 334 (Ind. Ct. App. 1999). The *McEnroy* case involved

"a professor of Catholic theology" at a "Catholic Seminary which serves to train candidates for the priesthood and other ministries of the Roman Catholic Church." *Id*. at 335. The professor signed an open letter publicly opposing the Pope's teachings on the ordination of women as priests. *Id*. at 336. The Archabbot retained the discretion to remove a seminary professor determined to be "seriously deficient" under the Statement on Governance. *Id*.

Given that *McEnroy* involved (a) a theology professor involved in the training of priests, (b) who engaged in public dissent of the Pope's teachings, and (c) whose employment status was subject to the Archabbot's discretion, it is unsurprising that the Court found it could not adjudicate the professor's claims in that case. *Id*. at 337. By contrast, Starkey (a) was a guidance counselor and head of the guidance department, (b) was not a religion teacher, and (c) did not publicly advocate against Church teachings. The Court will be able to apply neutral principles of law without interfering with church governance in this case.

*Brazauskas* is also distinguishable. That case involved a former Director of Religious Education and Liturgy who alleged that, after she was terminated, the Diocese prevented her from getting a job with another Catholic employer by informing it that she was suing the Diocese over that termination decision. *Brazauskas*, 796 N.E.2d at 288. In contrast, Starkey was not directly employed by the Archdiocese, and did not sue the Archdiocese before she got fired. Furthermore, Starkey was a guidance counselor, rather than a "Director of Religious Education and Liturgy." *See Id*. at 296 (Sullivan, J., dissenting) ("[C]ourts have not used the Free Exercise Clause to bar claims by non-ministerial employees of a religious institution.").  As noted by Justice Sullivan in dissent, the Court did not thoroughly analyze the religious autonomy defense in *Brazauskas* to confirm its applicability to the facts of that case. *Id*. at 295-296 (Sullivan, J., dissenting). For example, the Court did not determine: (a) whether the dispute was religious in nature; (b) whether it could be resolved

through neutral principles of law; or (c) whether the Plaintiff's prospective position "involved ministerial-type duties." *Id.* at 296 (Sullivan, J., dissenting). This Court should carefully examine whether Starkey's claim can be resolved through neutral principles, or whether she had ministerial job duties, before applying any "religious autonomy" doctrine.

Courts in other jurisdictions have frequently declined to apply the "religious autonomy" doctrine, making it clear that religious entities are not exempt from the operation of secular laws. *See*, *e.g.*, *Ogle v. Hocker*, 279 Fed. Appx. 391, 395 (6th Cir. 2008) (finding that "the disputed issues can be resolved through application of secular standards without any impingement upon church doctrine or practice" on bishop's defamation claim); *Shannon v. Mem'l Drive Presbyterian Church U. S.*, 476 S.W.3d 612, 625 (Tx. Ct. App. 2015) (declining to apply "ecclesiastical abstention" doctrine to dispute regarding potential violation of non-disparagement clause in contract); *Kirby v. Lexington Theol. Seminary*, 426 S.W.3d 597, 617-621 (Ky. 2014) (refusing to apply "ecclesiastical abstention" doctrine to plaintiff's breach of contract claims where they required "no inspection or evaluation of church doctrine" and neutral principles of law could be applied); *Galetti v. Reeve*, 331 P.3d 997, 1002 (N.M. Ct. App. 2014) (holding that the district court erred in dismissing the plaintiff's breach of contract claim and others because they could "potentially be resolved without any religious entanglement"); *Bilbrey v. Myers*, 91 So. 3d 887, 892 (Fla. Ct. App. 2012) (finding that plaintiff's defamation and breach of fiduciary duty claims "can be adjudicated without implicating the First Amendment" and "improperly dismissed on the basis of the church autonomy doctrine.").

The Court should decline to enter judgment on the pleadings on any of Starkey's claims on the basis of "religious autonomy."

**B.  Starkey's Claims Do Not Entangle the Court in Religious Questions.**

Defendants next argue that Starkey's claims are barred because their adjudication would "invite the Court to engage in 'religious line-drawing' that would 'impermissibly entangle[]' the Court in religious questions." Dkt. 59 at 35 (citing *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018)).[4] On the contrary, Starkey does not ask the Court to decide any religious questions. Her legal claims can be decided by applying the same legal tests and elements that are always applied in such cases, which would avoid any excessive entanglement with religion.

In *Herx*, the court "recognize[d] the necessity of avoiding excessive entanglement and/or intrusion into religious tenets." 48 F. Supp. 3d at 1182 (internal citations omitted). The court also acknowledged concerns about entanglement "prompted the development of the ministerial exception." *Id*. (internal citations omitted). However, the court concluded that these issues were avoidable:

> The Diocese is understandably concerned about the possibility of a judge or jury conducting its own secular analysis of Roman Catholic doctrine…. That shouldn't happen. In the ordinary Title VII case, the employer points to a non-discriminatory reason as the reason for the adverse employment action, and the plaintiff tries to prove that she suffered the adverse action because of her sex, race, national origin, and so on. In the ordinary Title VII trial, the judge instructs the jury along these lines: "In deciding Plaintiff's claim, you should not concern yourselves with whether Defendant's actions were wise, reasonable or fair. Rather, your concern is only whether Plaintiff has proved the Defendant [adverse employment action] him [because of race/sex]…." Seventh Circuit Federal Jury Instructions: Civil 3.07 (2010). The Diocese has given the court no reason to think a jury is likely to disobey that instruction in a case in which a religious employer claims to have acted for religious reasons.

*Id*. at 1182-83; *see also Redhead*, 566 F. Supp. 2d at 137 ("A number of courts have been called upon in the past to distinguish between a secular employee's lawful discharge for violating a religious policy…and an unlawful discharge…and, to the court's knowledge, none have found

---

[4] The context of the quoted portions of *Grussgott* involved the application of the ministerial exception. 882 F.3d at 660 (evaluating whether the plaintiff performed "important religious functions" as "final factor" in analysis of ministerial exception). Defendants have not raised the ministerial exception defense in their Rule 12(c) Motion.

excessive entanglement inevitable.") (*citing Cline*, 206 F.3d at 651; *Boyd*, 88 F.3d 410; *Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340 (E.D. N.Y. 1997); *Vigars v. Valley Christian Ctr.*, 805 F. Supp. 802 (N.D. Cal. 1992); and *Dolter*, 483 F. Supp. 266).

Defendants acknowledge that Starkey "hopes to show differential treatment by finding evidence that other employees entered opposite-sex marriages that 'violate Church teachings' and were not 'terminated or non-renewed.'" Dkt. 59 at 35. But Defendants claim that this comparative analysis would be relevant "only if the two types of violations are morally and theologically equivalent." *Id.* at 36. Defendants implicitly concede that their prohibition of "[R]elationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church" include certain opposite-sex relationships in addition to same-sex relationships. Dkt. 59-2 at 3. However, they argue that only the Church can decide whether such relationships are "equally weighty violations" of Church teachings. Defendants essentially argue (or preview a future argument) that it is worse for homosexuals to enter invalid marriages than for heterosexuals to enter invalid marriages. The Court should not accept their argument that this is off-limits. Otherwise, religious employers, schools, or other organizations could defeat any discrimination claim this way. For example, if a religious school fired a female teacher for engaging in premarital sex, but did not fire a male teacher for engaging in premarital sex, the school could justify its conduct by saying, "under our religion, it is worse for a woman than a man to engage in premarital sex, and therefore warrants more severe punishment."

Neither *Curay-Cramer* nor *Hall* compel a different result. In *Curay-Cramer*, the Court did not allow the plaintiff to pursue her gender discrimination claim because she had identified no males who had not been terminated for engaging in pro-choice advocacy, only males who had allegedly violated unrelated Church teachings. 450 F.3d at 139 n.7. However, it distinguished such a situation

from one where "a plaintiff avers that truly comparable employees were treated differently following substantially similar conduct." *Id.* at 141. The Court further stated: "[r]equiring a religious employer to explain why it has treated two employees who have committed essentially the same offense differently poses no threat to the employer's ability to create and maintain communities of the faithful." *Id.*

*Hall* is distinguishable because the plaintiff brought a religious discrimination claim, rather than a sex (or sexual orientation) discrimination claim. 215 F.3d at 621. Therefore, the court decided *Hall* based on Title VII's statutory religious exemptions. *Id.* at 623-625. Its discussion of whether it could compare the weight of different sins is best understood as dicta. *Id.* at 626-627. In any event, the plaintiff in that case only identified potential comparators who had allegedly violated unrelated Church teachings. *Id.* It was also decided at a later stage of the case (summary judgment), rather than a motion to dismiss or motion for judgment on the pleadings. *Id.* at 627; *see also Herx*, No. 1:12-cv-122, 2013 U.S. Dist. LEXIS 144420, *7 n.2 (N.D. Ind. Oct. 7, 2013) (distinguishing *Hall* on motion for judgment on the pleadings based on different procedural stages of case).

The Court should reject Defendants' entanglement argument, because all of Starkey's claims can be decided without excessively entangling the Court in religious questions.

### C.  Freedom of Association Does Not Bar Starkey's Claims.

Defendants argue that their right to engage in the freedom of expressive association bars all of Starkey's claims. "Freedom of association…presupposes a freedom not to associate." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984). However, this right is not absolute. *Id.* "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*

Title VII of the Civil Rights Act of 1964, and Title IX of the Educational Amendments of 1972, are both well-known Federal laws that have been in effect for decades, and are among the United States' most significant legislative achievements prohibiting discrimination. Both have roots in the Fourteenth Amendment of the U.S. Constitution, which includes the power of Congress "to enforce, by appropriate legislation, the provisions of this article." U.S. Const. 14th amend., § 5.  To Plaintiff's knowledge, neither statute has ever been held unconstitutional (either in a facial or an as-applied challenge) due to an alleged violation of the freedom of association, and Defendants cite not a single case on this point. Thus, they again invite this Court to go where no Court has gone before – with a significant expansion of constitutional protection for employers and schools – not just religious organizations, but secular ones as well. Defendants' request for broad application of this defense could significantly hamper enforcement of Title VII and Title IX's prohibitions of discrimination, and would open floodgates to constitutional challenges against otherwise valid discrimination laws. In theory, almost any employer or school could defend a Title VII or Title IX claim by arguing that it has a constitutional right not to "associate" with members of the protected class. This cannot be true. *See Hishon v. King & Spaulding*, 467 U.S. 69, 78 (1984) (rejecting law firm's freedom of association defense when it did not consider female associate for partnership, and stating that "discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections.") (internal citations omitted).

"Courts have repeatedly recognized that Title VII serves a compelling interest in eradicating all forms of invidious discrimination performed by statute." *EEOC v. R.G.*, 884 F.3d 560, 591 n.12 (6th Cir. 2018), *cert. granted*, 139 S. Ct. 1599 (2019) (internal citations omitted). This includes sexual orientation discrimination. *Hively*, 853 F.3d at 341. Title VII and Title IX are designed to

31

permit equal opportunities in employment or education, regardless of race, sex, national origin, etc. Although these statutes could be construed as suppressions of pro-discrimination viewpoints, such a reading would effectively nullify the government's ability to enforce these laws.  Furthermore, the goals of Title VII and Title IX to prohibit discrimination could not be achieved through significantly less restrictive means. Title VII and Title IX both include exemptions for religious employers and schools, which Defendants have cited in support of their defenses. *See* 42 U.S.C. §§ 2000e-1(a), 2000e-2(e)(2) (Title VII); 20 U.S.C. § 1681(a)(3) (Title IX). Courts have carved out an additional exception to Title VII and other employment discrimination laws through the judicially created ministerial exception. *Hosanna-Tabor*, 565 U.S. at 196.

Although the freedom of expressive association applies to both secular and religious organizations, it provides no greater protections to Defendants than they are afforded under the First Amendment's Religion Clauses. In fact, *Hosanna-Tabor* indicates that the opposite is true. *Id.* at 189 (stating that the First Amendment gives "special solitude to the rights of religious organizations."). If the Court agrees with Starkey that the First Amendment's Religion Clauses do not bar her claims, then it should likewise find that the freedom of association does not bar her claims. To hold otherwise would imply that the freedom of association is a more powerful defense, rendering the Religion Clauses superfluous. *Cf. Id.* ("We cannot accept the remarkable view that the Religion Clauses have nothing to say about a religious organization's freedom to select its own ministers.").

Defendants rely on *Boy Scouts of America v. Dale*, where plaintiff, a homosexual member of the Boy Scouts, sued under a state public accommodations statute after the Boy Scouts revoked his membership. 530 U.S. 640, 644 (2000). *Dale* did not expressly deal with an employment relationship, nor did it provide any guidance about how its analysis should be applied to a case

involving an employment relationship. *Id*.[5] *Dale* is also distinguishable because it found New Jersey's public accommodations law to be "extremely broad," as it included over 50 examples of "places," including some organizations, like the Boy Scouts, which were not even tied to a physical location. *Id*. at 656-657.

Defendants also cite *Christian Legal Soc'y v. Walker*, where a Christian student organization at a law school denied membership in its organization to people who disagreed with its religious views on homosexuality. 349 F.3d at 862. In *Walker*, the Seventh Circuit directed the entry of a preliminary injunction against the university, preventing it from revoking the group's registered student organization status. *Id*. at 867. Four years after *Walker* was decided, the U.S. Supreme Court held, in *Christian Legal Soc'y v. Martinez*, that another public university and law school did not violate the First Amendment, and denied the Christian Legal Society's application to be a registered student organization due to its exclusion of students who did not share its beliefs on homosexuality. 561 U.S. at 668-669. Although *Martinez* did not expressly overrule *Walker*, it seriously calls into question its viability, given the nearly identical facts at issue.

Finally, Defendants cite *Our Lady's Inn v. City of St. Louis*, where multiple organizations (both religious and secular) challenged a city ordinance that prohibited, *inter alia*, employment discrimination based on "reproductive health decisions or pregnancy status." 349 F. Supp. 3d 805, 810 (E.D. Mo. 2018). This case is an outlier, and has only been cited in another published court opinion once. *See Marianist Province of the United States v. City of Kirkwood*, 944 F.3d 996, 1004 (8th Cir. 2019). However, even *Our Lady's Inn* recognized that "a narrowly tailored anti-discrimination provision still might have application to the Archdiocese if…it were to apply its policies to its employees…unevenly." 349 F. Supp. 3d at 822 (*citing Cline*, 206 F.3d at 658). The

---

[5] In dissent, Justice Stevens noted that the Boy Scouts had published a letter acknowledging that if, in the future, a law prohibiting employment discrimination on the basis of homosexuality became applicable, "it would be necessary for the Boy Scouts to obey it." *Id*. at 672 (Stevens, J., dissenting).

freedom of association does not prohibit this Court from reviewing whether employers have applied their rules and policies consistently to employees within the protected class and outside of the protected class.

With respect to Starkey's Indiana business tort claims, Defendants' arguments fare no better. Unlike the vast majority of Defendants' cases, they involve no governmental action, nor do they arise under any statutory law. Starkey's claims arise under Indiana common law of torts and have been recognized as common law torts for decades. *See, e.g.*, *Daly v. Nau*, 167 Ind. App. 541, 549 n.6 (Ind. Ct. App. 1975) (collecting cases). In addition, Starkey's tort claims would not compel the Archdiocese to accept members it does not desire, because the Archdiocese has admitted in its pleadings that Starkey's employment relationship was with Roncalli, not the Archdiocese, during the relevant time period. Dkt. 20 at 2. Starkey has not filed these claims against Roncalli, just the Archdiocese. Dkt. 1 at 11-12.

The Court should deny Defendants' motion for judgment on the pleadings.

### D.  The Doctrine of Constitutional Avoidance Is Unnecessary.

Defendants' final argument is that the Court should "interpret Title VII and Title IX narrowly to avoid having to reach" constitutional questions. Dkt. 59 at 40-41. Starkey has already demonstrated how her claims may be litigated and tried without the Court having to reach constitutional questions. The Court should reject this argument.

Defendants' reliance on *N.L.R.B. v. Catholic Bishop of Chicago* is misguided. 440 U.S. 490 (1979). In that case, the Supreme Court interpreted the National Labor Relations Act to deny the Board jurisdiction over teachers in religiously affiliated schools out of concern that Board jurisdiction would raise the risk of an excessive entanglement of religion. *Id.* However, that risk is not present here because enforcement of Title VII against religious institutions does not

require the continuous supervision of church affairs that the NLRA mandates. *DeMarco v. Holy Cross High School*, 4 F.3d 166, 169 (2d Cir. N.Y. 1993) (unlike NLRB review "ADEA actions do not require extensive or continuous administrative or judicial intrusion into the functions of religious institutions."); *Pacific Press*, 676 F.2d at 1282 (Title VII's enforcement remedies "do[] not amount to continuous supervision of the kind the Supreme Court sought to avoid in *Catholic Bishop*"); *Lukaszweski v. Nazareth Hosp.*, 764 F. Supp. 57, 60 (E.D. Pa. 1991) (finding that EEOC's authority under the ADEA is limited in time and scope, unlike the continuous NLRB supervision in collective bargaining and labor disputes).

## CONCLUSION

For the foregoing reasons, Plaintiff Lynn Starkey requests that the Court deny Defendants' Motion for Judgment on the Pleadings in its entirety.

Respectfully submitted,

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney (#18604-49)
Christopher S. Stake (#27356-53)
DeLaney & DeLaney LLC
3646 Washington Blvd.
Indianapolis, IN 46205

*Attorneys for Plaintiff Lynn Starkey*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of April, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

John S. (Jay) Mercer
jsmercer@fitzwatermercer.com

Paul J. Carroll
pcarroll@fitzwatermercer.com

Daniel H. Blomberg
dblomberg@becketlaw.org

Christopher C. Pagliarella
cpagliarella@becketlaw.org

Luke W. Goodrich
lgoodrich@becketlaw.org

 _/s/ Kathleen A. DeLaney_
Kathleen A. DeLaney

DELANEY & DELANEY LLC
3646 N. Washington Blvd.
Indianapolis, IN  46205