# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

LYNN STARKEY,             )
                                   )
       Plaintiff,          )
                                   )
   v.                    )     Case No. 1:19-cv-03153-RLY-TAB
                                   )
ROMAN CATHOLIC ARCHDIOCESE  )
OF INDIANAPOLIS, INC. and      )
RONCALLI HIGH SCHOOL, INC.,    )
                                   )
       Defendants.      )

# DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR CERTIFICATION FOR INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1292(b)

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

PROCEDURAL HISTORY .......................................................................................... 3

QUESTIONS TO BE CERTIFIED ............................................................................... 5

LEGAL STANDARD ................................................................................................... 5

ARGUMENT ............................................................................................................... 7

I. The Court should certify the Title VII and First Amendment
   questions for interlocutory appeal............................................................................ 7

   A.  The Title VII question is a controlling, contestable
       question of law............................................................................................... 7

   B.  The church autonomy question is a controlling, contestable
       question of law. ............................................................................................ 14

   C.  The freedom of association question is a controlling, contestable
       question of law. ............................................................................................ 19

   D.  Resolution of each question would materially advance the
       ultimate termination of the litigation and is timely raised. ........................... 22

CONCLUSION........................................................................................................... 26

Defendants the Roman Catholic Archdiocese of Indianapolis and Roncalli High School, Inc. (collectively, "the Archdiocese") move to certify the Court's Order on Defendants' Motion for Judgment on the Pleadings (Dkt. 93) ("Ord.") for interlocutory appeal under 28 U.S.C. § 1292(b).

## INTRODUCTION

As this Court acknowledged, this "case places in stark relief the difficult questions that may arise when applying civil rights laws to religious institutions." Ord. 1. Anticipating this very case, the Supreme Court in *Bostock v. Clayton County* emphasized that it is "deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution" that "lies at the heart of our pluralistic society." 140 S. Ct. 1731, 1754 (2020). The *Bostock* Court explained that multiple statutory and constitutional "doctrines protecting religious liberty" would apply where sexual-orientation protections conflicted with "religious convictions"—including Title VII's "express statutory exception"—and that such "free exercise arguments [would] merit careful consideration." *Id.* at 1753-54.

In its Motion for Judgment on the Pleadings, the Archdiocese contended these religious-liberty doctrines protect religious schools when they make employment decisions based on religious conduct, even when an employee's ministerial status is debated. In a matter of first impression, this Court found that they do not. Other federal courts have come to opposite conclusions. Given the national importance of this controlling question, the Seventh Circuit should be permitted to resolve the tension expeditiously, rather than having the question linger—resulting in costly, complex, and potentially unnecessary proceedings in this case, and disruptive uncertainty for thousands of religious organizations and their employees throughout this Circuit. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 626-27 (7th Cir. 2010) (certification particularly appropriate where a "recent decision" of the U.S. Supreme Court has "its scope unsettled" as to the "novel[]" questions of law).

Accordingly, the Archdiocese seeks to certify for interlocutory appeal the following questions of law addressed in the Court's order on the motion for judgment on the pleadings:

(1) Whether Title VII's religious exemption bars only "claims of religious discrimination," Ord. 7, or whether it also bars other claims of discrimination when the employment decision was based on the employee's "religious observance," "practice," or "belief." 42 U.S.C. § 2000e(j).

(2) Whether the church autonomy doctrine bars an employment-discrimination suit only when "the employee qualifies as a minister," Ord. 18, or whether it also bars suits "[w]hen a church makes a personnel decision based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 660 (10th Cir. 2002).

(3) Whether the First Amendment right of expressive association extends to "the employment context." Ord. 22.

Each question satisfies the five requirements for interlocutory appeal pursuant to Section 1292(b) and Seventh Circuit precedent: each (1) involves a "question of law," not fact; (2) is controlling for all remaining federal claims; (3) is contestable, where multiple courts have taken conflicting positions, so no out-of-circuit consensus has developed on these issues of first impression; (4) could potentially expedite the litigation if finally resolved now; and (5) is timely raised. *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1007 (7th Cir. 2002).

In fact, federal district courts have regularly certified Section 1292(b) appeals on similar questions—including both the scope of Title VII's religious exemption and the scope of protection under First Amendment doctrines protecting religious autonomy. *See, e.g., Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011) (accepting certification of question as to scope of Title VII religious exemption); *Demkovich v. St. Andrew the Apostle Parish*, No. 16-cv-11576, 2019 WL 8356760 (N.D. Ill. May 5, 2019) (certifying question of scope of ministerial exception and staying discovery). Moreover, where necessary to protect against irreparable harm to First

Amendment rights, multiple courts, including the Seventh Circuit, have allowed interlocutory appeal of a church autonomy defense under the collateral order doctrine, without requiring certification under Section 1292(b). *See, e.g.*, *McCarthy v. Fuller*, 714 F.3d 971, 974 (7th Cir. 2013); *Whole Woman's Health v. Smith*, 896 F.3d 362, 368 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1170 (2019) (accepting collateral appeal of order compelling discovery over church autonomy objections); *Heard v. Johnson*, 810 A.2d 871, 876-77 (D.C. 2002) (First Amendment immunity defense "clearly satisfies the requirements" for "collateral order" appeal). And the Seventh Circuit has suggested that the precise Title VII question presented here is appropriate for certification. *Herx v. Diocese of Fort Wayne-S. Bend, Inc.*, 772 F.3d 1085, 1088 (7th Cir. 2014) (noting that the defendant could have "ask[ed] the court to certify [its] order for immediate appeal under 28 U.S.C. § 1292(b)," and citing with approval another court's "§ 1292(b) certification in a similar case raising a legal question about the scope of Title VII's religious-employer exemptions"). Accordingly, certification should be granted.

## PROCEDURAL HISTORY

Defendants are the Roman Catholic Archdiocese of Indianapolis and Roncalli High School, which is a ministry of the Archdiocese. Plaintiff Lynn Starkey worked at Roncalli as the Co-Director of Guidance and a member of the school's Administrative Council. Dkt. 1 (Compl.) ¶¶ 13, 39. In 2018, Starkey informed the school that she had entered a same-sex "civil union" in violation of her contract and of Catholic teaching. Compl. ¶ 39. The school then declined to renew her contract for the following academic year, citing that union. Compl. ¶ 44. On July 29, 2019, Starkey sued the Archdiocese and Roncalli alleging that the nonrenewal of her contract constituted sexual-orientation discrimination and retaliation in violation of Title VII, Title IX, and state tort law. Compl. ¶¶ 48-92. The Archdiocese's answer raised affirmative defenses that included: (1) Title VII and Title IX's religious exemptions; (2) the First Amendment's

religious autonomy doctrine; (3) the First Amendment's protection of expressive association; and (4) the ministerial exception. Dkt. 20 at 24-25.

On October 16, 2019, Starkey served wide-ranging discovery requests seeking, for example, all documents relating to any Archdiocesan employee alleged to have violated any "morals clause" on any ground whatsoever. *See* First Requests for Production at Requests No. 6–9 and 13 (Dkt. 27-7); First Set of Interrogatories at Interrogatory No. 15 (Dkt. 27-8). On November 7, the Archdiocese filed a motion requesting that initial discovery be limited to the applicability of the ministerial exception, and disclosed over 500 pages of documents and evidence relevant to that matter to Starkey. (Dkts. 25, 27). On December 20, calling it a "close question," the magistrate denied the Archdiocese's request to bifurcate discovery, but subsequently stayed its order pending this court's review. (Dkts. 40, 52).

On March 24, 2020, the Archdiocese filed a motion for judgment on the pleadings, invoking among other defenses Title VII's religious exemption and the First Amendment's religious autonomy doctrine and protection of expressive association. (Dkts. 58-59). The Archdiocese also sought leave to file a threshold motion for summary judgment on the ministerial exception, but the magistrate judge in a marginal entry denied leave. Dkts. 60, 66. On October 21, 2020, the Court granted in part and denied in part the motion for judgment on the pleadings, granting judgment for the Archdiocese on the Title IX claim as preempted but allowing the Title VII and state law claims to proceed. Ord. 1-2.

Acknowledging the "difficult questions" the case presented, the Court first addressed the Title VII exemption and whether it applied "when the religious reason [for an employment decision] *also* implicates another protected class[.]" Ord. 1, 11. The Court acknowledged the Archdiocese's argument that the definition of religion under Title VII would protect decisions based on an "employee's religious belief or

practice," but concluded that religious employers could not "favor coreligionists … in a way that also discriminates against another protected class." Ord. 14-15.

Turning to the church autonomy defense, the Court considered whether the First Amendment would bar a discrimination claim "arising from [the Archdiocese's] application of religious doctrine regardless of whether [Starkey] qualifies as a minister." Ord. 18. The Court found this reading of church autonomy precedent "would render the ministerial exception superfluous." *Id.* And on freedom of association, the Court "d[id] not read *Dale*" to provide a defense in "the employment context." Ord. 22.

## QUESTIONS TO BE CERTIFIED

(1) Whether Title VII's religious exemption bars only "claims of religious discrimination," Ord. 7, or whether it also bars other claims of discrimination when the employment decision was based on the employee's "religious observance," "practice," or "belief." 42 U.S.C. § 2000e(j).

(2) Whether the church autonomy doctrine bars an employment-discrimination suit only when "the employee qualifies as a minister," Ord. 18, or whether it also bars suits "[w]hen a church makes a personnel decision based on religious doctrine." *Bryce*, 289 F.3d at 660.

(3) Whether the First Amendment right of expressive association extends to "the employment context." Ord. 22.

## LEGAL STANDARD

Section 1292(b) provides for interlocutory appeal if the underlying order "involves a controlling question of law as to which there is substantial ground for difference of opinion" and "immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The Seventh Circuit applies this standard by considering five factors:

> Interlocutory appeal is appropriate when (1) the appeal presents a question of law; (2) it is controlling; (3) it is contestable; (4) its resolution will expedite the resolution of the litigation, and (5) the petition to appeal is filed in the district court within a reasonable amount of time after entry of the order sought to be appealed.

*Boim*, 291 F.3d at 1007 (accepting certified questions).

Section 1292(b) appeals serve "important" purposes and have multiple "benefits." *Johnson v. Jones*, 515 U.S. 304, 309-10 (1995). They can "simplify, or more appropriately direct, the future course of litigation[,] … thereby reduc[ing] the burdens of future proceedings, [and] perhaps freeing a party from those burdens entirely." *Id.* For that reason, "[i]nterlocutory appeal is favored where reversal would substantially alter the course of the district court proceedings or relieve the parties of significant burdens." *Ormond v. Anthem, Inc.*, No. 1:05-cv-1908-TWP-TAB, 2011 WL 3881042, at *6 (S.D. Ind. Sept. 2, 2011) (noting the value of "inject[ing] immediate certainty" as to multiple persons' rights); *see In re Text Messaging Antitrust Litig.*, 630 F.3d at 626 ("immediate appeal" can avoid unnecessarily "immers[ing] the parties in the discovery swamp").

The Seventh Circuit has also noted that interlocutory appeal can be particularly appropriate in the church autonomy context, where the defendant interposes a "defense of immunity" that arguably grants "immunity from the travails of a trial and not just from an adverse judgment." *McCarthy*, 714 F.3d at 975 (noting that church autonomy is "closely akin" to "official immunity"). In such circumstances, a denial of "interlocutory appeal" would "harm the appellant irreparably." *Id.* at 974-75; *accord Heard*, 810 A.2d at 877 (ministerial exception, deriving from broader church autonomy doctrine, is a "claim of immunity from suit under the First Amendment" that is "effectively lost if a case is erroneously permitted to go to trial").

When the requirements of Section 1292(b) are satisfied, it is "the duty of the district court … to allow an immediate appeal," and to allow the Court of Appeals the option to conclusively resolve the law. *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000).

## ARGUMENT

## I.  The Court should certify the Title VII and First Amendment questions for interlocutory appeal.

Here, each question to be certified satisfies all five criteria for interlocutory appeal. Each is a controlling, contestable question of law. *Boim*, 291 F.3d at 1007. And resolving any of them now would expedite the resolution of litigation.

### A.  The Title VII question is a controlling, contestable question of law.

The scope of Title VII's religious exemption—in particular, whether the exemption applies only against "claims of religious discrimination," Ord. 7, or by contrast applies whenever the challenged decision was based on the employee's "religious observance," "practice," or "belief," 42 U.S.C. § 2000e(j)—is a controlling and contestable question of law, as demonstrated by multiple authorities and the Court's own decision.

#### 1.  The scope of Title VII's religious exemption is a controlling question of law.

"[A] question of the meaning of a statutory or constitutional provision" qualifies as a "question of law." *In re Text Messaging Antitrust Litig.,* 630 F.3d at 626 (quoting *Ahrenholz*, 219 F.3d at 676). And "[a] question of law may be deemed 'controlling' if its resolution is quite likely to affect the further course of the litigation, even if not certain to do so." *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 659 (7th Cir. 1996) (granting interlocutory appeal); *see Stout v. Ill. Farmers Ins. Co.*, 882 F. Supp. 776, 778 (S.D. Ind. 1994) (legal question that "impact[s] whether or not the plaintiff has a cause of action under a particular statute" would qualify). As this Court has put it, where a question poses an "abstract legal issue" not requiring review of "a record of facts" and "the entire action would be dismissed if this court's opinion is reversed," it is a "controlling question of law." *Patrick v. Pyod, LLC*, No. 1:14-cv-00539-RLY-TAB, 2014 WL 5343284, at *1 (S.D. Ind. Oct. 20, 2014).

Under these standards, there is no doubt that the scope of Title VII's religious exemption is a controlling question of law. First, whether the exemption "should be

narrowly construed" or should be understood to protect "a religious reason for an employment decision … when the religious reason *also* implicates another protected class," Ord. 11, is simply "a question of the meaning of a statutory ... provision," and therefore a "question of law." *In re Text Messaging Antitrust Litig.,* 630 F.3d at 626. That is why the Fourth Circuit has already granted certification on the scope of Title VII's religious exemption. *Kennedy*, 657 F.3d at 195. And that is why the Seventh Circuit itself has cited the Fourth Circuit's interlocutory review of this question with approval, noting that a religious employer defending against a Title VII claim can "ask the court to certify" the very same question the Archdiocese seeks to certify here. *Herx*, 772 F.3d at 1088 (citing *Kennedy*). In short, this question is one that "the court of appeals could decide quickly and cleanly without having to study the record," just as this Court did not need to look beyond the pleadings to address the issue. *Ahrenholz*, 219 F.3d at 677.

Second, this question is also controlling. Indeed, it is "quite likely to affect the further course of the litigation," *Sokaogon*, 86 F.3d at 659, because "the entire action would be dismissed if this court's opinion is reversed." *Pyod*, 2014 WL 5343284, at *1 (finding this fact alone met the standard). That is, if applicable, the religious exemption would bar all of Plaintiff's Title VII claims, Dkt. 59 at 9-10 (citing *Garcia v. Salvation Army*, 918 F.3d 997, 1006 (9th Cir. 2019) and collecting cases), and the normal course would then be for the Court to decline to exercise supplemental jurisdiction over the remaining state-law claims. *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012). Accordingly, this is a controlling question of law.

### 2. The scope of Title VII's religious exemption is contestable.

The scope of Title VII's religious exemption is also "contestable." *Boim*, 291 F.3d at 1007. That is, there is "room for reasonable minds to differ." *Elliott v. Bd. of Sch. Trustees of Madison Consol. Sch.*, No. 1:13-cv-219-WTL-DML, 2015 WL 2341226, at *1 (S.D. Ind. May 13, 2015). To determine whether a question is contestable, courts

"examin[e] 'the strength of'" contrary arguments, including "whether other courts have adopted conflicting positions." *Pyod*, 2014 WL 5343284, at *1 (quoting *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 212 F. Supp. 2d 903, 909 (S.D. Ind. 2002)). In *Pyod*, for example, disagreement among "other district courts" satisfied this element, even where the only published Court of Appeals decision supported the certified order. *Id.*

But there is no "formalistic *requirement*" of "adverse authority." *Reese v. BP Expl., Inc.*, 643 F.3d 681, 688 n.5 (9th Cir. 2011) (emphasis added). Rather, "when novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent." *In re Trump*, 874 F.3d 948, 952 (6th Cir. 2017) (quoting *Reese*, 643 F.3d at 688).

Moreover, "[t]he level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case." Wright & Miller, *Fed. Practice and Proc.* § 3930 (3d ed.). That is, if an "initial question" is sufficiently important, "certification may be justified at a relatively low threshold of doubt." *Id.*

The interlocutory appeal in *Kennedy*—which also addressed the scope of Title VII's religious exemption—is instructive. There, though the district court found no case directly disagreeing with its ruling, it nonetheless certified the case for immediate appeal, finding it "significant" that the scope of Title VII's religious-employer exemption concerned the "fundamental right[]" of "religious organizations … to be free from government intervention" and "entanglement," and that "denying the request for an interlocutory appeal and requiring the case to proceed to a final conclusion in this Court permits government intervention into a religious organization." *Kennedy v. Villa St. Catherine, Inc.*, No. PWG-09-3021 (WDQ), 2010 WL 9009364, at *3 (D. Md.

June 16, 2010); *see Kennedy*, 657 F.3d at 191 (Fourth Circuit subsequently granted permission to appeal).

Under these standards, the Title VII question here is contestable. This Court has already acknowledged that this case raises "difficult questions" in "applying civil rights laws," and that the Court is "not aware of any cases dealing with the questions presented here." Ord. 1, 12. The Fourth Circuit in *Kennedy* heard a certified interlocutory appeal on the scope of Title VII's religious exemption. Most importantly, the Seventh Circuit cited the interlocutory appeal in *Kennedy* with approval, suggesting that the same Title VII question presented here is appropriate for certification. *Herx*, 772 F.3d at 1088. And if the importance of the issue may be considered, as it was in *Kennedy*, the U.S. Supreme Court has doubly underscored the importance of this question. First, in *Amos*, the Court emphasized that Title VII's religious-employer exemption serves both Religion Clauses by "alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 339 (1987). Second, in *Bostock*, the Supreme Court emphasized the need for "careful consideration" of the "doctrines protecting religious liberty"—including the Title VII religious-employer exemption. *Bostock*, 140 S. Ct. at 1753-54.

Beyond that, many courts have adopted "conflicting positions regarding the issue." *Pyod*, 2014 WL 5343284, at *1. Justices Alito and Thomas recognized as much in *Bostock*, explaining that whether Title VII's religious-employer exemption covers all religious-conduct decisions in religious schools is "disputed" among the "lower courts." 140 S. Ct. at 1781 (Alito, J., dissenting). And scholars, too, agree that the "cases are mixed" on this important question, supporting definitive resolution by the Seventh Circuit here. Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination: Can Religious Organizations Continue to Staff on a Religious Basis?*, 4 Oxford J.L. & Relig. 368, 372 (2015); Stephanie N. Phillips, *A Text-Based*

*Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295, 301 (2016) ("Courts have not consistently applied Title VII's religious-employer exemption, and the Supreme Court has not yet clarified the proper interpretation.").

First, contrary to this Court, at least four courts have concluded that Title VII's religious exemption bars not just "claims of religious discrimination" but also "other forms of Title VII discrimination" (Ord. 7):

- In *Curay-Cramer v. Ursuline Academy*, a teacher at a Catholic school alleged that her termination for pro-choice advocacy constituted sex discrimination. 450 F.3d 130, 137-38 (3d Cir. 2006). Citing Title VII's religious exemption, the Third Circuit rejected the claim. It held that the exemption was designed to protect "a religious institution's ability to 'create and maintain communities composed solely of individuals faithful to their doctrinal practices,'" and that because this ability would "be jeopardized by [the] plaintiff's claim of gender discrimination," the claim was barred. *Id.* at 141.

- The district court in *Curay-Cramer* likewise applied Title VII's religious exemption to bar multiple claims of gender discrimination. 344 F. Supp. 2d 923, 935 (D. Del. 2004). The court held that it was immaterial that the plaintiff's claims were "characterize[d] as gender discrimination"—including that the plaintiff claimed opposition to pro-choice advocacy is *per se* gender discrimination—because any termination over a "doctrinal dispute" falls with Title VII's religious exemption. *Id.* at 935.

- In *Maguire v. Marquette University*, the plaintiff claimed sex discrimination, alleging she was denied a position as a professor at a Catholic university "because she is a woman and because of … [her] views respecting … abortion." 627 F. Supp. 1499, 1500 (E.D. Wis. 1986), *aff'd in part and vacated in part*, 814 F.2d 1213 (7th Cir. 1987). The court held that her claim was barred by "the exception to Title VII created by 42 U.S.C. § 2000e–2(e)(2)," because, "[d]espite her protests that she is a Catholic, 'of a particular religion,'" "plaintiff's own complaint reveals that the [university's] agents do not believe that her theological beliefs make her an appropriate person to teach." *Id.* at 1506-07.

- In *EEOC v. Mississippi College*, the EEOC asserted that a religious college violated Title VII by denying a woman a job as a psychology professor because of her sex. 626 F.2d 477, 479 (5th Cir. 1980). The college maintained that it had instead "applied its policy of preferring Baptists over non-Baptists." *Id.* at 486. Although the EEOC asserted the position adopted by the Court in this case—namely, "that [§] 702 only exempts from the coverage of Title VII

discrimination based upon religion, not discrimination predicated upon race, color, sex, or national origin"—the Fifth Circuit rejected that position. *Id.* at 484. Instead, it held that if "the College applied its policy of preferring Baptists over non-Baptists … then [§] 702 exempts that decision from the application of Title VII and would preclude any investigation by the EEOC" of sex discrimination. *Id.* at 486.

These four decisions offer "conflicting positions regarding the issue of law" decided by this Court. *Pyod*, 2014 WL 5343284, at *1.

This Court did not address the Title VII ruling in *Mississippi College*. *Cf.* Dkt. 59 at 10; Dkt. 69 at 3. Nor did the Court address *Maguire*'s Title VII analysis; instead it said *Maguire*'s First Amendment *entanglement* analysis is limited to positions with concededly religious character. Ord. 20-21. As for *Curay-Cramer*, the Court said it "sheds little light on the issue" because the Third Circuit found that the plaintiff "did not engage in activity protected by Title VII" when she signed a pro-choice advertisement. Ord. 14-15. But that is only what the Third Circuit said about the *first two counts* of the complaint. 450 F.3d at 134. The *third* count alleged that the plaintiff was treated worse than male employees who also violated church teaching—paralleling what Starkey claims here—and the Third Circuit block-quoted and expressly relied on Title VII's religious exemption in barring that claim. In short, *Curay-Cramer*, *Maguire*, and *Mississippi College* all involved "a plaintiff's Title VII claim that implicate[d] both religious practice and another protected trait." Ord. 7. And all four cases invoked the religious exemption to bar the claims. Thus, at a minimum, they show that the scope of the religious exemption is contestable.[1]

---

[1] Nor is it any answer to suggest that this case as unique on the ground that "the religious grounds for the decision and Starkey's sexual orientation are two sides of the same coin." Ord. 10. As this Court has recognized, Starkey doesn't dispute the Archdiocese's religious reason for nonrenewal; instead, she argues that regardless of the religious reason, her sexual orientation was *also* "a but-for cause" of nonrenewal. Ord. 11. But that is the same argument made by the plaintiffs in *Curay-Cramer*, *Maguire*, and *Mississippi College*. They didn't dispute that they held different religious views on abortion (*Curay-Cramer* & *Maguire*) and Baptist doctrine (*Mississippi*

Second, while it did not prejudge any specific case, *Bostock* is in tension with this Court's ruling that the religious exemption is inapplicable to religious conduct rules that implicate same-sex relationships. As discussed in our supplemental brief, Dkt. 78 at 5-6, the *Bostock* majority identified Title VII's "express statutory exception for religious organizations" as relevant for "careful consideration" in future cases involving sexual orientation discrimination. *Bostock*, 140 S. Ct. at 1754. But it would make no sense to mention Title VII's religious exemption in *Bostock* if the exemption yielded every time the religious conduct at issue was a same-sex relationship. *Bostock*'s reference to the religious exemption makes sense only if—as Justices Sotomayor and Ginsburg noted last Term—Title VII "protect[s] religious autonomy" by "protect[ing] a religious entity's ability to make employment decisions—hiring or firing—for religious reasons" even where they implicate other protected categories. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2072 (2020) (Sotomayor, J., dissenting).

Third, as this Court acknowledged, the Archdiocese cited multiple circuit authorities holding that religious employers may "terminate an employee whose conduct … [is] inconsistent with" the employer's beliefs. *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000) (collecting cases); *see Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) (permissible for parish to "not to rehire [plaintiff] because of her remarriage"). This Court stated that *Little* "did not require the court to consider whether the same result would occur if the inconsistency between religious principles and conduct involved a protected class, such as sexual orientation." Ord. 14. But neither *Little* nor any other case stating the relevant rule (such as *Hall* and *Killinger v.*

---

*College*); instead, they argued that, regardless of their religious views, sex was the but-for cause of the employment decision. Yet the courts in those cases still invoked the religious exemption and barred the claims. If anything, the fact that Starkey *concedes* that she violated core Church teachings as set forth in her contract makes this an even stronger case for applying Title VII's religious exemption.

*Samford Univ.*, 113 F.3d 196, 200 (11th Cir. 1997)) included any caveat for conduct rules that involve a protected class other than religion. Instead, they pronounced a clear, general rule that would protect the Archdiocese. So even assuming it was appropriate for this Court to distinguish those authorities on the facts, they nonetheless constitute conflicting authority for the purposes of a Section 1292(b) motion.

Taken together, the above authorities show this issue is contestable, particularly where this Court noted it was not "aware of any cases" contradicting the Archdiocese's view on "the questions presented here." *See* Ord. 12-15. Indeed, given how infrequently a religious-conduct policy implicated another protected class prior to *Bostock*, the weight of authority in favor of the Archdiocese's position is striking. Ord. 15.

## B. The church autonomy question is a controlling, contestable question of law.

The second question to be certified—whether church autonomy prohibits the application of Title VII only when the plaintiff "qualifies as a minister," Ord. 18, or whether it also bars suits "[w]hen a church makes a personnel decision based on religious doctrine"—is also a controlling, contestable question of law. *Bryce*, 289 F.3d at 660. The Tenth Circuit and several district courts have resolved that question differently than this Court did, which further counsels in favor of certification.

### 1. Whether the Archdiocese may invoke the church autonomy defense is a controlling question of law.

The church autonomy defense poses "a question of the meaning of a … constitutional provision" and thus, a "question of law." *In re Text Messaging Antitrust Litig.*, 630 F.3d at 626 (7th Cir. 2010) (citation omitted). Where the church autonomy defense applies, it bars not only claims regarding hiring and firing, but also lawsuits complaining of ill treatment or raising business tort claims. *See, e.g.*, *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 717-18 (1976) (removal of a bishop); *Bryce*, 289 F.3d at 653 (Title VII harassment claim); *Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 289 (Ind. 2003) (blacklisting and tortious

interference claims); *Van Osdol v. Vogt*, 908 P.2d 1122, 1132 (Colo. 1996) (en banc) (tortious interference claim; declining "to separate arguably impermissible discriminatory grounds for a decision from grounds stemming from the church beliefs" as entangling). Therefore, the question is "quite likely to affect the further course of the litigation," *Sokaogon*, 86 F.3d at 659, because "the entire action would be dismissed if this court's opinion is reversed." *Pyod*, 2014 WL 5343284, at \*1. The question easily clears the bar of "impacting whether or not the plaintiff" can retain all of her "cause[s] of action." *Stout v. Ill. Farmers Ins. Co.*, 882 F. Supp. 776, 778 (S.D. Ind. 1994).

### 2. Whether the Archdiocese may invoke the church autonomy defense is contestable.

The church autonomy defense is also "contestable," *Boim*, 291 F.3d at 1007, particularly since "other courts have adopted" positions that "conflict[]" with this Court's, *Pyod*, 2014 WL 5343284, at \*1.

A leading case is the Tenth Circuit's decision in *Bryce v. Episcopal Church*. There, a church's youth minister sued under Title VII and other civil rights laws, asserting harassment when church officials expressed theological opposition to her same-sex relationship and determined she should be demoted. 289 F.3d at 651-53. Although federal courts had long recognized the ministerial exception, the Tenth Circuit expressly declined "to determine whether Bryce, as Youth Minister, was a 'minister' for purposes of this exception." *Id.* at 658 n.2. Instead, the court concluded that the plaintiff's claims were barred under "the broader church autonomy doctrine," because they challenged "an internal church personnel matter" where "the alleged misconduct is 'rooted in religious belief.'" *Id.* at 657-58 & n.2 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). Thus, *Bryce* squarely departs from this Court's conclusion that the religious-autonomy defense applies only when "the employee qualifies as a minister." Ord. 18.

15

The *Garrick* decisions from the Northern District of Illinois likewise hold that church-autonomy can bar sex discrimination claims by non-ministers, as long as the employment decision is "rooted firmly in [the employer's] religious beliefs." *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 872 (N.D. Ill. 2019) (*Garrick I*). In *Garrick I*, a former communications instructor at Moody Bible Institute sued under Title VII and Title IX, alleging discrimination, retaliation, and hostile work environment based on her sex (female). *Id.* at 866-67. Garrick alleged that she experienced these adverse actions "because of her advocacy in favor of female students joining the Pastoral Ministry Program," arguing that Moody's expression of its "complementarian doctrine" to limit the roles of women constituted sex discrimination. *Id.* at 872. The court found Garrick was not clearly a minister on the record presented, such that Moody could not avail itself of the ministerial exception. *Id.* at 871. But, citing *Bryce*, the court determined that the "overarching principle of religious autonomy" barred Garrick from asserting sex discrimination claims that directly challenged "doctrin[al]" decisions, as they "would impermissibly inject the auspices of government into religious doctrine and governance." *Id.* at 871-72.

Garrick later repleaded her claims, asserting instead that Moody engaged in Title VII sex discrimination unrelated to its religious beliefs—such as "expect[ing] female teachers of secular subjects to perform more demanding duties and submit to more onerous performance reviews than similarly situated male teachers." *Garrick v. Moody Bible Inst.*, No. 18 C 573, 2020 WL 6044292, at *6 (N.D. Ill. Oct. 13, 2020) (*Garrick II*). And while the court determined that claims not "inextricably related to Moody's religious beliefs" could proceed, it reaffirmed its prior ruling that any claims about "policies" or practices inextricably related to Moody's religious beliefs—such as "prohibiting women from … speaking at chapel"—were still barred even if they otherwise fell within Title VII's coverage. *Id.* The court did not revisit its prior conclusion

that Garrick was not established as a minister, continuing to rely solely on the church autonomy doctrine.

*Aparicio v. Christian Union, Inc.* addressed a similar issue of a Title VII claim of "gender discrimination" that was co-extensive with a religious practice. No. 18-cv-0592, 2019 WL 1437618, at *1 (S.D.N.Y. Mar. 29, 2019). Aparicio, the "Director of Public Affairs" at a non-profit organization that funds Christian leadership organizations, "allege[d] his employment was terminated for opposing Defendants' discriminatory policy against women" which barred them from leadership roles. *Id.* at *1, *8 (explaining that such an "association discrimination and termination" is well-recognized). The court confirmed that "Plaintiff is not a 'minister' and, thus, CUI is not entitled to the ministerial exception for the purposes of this motion." *Id.* at *7. But the court nevertheless found that under the church-autonomy doctrine, "applying Title VII's discrimination and retaliation provisions to CUI's 'complementarian' policy violate[s] the Free Exercise Clause." *Id.* at *10.

Lastly, the Indiana Supreme Court's decision in *Brazauskas* also is in tension with this Court's conclusion that only claims by ministers are barred by the church autonomy doctrine. There, the court held that church autonomy barred a tortious interference claim by a plaintiff applying to be director of a "sabbatical program." *Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 289 (Ind. 2003). The dissent, like the Court in this case, argued that church autonomy applies only "in cases involving members of the clergy" and not to claims "by non-ministerial employees." *Id.* at 295-96 (Sullivan, J., dissenting). But the Indiana Supreme Court rejected that argument and applied church autonomy to bar the plaintiff's claim without any finding that the plaintiff was a minister—and without even discussing the duties of plaintiff's role. *Id.* at 293-94. Thus, even if this Court believes *Brazauskas* dealt with a "plaintiff[] who filled [a] religious role[]," Ord. 19, the Indiana Supreme Court's decision did not

17

turn on this point, and it expressly rejected the dissenter's argument that the church-autonomy doctrine was limited to claims by ministers. Ord. 19.

In short, *Bryce*, *Garrick*, *Aparicio*, and *Brazauskas* all applied church-autonomy doctrine to bar employment claims when the plaintiff's status as a minister was disputed, unresolved, or resolved in plaintiff's favor. Thus, they show that "other courts have adopted conflicting positions" on the church autonomy question at issue here, such that the issue is contestable. *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 212 F. Supp. 2d at 909.

The Seventh Circuit's decision in *Demkovich*—which may soon be reheard *en banc*—is not to the contrary. *See* Req. to File an Answer to Pet. for Reh'g En Banc, *Demkovich v. St. Andrew the Apostle*, No. 19-2142 (7th Cir. Oct. 9, 2020), ECF No. 38. *Demkovich* simply stated that "[a]s a general matter, it does not violate the First Amendment to apply federal employment discrimination laws to churches and other religious employers"—a proposition that was conceded in *Demkovich* and is uncontested here. 973 F.3d 718, 723 (7th Cir. 2020) (also noting the Title VII "exception" was "not relevant" on the facts of the case). The Archdiocese does not contend that the church-autonomy doctrine bars the application of employment discrimination laws "as a general matter." Instead, it asserts the narrower claim that the First Amendment bars suit by employees of core religious ministries regarding "personnel decision[s] based on religious doctrine." *Bryce*, 289 F.3d at 660. This narrower claim is fully consistent with *Demkovich*, as *Garrick II* already indicated. *See* 2020 WL 6044292, at *6 (reaffirming post-*Demkovich* that claims inextricably linked to "Moody's complementarian creed" are barred by the First Amendment). And it is supported by the well-reasoned decisions in *Bryce*, *Garrick*, *Aparicio*, and *Brazauskas*. Accordingly, certification is appropriate.

18

**C. The freedom of association question is a controlling, contestable question of law.**

Finally, whether the First Amendment right of expressive association extends to employment decisions made by an expressive organization—here, a Catholic school, which exists to pass on the Catholic faith—is a controlling and contestable question of law. Numerous courts have understood *Boy Scouts of America v. Dale* to protect religious schools and organizations like the Boy Scouts not only in membership decisions but also in employment.

**1. Whether the Archdiocese may invoke the freedom of association defense is a controlling question of law.**

Like the church autonomy defense, whether the right of expressive association extends to employment decisions poses "a question of the meaning of a … constitutional provision" and thus, a "question of law." *In re Text Messaging Antitrust Litig.*, 630 F.3d at 626 (citation omitted). And its significance is straightforward. The First Amendment's "freedom of expressive association" protects an expressive organization's choice to expel a group member who it determines "affects in a significant way [its] ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (local youth-group leader in nonprofit organization); *see Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1000 (7th Cir. 2019) (*Dale* not limited to "leadership role[s]"). If that extends to employment—as numerous courts have understood *Dale*—then Starkey's claims are barred, as forcing the Archdiocese to retain an educator who rejects its views on marriage would "significantly affect" the Archdiocese's "ability to advocate" its view on marriage. *Dale*, 530 U.S. at 650; Compl. ¶¶ 12-47.

**2. Whether the Archdiocese may invoke the freedom of association defense is a contestable question.**

The question is also contestable. Although this Court held that *Dale* is confined to the narrow field of "membership in a private organization," rather than "the employment context," Ord. 22-23, other courts have come to a different conclusion.

First, as the Archdiocese has discussed, *Our Lady's Inn v. City of St. Louis* applied *Dale* to bar the application of employment laws to Catholic schools. 349 F. Supp. 3d 805 (E.D. Mo. 2018). The schools had sued to challenge an employment law that prohibited discrimination based on "reproductive health decisions," including abortion. *Id.* at 810. In its ruling in favor of the schools, the Court confirmed that "instruction of the young" is an "expressive activity" as a matter of law, particularly where the schools were "engaged in instilling Catholic, pro-life values in young people." *Id.* at 821. And it further confirmed that the "forced inclusion of teachers or other staff who do not adhere to those values" and obtain abortions would per se "significantly affect the Archdiocesan Elementary Schools' ability to advocate their viewpoints, through its teachers and staff, to their students." *Id.* at 821-22. Thus, by applying the doctrine of expressive association to bar employment claims, *Our Lady's Inn* is an example of "other courts hav[ing] adopted conflicting positions" from this Court's order. *Pyod*, 2014 WL 5343284, at *1.

Second, post-*Dale* litigation involving the Boy Scouts themselves confirms that *Dale* extends to employment. In *Boy Scouts of America v. Wyman*, the Second Circuit considered a case where Connecticut had chosen to exclude the Boy Scouts from a charitable campaign based on "the Boy Scouts of America's policy of excluding homosexuals from membership *and employment* positions." 335 F.3d 80, 83 (2d Cir. 2003) (emphasis added). The Second Circuit made no distinction between the two, finding that at a minimum "the BSA's exclusion of gay activists from leadership positions … under any reading of *Dale*, is constitutionally protected." *Id.* at 91.

Similarly, an Illinois appellate court applied *Dale* in an employment lawsuit against a Boy Scouts council that refused to hire a gay person who was acting as an "employment tester[]" to reveal discriminatory policies. *Chi. Area Council of Boy Scouts of Am. v. City of Chi. Comm'n on Hum. Rels.*, 748 N.E.2d 759, 769 (Ill. App. Ct. 2001). The Court determined that to require the hiring of a person with the

tester's views would work "a severe intrusion on the Boy Scouts' rights to freedom of expressive association" under *Dale. Id.* at 767. And in *Priests for Life v. United States Department of Health and Human Services*, a federal district court explained that "[t]he government violates expressive association rights … by forcing [groups] to accept members *or hire employees* who would 'significantly affect [the association's] expression.'" 7 F. Supp. 3d 88, 109 (D.D.C. 2013) (emphasis added) (finding the contraceptive mandate in the Affordable Care Act comported with freedom of association because it did not "force Plaintiffs to accept members or employees" who disagree with their views), *subsequent affirmance vacated and remanded on other grounds, Zubik v. Burwell*, 136 S. Ct. 1557 (2016).

In short, multiple courts have understood *Dale* to extend to the employment context. And while this Court cited *Hishon v. King & Spalding* as "reject[ing] a freedom of association defense in the employment context," Ord. 23, *Hishon* is no bar to applying *Dale* to employment claims (as the above cases recognize). 467 U.S. 69 (1984). If the doctrine of expressive association had no application in the employment context, the Supreme Court could have said so in *Hishon*—which would have been the simplest way to dispose of the case. But instead, the Supreme Court analyzed the expressive-association defense on the merits, ultimately concluding that King & Spalding (a law firm) hadn't met the necessary element of showing how considering a woman for partnership would "inhibit[]" any expressive aspect of lawyering. *Id.* at 78. That analysis indicates that expressive association *can* operate as a defense in the employment context, as long as the elements are fully met.

Lastly, while this Court found it less "important[]" to its analysis, the Court also stated that *Dale* "turned in part on the particular law at issue"—specifically, the ambiguity as to whether the Boy Scouts should be deemed a place of public accommodation. Ord. 22. But the cases cited above demonstrate that courts have applied *Dale* to bar employment claims—demonstrating that this issue is contestable.

21

### D. Resolution of each question would materially advance the ultimate termination of the litigation and is timely raised.

Allowing interlocutory appeal of the Court's order—and therefore any of the above questions—"may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

As the Seventh Circuit has emphasized, the "may" standard requires only a possibility, not a certainty: "[A]ll that section 1292(b) requires ... is that an immediate appeal *may* materially advance the ultimate termination of the litigation." *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012) (emphasis in original). In *Sterk*, the Seventh Circuit found an appeal was "almost certain" to advance the ultimate termination where reversal would take a central claim "out of the case." *Id.*; *accord Reese*, 643 F.3d at 688 ("sufficient" for the materially-advance standard that certified issue "may" take a set of claims "out of the case," along with one defendant). Likewise, appeal on a "threshold question" that is also a "question of law" has been held to satisfy the "materially advance" standard. *Johnson v. Burken*, 930 F.2d 1202, 1205 (7th Cir. 1991). Other cases confirm that a Section 1292(b) appeal materially advances the completion of the litigation if "resolution of a controlling legal question would serve to avoid a trial." *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) (citing 16 Wright & Miller, Federal Practice and Procedure § 3930); *see Neal v. Honeywell, Inc.*, 191 F.3d 827, 830 (7th Cir. 1999) (case advances ultimate termination "if its disposition is conclusive on the contested issue"); *Pyod*, 2014 WL 5343284, at *2 (relevant that "the case would be dismissed should the Defendants prevail on appeal").

For that reason, "[a]lthough technically the question of whether there is a controlling issue of law is distinct from the question of whether certification would materially advance the ultimate termination of the litigation, in practice the two questions are closely connected." *S.E.C. v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227

(S.D.N.Y. 2000). Thus, the materially-advance standard is often met by a certified question for the same reason the question would be controlling in the case.

Courts considering the "ultimate termination" issue sometimes also consider the potential cost of discovery, trial, and other litigation expenses that could arise absent certification. *See, e.g.*, *McFarlin*, 381 F.3d at 1259 (helping to "avoid a trial" is a good reason for immediate appeal); *Pyod*, 2014 WL 5343284, at *2 (finding relevant that "costly discovery and other litigation expenses" were expected and "could be spared with an immediate appeal"); *Gamboa v. City of Chi.*, No. 03 C 219, 2004 WL 2877339, at *4 (N.D. Ill. Dec. 13, 2004) (deciding dispositive issue would advance proceeding as "[e]ven if the appellate court agrees with our decision," it would provide "guidance" that would simplify trial). *Compare Common Cause Ind. v. Ind. Sec'y of State*, No. 1:12-cv-01603-RLY-DML, 2013 WL 12284649, at *1 (S.D. Ind. Nov. 7, 2013) (constitutional challenge to state statute, as pure legal issue, involved minimal discovery and "most likely [would] be decided on summary judgment").

Here, immediate resolution of the certified questions would advance the ultimate termination of the litigation because, if resolved in the Archdiocese's favor, they would obviate the need for further proceedings in their entirety. In addition, it is highly likely that discovery, trial, and other litigation expenses will be significant if the parties are required to begin plenary discovery and proceed to trial. "A Title VII action is potentially a lengthy proceeding," and in this case, "[c]hurch personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church." *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (Wilkinson, J.); *see E.E.O.C. v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) (citing *Rayburn* and noting the Title VII claim entailed "extensive pre-trial inquiries," along with EEOC investigation and trial, that "constituted an impermissible

entanglement" with religious judgments). And further litigation here is likely to be especially complex due to the immunity rights at issue.

As the Archdiocese has explained in prior briefing, both the church autonomy defense and the ministerial exception, when applicable, function not just as a defense to liability but as an immunity from the burdens of discovery and trial. *See* Dkt. 42 at 14-21 (collecting cases confirming the immunity and granting interlocutory appeal or bifurcation to protect it). In *Our Lady*, the Supreme Court reaffirmed that while the Religion Clauses do not provide churches a "*general* immunity" from all secular law, they do "protect [churches'] autonomy with respect to internal management decisions that are essential to the[ir] central mission," especially in "the selection of the individuals who play certain key roles." *Our Lady*, 140 S. Ct. at 2060 (emphasis added). And the Seventh Circuit has confirmed that the purpose of the ministerial exception is "precisely to avoid such judicial entanglement" as "subjecting religious doctrine to discovery and, if necessary, jury trial." *Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 570 (7th Cir. 2019). For that reason, numerous authorities conclude that this First Amendment "immunity from civil discovery and trial" includes the right to immediate appeal from an order granting plenary discovery because "once exposed to discovery and trial, the constitutional rights of the church to operate free of judicial scrutiny would be irreparably violated." *United Methodist Church v. White*, 571 A.2d 790, 792-93 (D.C. 1990); *see, e.g.*, *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 609 n.45 (Ky. 2014) (ministerial exception); *Harris v. Matthews*, 643 S.E.2d 566, 569-70 (N.C. 2007) (church autonomy).

Multiple federal circuit courts, including the Seventh Circuit, have recognized the right to immediately appeal church autonomy issues under the collateral order doctrine, rather than allow unbridled discovery. In *McCarthy v. Fuller*, the Seventh Circuit accepted a collateral appeal relating to a judge's refusal to defer to the Holy See regarding a party's standing in the Catholic Church. 714 F.3d at 974. The Seventh

Circuit explained that the Religion Clauses' rule against judicial interference in internal religious affairs was "closely akin" to a type of "official immunity," since it conferred "immunity from the travails of a trial and not just from an adverse judgment." *McCarthy*, 714 F.3d at 975-76 (noting "irreparable" harm at issue justified collateral appeal); *see also, e.g.*, *Whole Woman's Health*, 896 F.3d at 368 (accepting collateral appeal of order compelling discovery over church autonomy objections); *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1242 (10th Cir. 2010) ("[T]he ministerial exception, like the broader church autonomy doctrine, can be likened to … qualified immunity." (internal quotation marks omitted)). For that reason, courts recognize that allowing the Church to be "deposed, interrogated, and haled into court" where an immunity attaches is "impermissible entanglement" and thus "forbidden by the First Amendment." *Catholic Univ.*, 83 F.3d at 466-67 (quoting *Young v. N. Ill. Conf.*, 21 F.3d 184, 187 (7th Cir. 1994)); *see Young*, 21 F.3d at 187 ("civil court review of ecclesiastical decisions of church tribunals … are *in themselves* an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment") (emphasis in original). Thus, proceeding to plenary discovery here not only would threaten fundamental First Amendment rights by depriving the Archdiocese of its immunity from suit, but also could produce an interlocutory appeal under the collateral order doctrine anyway.

Further, the discovery sought by Starkey into internal disciplinary records regarding all manner of moral infractions goes to the very heart of "church discipline," one of the areas of religious autonomy "over which the civil courts exercise no jurisdiction," and proposes "inquiry into the procedures [of] canon or ecclesiastical law … that the First Amendment prohibits." *Milivojevich*, 426 U.S. at 713-14. The Fifth Circuit has acknowledged that compelling such discovery, which could violate the "structural protection afforded religious organizations and practice under the Constitution," is "effectively unreviewable' on appeal from the final judgment," and therefore justifies

25

an appeal "under the collateral order doctrine." *Whole Woman's Health*, 896 F.3d at 367, 373. Similarly, in parallel litigation in Indiana state court—involving a challenge to a teacher's dismissal for entering a same-sex marriage, and seeking similar discovery into matters of church discipline—the Indiana Supreme Court recently issued a rare emergency order to halt all discovery in the trial court so the Supreme Court could consider the church autonomy defense on a writ of mandamus. Emergency Writ, *State of Ind. ex rel. Roman Catholic Archdiocese of Indianapolis, Inc. v. Marion Sup. Ct.*, No. 20S-OR-520 (Ind. Aug. 21, 2020), https://perma.cc/KJ77-QJGC.

In short, moving forward with discovery and trial in this case, without definitive resolution of the threshold statutory and constitutional defenses, would raise a host of complex, costly, and significant First Amendment issues that could themselves prompt interlocutory appeal. By contrast, certifying these important threshold questions now may well resolve the entire case and thus "head off protracted, costly litigation." *Ahrenholz*, 219 F.3d at 677.

Finally, this request has been filed "within a reasonable amount of time after entry of the order sought to be appealed," since the order was entered just seven days ago. *Boim*, 291 F.3d at 1007. A request "filed within two weeks of the order it seeks to appeal" is accepted as "timely" across Seventh Circuit district courts. *Sterk v. Path, Inc.*, No. 13 CV 2330, 2014 WL 8813657, at *3 (N.D. Ill. Aug. 8, 2014); *accord Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-CV-044-JD, 2016 WL 1593232, at *5 (N.D. Ind. Apr. 21, 2016) (collecting cases and contrasting *Sterk*'s two-week delay with more dilatory "requests filed more than a month or so after the order"). Here, the Archdiocese is filing in half that time.

## CONCLUSION

The issues presented by the Order on Judgment on the Pleadings are controlling and contestable questions of law where early appellate resolution will advance the

ultimate termination of this litigation. The Court should certify the threshold questions and allow the Seventh Circuit to decide whether to accept the appeal.

Respectfully submitted,

By: /s/ Luke W. Goodrich
Luke W. Goodrich (DC # 977736)
Daniel H. Blomberg (DC # 1032624)
Joseph C. Davis (DC #1047629)
Christopher C. Pagliarella (DC # 273493)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave NW
Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090 fax

John S. (Jay) Mercer, #11260-49
FITZWATER MERCER
One Indiana Square, Suite 1500
Indianapolis, IN 46204
(317) 636-3551
(317) 636-6680 fax

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served upon the following on October 28, 2020 by this Court's electronic filing system:

Kathleen A. DeLaney
Christopher S. Stake
DeLaney & DeLaney LLC
3646 N. Washington Boulevard
Indianapolis, IN 46205
KDelaney@delaneylaw.net
CStake@delaneylaw.net

By: /s/ Luke W. Goodrich
Luke W. Goodrich (DC # 977736)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave NW
Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090 fax