## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LYNN STARKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-03153-RLY-TAB |
| | ) | |
| ROMAN CATHOLIC ARCHDIOCESE | ) | |
| OF INDIANAPOLIS, INC. and | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
## MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION .................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................... 2

    A.  The Archdiocese and Roncalli.................................................................. 2

    B.  Faculty and Staff at Roncalli................................................................... 3

    C.  Starkey's Roles in Religion and Liturgy ............................................... 4

    D.  Starkey's Role in Guidance..................................................................... 6

    E.  Starkey's Role in Roncalli's Senior Leadership ................................. 14

    F.  Starkey's Non-Renewal.......................................................................... 16

STANDARD OF REVIEW................................................................................... 17

ARGUMENT ........................................................................................................ 18

I.   Starkey's claims are barred by the ministerial exception ..................... 18

    A.  The ministerial exception bars claims by ministers
        suing over their employment.......................................................... 18

    B.  Starkey was a minister.......................................................................... 20

        1.  Starkey performed the functions of a minister ......................... 21

        2.  Other considerations confirm Starkey was a minister ............. 26

    C.  All of Starkey's claims are barred ...................................................... 29

II.  Starkey's federal claims are barred by RFRA...................................... 31

III. Starkey's Title VII claims are barred by Title VII............................... 32

IV. Starkey's claims are barred by the First Amendment......................... 34

CONCLUSION..................................................................................................... 35

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. City of Indianapolis,*
742 F.3d 720 (7th Cir. 2014) ................................................................. 18

*Alicea-Hernandez v. Catholic Bishop of Chi.,*
320 F.3d 698 (7th Cir. 2003) .........................................................*passim*

*Anderson v. Liberty Lobby,*
477 U.S. 242 (1986) ............................................................................. 18

*Archdiocese of Miami v. Minagorri,*
954 So.2d 640 (Fla. Dist. Ct. App. 2007) ............................................ 26

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ....................................................................... 18, 30

*Bell v. Presbyterian Church (U.S.A.),*
126 F.3d 328 (4th Cir. 1997) ............................................................... 30

*Black v. St. Bernadette Congregation of Appleton,*
360 N.W.2d 550 (Wis. Ct. App. 1984) ................................................ 26

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ............................................................ 2, 31, 33

*Boy Scouts of Am. v. Dale,*
530 U.S. 640 (2000) ............................................................................. 35

*Bryce v. Episcopal Church in the Diocese of Colo.,*
289 F.3d 648 (10th Cir. 2002) ............................................................. 34

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ............................................................................. 31

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006) ......................................................... 32, 34

*Ciurleo v. St. Regis Parish,*
214 F. Supp. 3d 647 (E.D. Mich. 2016) .............................................. 29

*Conlon v. InterVarsity Christian Fellowship,*
777 F.3d 829 (6th Cir. 2015) ......................................................... 25, 27

*Dayner v. Archdiocese of Hartford,*
    23 A.3d 1192 (Conn. 2011) .............................................................. 26, 30

*Demkovich v. St. Andrew the Apostle Parish,*
    973 F.3d 718 (7th Cir. 2020) ........................................................... 30, 34

*EEOC v. Catholic Univ. of Am.,*
    83 F.3d 455 (D.C. Cir. 1996) ................................................................ 32

*Fratello v. Archdiocese of N.Y.,*
    863 F.3d 190 (2d Cir. 2017) .............................................. 19, 23, 25, 28

*Grossman v. S. Shore Pub. Sch. Dist.,*
    507 F.3d 1097 (7th Cir. 2007) ............................................................. 29

*Grussgott v. Milwaukee Jewish Day Sch., Inc.,*
    882 F.3d 655 (7th Cir. 2018) ........................................................*passim*

*Hoffman-Dombrowski v. Arlington Int'l Racecourse,*
    254 F.3d 644 (7th Cir. 2001) ............................................................... 18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
    565 U.S. 171 (2012) ....................................................................*passim*

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.,*
    665 F.3d 930 (7th Cir. 2012) ............................................................... 18

*Kodl v. Bd. of Educ.,*
    490 F.3d 558 (7th Cir. 2007) ............................................................... 30

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ........................................... 18, 31-32, 34

*Lee v. Sixth Mount Zion Baptist Church,*
    903 F.3d 113 (3d Cir. 2018) ................................................................ 31

*Listecki v. Off. Comm. of Unsecured Creditors,*
    780 F.3d 731 (7th Cir. 2015) ............................................................... 31

*Natal v. Christian & Missionary All.,*
    878 F.2d 1575 (1st Cir. 1989) ............................................................. 31

*NLRB v. Catholic Bishop,*
    440 U.S. 490 (1979) ........................................................................... 35

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ................................................................*passim*

*Pardue v. Ctr. City Consortium Schs. of Archdiocese of Wash.*,
    875 A.2d 669 (D.C. 2005) ........................................................ 26

*Paul v. Watchtower Bible & Tract Soc'y*,
    819 F.2d 875 (9th Cir. 1987) .................................................. 32

*Petruska v. Gannon Univ.*,
    462 F.3d 294 (3d Cir. 2006) .................................................. 25

*Rweyemamu v. Cote*,
    520 F.3d 198 (2d Cir. 2008) .................................................. 30

*RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*,
    672 F.3d 476 (7th Cir. 2012) .................................................. 30

*Sabatino v. St. Aloysius Par.*,
    672 A.2d 217 (N.J. Super. Ct. App. Div. 1996) ..................... 26

*Schleicher v. Salvation Army*,
    518 F.3d 472 (7th Cir. 2008) .................................................. 19

*Scott v. Harris*,
    550 U.S. 372 (2007) ............................................................... 18

*Sheliehsabou v. Hebrew Home of Greater Wash., Inc.*,
    363 F.3d 299 (4th Cir. 2004) .................................................. 19

*Sterlinski v. Catholic Bishop of Chi.*,
    934 F.3d 568 (7th Cir. 2019) ...................................... 19, 24, 29

*Vore v. Ind. Bell Tel. Co.*,
    32 F.3d 1161 (7th Cir. 1994) .................................................. 34

*Werft v. Desert Sw. Ann. Conf.*,
    377 F.3d 1099 (9th Cir. 2004) ............................................... 31

*Yin v. Columbia Int'l Univ.*,
    335 F. Supp. 3d 803 (D.S.C. 2018) ................................... 19, 22

*Young v. N. Ill. Conf. of United Methodist Church*,
    21 F.3d 184 (7th Cir. 1994) ............................................. 20, 29

**Statutes**

42 U.S.C. § 2000bb-1 ................................................................. 32

42 U.S.C. § 2000e ................................................................... 2, 33

42 U.S.C. § 2000e-1 ................................................................................................ 2, 33

**Other Authorities**

1983 Code of Canon Law ...................................................................... 3, 7, 17

Catechism of the Catholic Church ................................................... 5, 12, 17

Fed. R. Civ. P. 56(a) ............................................................................. 17

L.R. 56-1 ................................................................................................... 17

Second Vatican Council's *Gravissimum Educationis* (Oct. 28, 1965) .......................... 3

## INTRODUCTION

This case strikes at the heart of the First Amendment's protections for religious autonomy. The Plaintiff, Lynn Starkey, was a leader and Co-Director of Guidance at Roncalli Catholic High School. She lost her job after informing the school that she entered a same-sex union in knowing violation of her contract and Church teaching. She now sues, seeking to penalize the Archdiocese of Indianapolis for a religious decision about who can lead and transmit the faith in its Catholic schools.

Not surprisingly, this suit is barred by multiple protections for religious freedom. *First*, it is barred by the ministerial exception, which applies to employment claims by "any 'employee' who leads a religious organization" or has a "role in conveying the Church's message and carrying out its mission." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063 (2020). Here, Starkey played a crucial role in conveying the Catholic faith and carrying out the school's religious mission. As Co-Director of Guidance, she was designated in her contract as a "minister of the faith"; was tasked with forming students in the faith, praying with them, modeling the faith for them, and worshiping with them; was commissioned as a minister and held herself out as one; and was asked to teach and model the Catholic faith while counseling students through some of the most sensitive issues of their lives. Beyond that, she served as a department chair and leader on the school's Administrative Council—helping make key decisions shaping the religious mission of the entire school. These duties easily bring her within the ministerial exception.

*Second*, this suit is barred by the Religious Freedom Restoration Act (RFRA), which prohibits the application of any federal law that would substantially burden the exercise of religion unless the law satisfies strict scrutiny. Here, penalizing the Archdiocese under Title VII would obviously impose a substantial burden on its religious exercise, and that application of Title VII cannot satisfy strict scrutiny. Indeed, the Supreme Court recently emphasized that RFRA "operates as a kind of

super statute" that "might supersede Title VII's commands in appropriate cases." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020). This is such a case.

*Third*, this suit is barred by Title VII itself, which states that it "shall not apply" to a religious "educational institution" when it employs "individuals of a particular religion"—and then defines "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §§ 2000e-1(a), 2000e(j). Here, the Archdiocese sought to employ individuals who adhered to the Church's particular "religious observance and practice" regarding male-female marriage. Thus, it is protected by Title VII.

*Finally*, this suit is barred by several First Amendment doctrines that apply regardless of whether Starkey was a minister. First, the religious-autonomy doctrine protects the right of a religious organization to limit hiring to persons who adhere to its religious beliefs. Second, the doctrine of non-entanglement forbids courts from becoming entangled in religious questions—such as Starkey's request that the Court (or jury) weigh the gravity of different Church teachings. Third, the freedom of association protects the ability of religious groups to exclude employees who would undermine the group's religious message. Finally, the doctrine of constitutional avoidance requires the Court to construe Title VII in a way that avoids these constitutional problems. Taken together, these constitutional and statutory protections require judgment for the Archdiocese.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Archdiocese and Roncalli

The Roman Catholic Archdiocese of Indianapolis is a religious community led by the Archbishop of Indianapolis, subject to the Roman Catholic Pontiff, and governed under the Roman Catholic Code of Canon Law. *See* App.57-59. The Archdiocese's mission is to "live the Gospel" by "[w]orshipping God in word and sacrament"; "[l]earning, teaching and sharing [the Catholic] faith"; and "[s]erving human needs." App.63.

Founded in 1969, Roncalli High School is a Catholic school "under the auspices of the Roman Catholic Archdiocese of Indianapolis." App.63-64. Its purpose is "supporting and otherwise furthering the mission and purposes of," the Archdiocese, including "faith formation." App.51. Per its mission statement, Roncalli seeks "to form Christian leaders in body, mind, and spirit," to challenge students to "respond to the call of discipleship," and "to make God's love complete among us." App.63; *accord* App.18 ¶9. Its student handbook states that "the most important program at Roncalli is our spiritual formation program" and that "true education is aimed at the formation of the human person in the pursuit of his ultimate end." App.148 (adapted from the Second Vatican Council's *Gravissimum Educationis* (Oct. 28, 1965), App.198-206); *see* App.65-66 (similar language in faculty handbook).

### B. Faculty and Staff at Roncalli

Catholic canon law requires Catholic educators "to be outstanding in correct doctrine and integrity of life." 1983 Code c.803, §2. Accordingly, Roncalli's faculty handbook emphasizes that a "foundational element" of Catholic education is "[t]he evangelizing witness of faith in action that is so obvious in the life of our teachers." App.66. The handbook charges Roncalli's principal with "[h]ir[ing] faculty and staff whose values are compatible with the mission of Roncalli High School." App.79. The principal prefers whenever possible to hire faithful Catholics in teaching, administrative, and guidance counseling roles, and expects all teachers and guidance counselors to be "actively seeking opportunities to be involved in the faith formation and overall development of our students even outside school hours." App.23 ¶¶32-34; App.148 (student handbook) (staff participation in "Liturgies, Retreat Experiences, Adoration, Community Service, Service Learning, Days of Reflection, and Penance Services").

Teachers and guidance counselors at Roncalli are typically employed under one-year contracts, which incorporate job descriptions. App.358, 378-80 at 107:11-21, 127:1-129:24. When this dispute arose, the job descriptions for both teachers and

guidance counselors required them to "[c]ommunicate[] the Catholic faith to students," "[p]ray[] with and for students," "[p]articipate[] in religious instruction," and "carr[y] out [the Church's] mission by modeling a Christ-centered life." App.526 (guidance); App. 519 (teachers); *see* App.369, 376-77 at 118:7-15, 125:19-126:11. Likewise, these descriptions indicate that teachers' and guidance counselors' "personal conduct … both at school and away from school, must convey and be supportive of the teachings of the Catholic Church." App.521, 529.

### C. Starkey's Roles in Religion and Liturgy

Plaintiff Lynn Starkey began working at Roncalli in 1978. App.267-68 at 16:12-17:4. Starkey was raised Catholic. App.263 at 12:13-16. Before working at Roncalli, she attended multiple Catholic schools, ultimately obtaining an undergraduate degree from Saint-Mary-of-the-Woods College. App.262-63. At Roncalli, Starkey served in several different roles, including New Testament Teacher, Choral Director, and Fine Arts Chair. App.222. When this dispute arose, Starkey was serving as Guidance Counselor and Co-Director of Guidance. App.283, 376-77 at 32:1-17; 125:24-126:1.

Starkey served as New Testament Teacher for seven years, from 1982 to 1989. App.222. In that role, she taught a course on various aspects of the New Testament, including the Gospels and the Sermon on the Mount. App.274, 276 at 23:1-7, 25:6-9. One of Starkey's lessons on Matthew's Gospel, for example, explained to students that "Matthew shows that Jesus is the long-awaited Messiah and the fulfillment of Hebrew Old Testament scripture," and asked students to "examine and evaluate [their] own beliefs in light of New Testament scripture and Church teaching." App.397 at 146:4-21; App. 576-77 (Starkey class notes). Worksheets from Starkey's New Testament class asked students to describe their "image of God" and to reflect on "[h]ow have <u>you</u> gotten to know God?" App.244.

In 1985, Roncalli's chaplain informed Starkey that she must apply for catechesis certification in order to continue teaching religion at Roncalli; Starkey then applied

for recognition as a certified catechist. App.277-78, 412-13 at 26:10-27:14,161:16-162:4; *see* App.609 (listing qualifications of "applicant"). Her application states that among "the outstanding gifts" that qualify her for "the ministry of catechist" are her service with "music at Liturgy" and "help[ing] on Senior Retreats." App.609. Starkey listed over 300 hours of coursework in support of her application, grouped under topics such as "Scripture, Liturgy and Prayer." *Id.*

Starkey's application was approved. App.277 at 26:10-17, App.437 at 186:13-15; App.608. The resulting certificate stated: "Having accepted the call of the local Catholic community and having met the standards of the Archdiocese of Indianapolis, the title Catechist is hereby bestowed upon Lynn M. Starkey with a call to continue to 'act justly, love tenderly and walk humbly' with Our God." App.608 (capitalization modified). The Catechism of the Catholic Church lists "catechists" alongside "priests" as those with a particular "responsibility of teaching" Catholic doctrine to "the People of God." Catechism of the Catholic Church—Prologue § 12.

Starkey also served as Choral Director, and later attained the additional role of Fine Arts Chair. App.222; App. 279-80 at 28:4-29:3. Contemporaneous reviews of Starkey's performance commend her for the "positive impact" she had on students through her "use of prayer" in opening lessons. App.578; *see* App.580.

As Choral Director, Starkey sometimes "prepared students for the music that was used during the all-school liturgy"—that is, the school's monthly Mass. App.269 at 18:19-22; *see* App.238 ¶12. For "more involved" pieces, she directed the choir during the liturgy. App.271-72 at 20:23-21:7. She also "prepared" individual choral students to perform music requested by a pastor or religion teacher. App.272-73 at 21:15-22:9.

Starkey also participated in the "Christian Awakening Retreat," a retreat held for Roncalli seniors every year, where she "facilitated a group discussion" and "gave a talk" on "God's friendship." App.422-23 at 171:20-172:12. A current Guidance Counselor who volunteers at the Retreat describes it as "help[ing] students understand

5

how Christ is present in their daily life." App.6 at ¶35. She describes the "God's Friendship" talk as "a talk about friends that have shown God's love to us," while other talks cover topics such as how to "celebrate God in the good times and lean on him in the bad times." App.6 at ¶¶36-37. Starkey also "held a choral camp where she rehearsed songs for a liturgy that took place" there. App.630, 420.

As Fine Arts Chair, Starkey "oversaw the fine arts department." App.279 at 28:4-16; App.113. A contemporaneous review of Starkey's work in this role states that "[y]ou have truly been a leader in the school community for many years." App.248. The review "encourage[d]" Starkey "to continue the professionalization of your skills through the counseling program," and praised her for "trying to listen intently" to "God's way of talking to us" as to vocation. *Id.*

### D. Starkey's Role in Guidance

In 1997, Starkey assumed a new role as Guidance Counselor. App.222. Guidance Counselors are held to a high educational standard; while teachers can have "a bachelor's degree," "counselors must have a master's degree." App.358 at 107:12-15. In 2007, Starkey was promoted to Co-Director of Guidance, which entailed "additional responsibilities," and which Starkey decided to share because it was "a big job" in the school. App.222; App.283 at 32:16-33:1. Principal Chuck Weisenbach states that the "track record of Lynn's commitment to and leadership in … areas of faith formation was a part of what made [him] comfortable elevating Lynn." App.25 ¶44 (citing her Catholic education, history as a certified catechist, and past religious roles).

As Co-Director of Guidance, Starkey held a supervisory role, as all guidance counselors are "responsible to the Director of Guidance." App.97. In that role, Starkey engaged in "mentoring" and "performance evaluations" of the other guidance counselors and oversaw the department's social worker. App.284-85, 348 at 33:21-34:8, 97:11-18. She also "attend[ed] department chair meetings as a department chair." App.357. at 106:5-7. She answered directly to the Principal and was part of the

school's Administrative Council. App.63-67, 78-82, 93-98; App.17 at ¶4; App.286 at 35:12-20. Starkey held each of these positions—guidance counselor, Co-Director/Chair of Guidance, and Administrative Council member—for over a decade before this dispute arose. App.222.

In May 2018, Starkey signed a "School Guidance Counselor Ministry Contract." App.532-33; *see* App.530-31. The contract states that she "acknowledges having been provided with a copy of the Faculty Handbook" and "agrees that conscientious observance of the Faculty Handbook … is an expressed duty of [her] performance of this contract." App.532; *see* App.530 (similar). The faculty handbook provides that the Director of Guidance and Guidance Counselor "assist[] the students in strengthening and developing their social, emotional, intellectual and Christian development," with the non-Director Counselors being "responsible to the [Co-]Director," Starkey, in this task. App.93, 97.

The Guidance Counselor Ministry Contract also states that "School Guidance Counselor also acknowledges receipt of the ministry description that is attached to this contract and agree[s] to[]fulfill the duties and responsibilities listed in the ministry description." App.532. Starkey acknowledges having received that description "in May 2018." App.376-77 at 125:19-126:11; *see* App.380 at 129:14-19.

The ministry description states that the guidance counselor is "a minister of the faith." App.9. The first "Role" listed in the description is that a guidance counselor "Facilitates Faith Formation," which includes the following responsibilities:

- "Communicates the Catholic faith to students and families through implementation of the school's guidance curriculum … [and] offer[s] direct support to individual students and families in efforts to foster the integration of faith, culture, and life."
- "Prays with and for students, families, and colleagues and their intentions.[1] Participates in and celebrates liturgies and prayer services as appropriate."

---

[1] An "intention" is a Catholic term for the object of a prayer. *See* 1983 Code c.945-951.

- "Teaches and celebrates Catholic traditions and all observances in the Liturgical Year."
- "Models the example of Jesus, the Master Teacher, in what He taught, how He lived, and how He treated others."
- "Conveys the Church's message and carries out its mission by modeling a Christ-centered life."
- "Participates in religious instruction and Catholic formation, including Christian services, offered at the school …" *Id.*

The ministry description includes several other responsibilities relating to personal and spiritual counseling duties, such as: (1) "Uses techniques and methods that foster a Christ-centered atmosphere"; (2) "Participates in spiritual retreats, days of reflection, and spiritual formation programs"; (3) Coordinates "bullying awareness and prevention, suicide awareness and prevention, substance abuse awareness and prevention"; (4) "Proactively identifies and addresses physical, social, emotional, and spiritual needs"; and (5) "Display of Gospel values." App.10-12.

The ministry description also states that "Catholic schools are ministries of the Catholic Church, and school guidance counselors are vital ministers sharing the mission of the Church. School guidance counselors are expected to be role models and are expressly charged with leading students toward Christian maturity and with teaching the Word of God." App.12 (must be "credible witnesses of the Catholic faith"). The description says that "[a]s role models," the "personal conduct" of guidance counselors "both at school and away from school, must convey and be supportive of the teachings of the Catholic Church," including the "call[ing] to respect human sexuality and its expression in the Sacrament of Marriage." *Id.*

Angela Maly, a Guidance Counselor at Roncalli since August 2018, confirms that the ministry description "is a fair description of the day-to-day expectations" of the job, including the "role in facilitating faith formation among students." App.1, 7 at ¶¶2, 39, 40; *accord* App.21-22 at ¶¶26-28. Maly describes her "day-to-day work" in faith formation as a Guidance Counselor as "specifically geared toward modeling and

teaching not just a generic 'Christian' faith but the Catholic faith specifically": "I pray with and for them. I join with them in liturgies and prayer services. ... And I try to help them understand and be formed in the Catholic faith." App.7 at ¶40.

Consistent with the expectation that she participate in religious services offered at the school, Starkey regularly attended monthly Masses at Roncalli, singing with the congregation and receiving Holy Communion along with the rest of the Roncalli community, including students who met with her and counselors who reported to her. App.332 at 81:4-21; *see* App.25 ¶42. As a guidance counselor, Starkey gave other staff guidance on how to incorporate students of different faiths into Catholic liturgy, such as by preparing students for "congregational responses" and helping them adapt to the Catholic version of the "Lord's Prayer." App.652; *see* App.434 at 183:12-16.

Starkey also attended "Days of Reflection." App.421-22 at 170:24-171:14 (discussed as "Days of Recollection"). These are gatherings at the beginning of the year for "faculty who are impacting kids in their spiritual life on a day-to-day basis." App.21 ¶23. Guidance counselors are included. *Id.* Supported by campus ministry, the day features an outside Catholic speaker and a liturgy, or Mass, with Holy Communion, and has also featured church visits. App.421-22 at 170:24-171:19; App.7 ¶44; App.20-21 ¶¶19-22. Days of Reflection Starkey attended included talks by Catholic clergy and religious sisters. App.631 ¶17.

At the Day of Reflection, Roncalli's Principal Weisenbach delivers a "call-and-response Commissioning Prayer" to the assembled faculty. App.21 ¶22. In a typical prayer, the faculty state that they "accept the responsibilities of my ministry," "promise to share my faith with others," and "promise to form youth and support families in the faith by following the example of our Master Teacher, Jesus Christ." App.31; App.21 ¶22. The leader then states: "I hereby commission you to faithfully and joyfully serve as ministers of the faith." App.31; *see also* App.8 ¶45.

9

The guidance department is the only department at Roncalli whose members meet one on one with every student every school year. App.309-10 at 58:19-59:9; *accord* App.22 ¶29. Consistent with contract expectation, Roncalli Guidance Counselors under Starkey's leadership were closely engaged in tracking and managing students' "most sensitive issues." App.598; App.405-06 at 154:2-155:4. One way they did so was through the Student Assistance Program, or SAP (recently renamed STAND UP). App.298-99 at 47:24-48:4; App.3-4 ¶14-18.

SAP helps identify and address students "struggling the most" due to issues such as "dysfunction in their homes, death of a loved one, [or] substance use." App.299, 313-14 at 48:6-16, 62:20-63:3. All five counselors participate in SAP, along with the chaplain, campus minister, social worker, and several administrators and teachers. App.299 at 48:17-23. Starkey at one point was the lead "facilitat[or]" for the team. App.299-300 at 48:24-49:10. In 2018, Starkey expressed concern to the Principal about counselors being asked to track the issues raised in SAP in a format that could be "accessible to not only counselors, but SAP teachers," since "we want students to continue to trust counseling professionals" with these sensitive issues. App.598-99.

Roncalli Guidance Counselor Angela Maly has taken on a "leadership role" within SAP/STAND UP, as did Starkey. App.3 ¶15; *compare* App.299-300 at 48:24-49:10. She describes her direct-guidance role as "assist[ing] students with their social, mental, academic, emotional, and spiritual needs" and "showing the face of Christ to the Roncalli family." App.2 ¶¶4-5. That assistance has included discussions of "anxiety, stress, depression, romantic relationship issues, thoughts of suicide, sexual orientation, gender identity, and questions and doubts about the Catholic faith and its moral teachings." App.3 ¶¶4-6. Representative conversations included: (1) talking a student through "how to rely on God" during a breakup; (2) encouraging students facing academic challenges to pray, emphasizing "that God has a plan bigger than we can imagine"; and (3) assuring students "struggling to reconcile their sexual orientation

10

with their faith" that they are loved by God "no matter what" and "not define[d]" by their orientation. App.2-3 ¶¶7-12.

Maly "regularly pray[s]" with students, reminding them to "offer the struggle up to Christ through prayer." Those prayers "often incorporat[e] traditional Catholic prayer practices" such as "prayer cards" or intercessory prayer using "'tiny saints,' small keychains with an image of a saint." App.2-3, 5 ¶¶9, 13, 24. She understands prayer with counselees to be an "essential component[]" of her job. *Id.* ¶10.

Prayer is also "a huge part of [Maly's] daily life and work at Roncalli" even outside of counseling meetings, including leading students and faculty in morning rosaries and adoration of the Blessed Sacrament; daily all-school prayer; opening every Guidance meeting with prayer; praying at STAND UP meetings; and participating in monthly Mass. App.4-6 ¶¶18-32. Maly also states that she is "instructed and encouraged by Roncalli to" "put[] faith into action." App.6 ¶33. To that end, she has engaged in charitable endeavors with students, including at a food pantry and a weeklong mission trip with students focused on service projects and prayer. App.6 ¶¶33-34.

As Co-Director of Guidance, Starkey affirmed on multiple occasions the faith-formation component of Roncalli Guidance Counselors' work discussed by Maly. App.517; App.563, 565. For example, in May 2016, Starkey was part of an email conversation with Roncalli administrators on how to classify the school's guidance counselors under the Fair Labor Standards Act. App. 523-25; *see* App.358-60 at 107:4-109:19. As part of that conversation, she co-wrote a letter with her Co-Director to Principal Weisenbach, explaining why "school counselors qualify for a salaried contract to the same degree as … teachers do." App.517. Starkey's letter referenced "ArchIndy's Ministry Description for 'Teacher' (2.22.2016)," and explained that "[i]f school counselors had a Ministry Description, it would be identical to that of teachers, except for III.B.2 (daily lesson plans) and III.C.5 (efficient classroom routines)." *Id.*; *see* App.361-62, 369 at 110:22-111:3, 118:7-15; App.519-22. The duties in the Teacher

11

Ministry Description that Starkey identified as "identical" substantially match all of the counselor duties noted in bullet points above (*supra*, pp.7-8), and also include "[p]articipates in spiritual retreats, days of reflection, and spiritual formation programs"; "[d]isplays" "Gospel values"; and "[l]ead[s] their students toward Christian maturity" and "teach[es] the Word of God." App.519-22; *compare* App.9-12 (later-adopted Ministry Description for Guidance Counselors).

Weisenbach shared Starkey and Fitzgerald's letter with Archdiocesan staff, saying it "sets out some very clear reasons why a guidance counselor qualifies for the same ministerial exemption as the teachers." App.523; *accord* App.373-74 at 122:18-123:3. Weisenbach went on: "There are 67 items listed on the archdiocesan ministry description for a teacher. A guidance counselor fulfills 65 of the 67.... Given they are being held accountable for 97% of the same expectations as the teacher, being granted the same exemption as the teacher makes sense to me." *Id.* Weisenbach has since reaffirmed that Starkey and Fitzgerald's letter "characterized their roles accurately," including their roles in "forming the faith of students." App.26 ¶46.

Starkey also noted in her letter that "school counselors are evaluated using the … school counselor version of the Catholic *Educator* Advancement Program," or CEAP. App.517. CEAP "allows educators"—both teachers and guidance counselors—"to advance in their career levels and pay scale based on their performance[.]" App.24 ¶¶36-37. When the CEAP was extended to counselors, Starkey participated in drafting and establishing the performance criteria. App.366-67 at 115:13-116:8; App.24 ¶38. Those criteria included the following for a "Distinguished School Counselor":

- "School counselor embodies the charisms[2] of Saint John XXIII and lives out his traits."
- "School counselor encourages students' spiritual life and resources in counseling conversation as appropriate (i.e. encouraging prayer/reflection, sharing

---

[2] "[C]harisms" are "graces of the Holy Spirit which directly or indirectly benefit the Church," by which the Holy Spirit "makes the faithful 'fit and ready to undertake various tasks and offices for the renewal and building up of the Church.'" Catechism §§ 798-799.

one's own spiritual experiences as appropriate; encouraging retreat, parish, youth ministry, mission work)."

- "School counselor consistently attends their Sunday liturgy or church service."

App.563-65. Starkey herself was designated a Distinguished School Counselor. App.378, 394-95 at 127:3-18, 143:21-144:5; App.574.

Counselors at Roncalli were in fact evaluated according to these religious criteria, under the CEAP and otherwise. App.581-97; App. 38-46. For example, one former Guidance Counselor—in completing the CEAP-required self-assessment of her performance in "Spirit of Roncalli Formation"—explained that she fulfilled these criteria by "highly encourag[ing] students to attend retreat," and "encouraging faith with my students." App.595; *see* App.400-01 at 149:17-150:6. The counselor pointed out that she had become "more confident in" doing so by "[o]bserving retreat" herself, going through the Rite of Christian Initiation of Adults (the process for entering the Catholic Church as an adult), and Mass attendance. *Id.* (also discussing the "charisms of St. John XXIII I live out most").

Fitzgerald, the other Co-Director of Guidance, also went through CEAP. App.38-46; *see* App.25 ¶42. In her self-assessment, Fitzgerald explained that she meets with students individually at least once a year "but often times, much more" and discusses "personal and social issues … and faith formation." App.41-42 ("personal and social counseling" can include "serious crisis situation[s]"). As for "Spirit of Roncalli Formation," Fitzgerald stated that she "love[s] … sharing [her] experience and faith with others," and was "working the first retreat of the year, and plan[ning] to help more with St. Vincent de Paul." App.45; *see* App.6 ¶33 ("St. Vincent DePaul Food Pantry"). She also emphasized:

> I consistently attend Sunday church service, all masses at Roncalli, and morning communion services when I am able. I consistently use spiritual life and resources in my counseling conversations as well as sharing my own spiritual experiences. … I am faithful, and have no problems sharing my beliefs and my love of God. In a faith-based school, I feel this definitely is a strength when working with young people who are seeking direction.

13

App.45. Fitzgerald's narrative closes on her four "Goals" for the coming year, which included "[w]ork[ing] a senior retreat." App.46. Like Fitzgerald and other counselors going through CEAP, Angela Maly reports that "[o]ne of my goals is always spiritually based" in her annual review. App.7 ¶43; *see* App.581; App.35 (Principal noting Fitzgerald's success in "find[ing] more ways to celebrate Christ, specifically through reading, journaling, praying, etc.," and sharing the Principal's own efforts "to include Christ in more of my daily life").

Similarly, in one of Starkey's own performance reviews, the Principal said he "look[ed] forward to assisting you in any way possible as you seek to continue to grow as a Christian and in your profession." App.538. He asked Starkey to be "even more deliberate and more pronounced in your leadership" given that the department chairs in "the core academic areas … have less department chair experience than you." App.537-38. Starkey agrees that the Principal was "looking to [her] to exercise some measure of leadership within the school." App.388 at 137:6-9.

### E. Starkey's Role in Roncalli's Senior Leadership

As Co-Director of Guidance, Starkey was the Department Co-Chair. App.18 at ¶6-7; App.22 ¶31; App.357 at 106:3-12; App.537-38. That meant she was responsible to oversee the Guidance Department, including conducting monthly department meetings, formulating the guidance curriculum, managing the budget, and working with the Principal in the hiring and supervision of all Guidance personnel. App. 113, 94, 391-92, 537-38; *cf.* App.278-79 at 27:19-25.

Starkey also served on Roncalli's Administrative Council—"[t]he main leadership body within the school." App.17 at ¶4. It includes the Principal, Campus Minister, Chaplain, two Assistant Principals, Dean of Students, Athletic Director, and Co-Directors of Guidance. *Id.* During Starkey's tenure, the Council met weekly for around "50 to 110 minutes" and always opened in prayer. App.289 at 38:8-15, 316-17 at 65:21-66:7.

14

Principal Weisenbach states that "[m]ost faculty and staff recognize the Administrative Council as the lifeblood of decision-making at the school," and that "the Administrative Council and the Department Chairs are responsible for 95% of Roncalli's daily ministry, education, and operations." App.18 at ¶¶5-7. Along with the Principal and Assistant Principal for Academic Affairs, the Director of Guidance (Starkey's role) "is the only staff member who serves on both those bodies." *Id.*

During Starkey's tenure, as today, the Council informed key decisions relating to the life of the school, including issues core to Roncalli's religious mission. For example, the Council helped plan "all-school liturg[ies]," including by deciding who could serve "as Eucharistic ministers" and the terms under which students could be suspended from this role. App.293 at 42:7-12; App.323-24, 343. The Council discussed how to handle a student "morality survey" on important Catholic beliefs regarding "sexual activity," "[b]ullying," and drug and alcohol use. App.314-16. The Council discussed other aspects of faith formation programming, such as compensation for theology teachers (App.321-22) and the "Senior Capstone Project" for the Religion Department (App.341-42). The Council discussed contemporary research on how to address adolescents identifying as transgender. App.294-96, 481.

Council agendas show Starkey's input on issues of faith, mission, and student challenges. App.495, 605, 502, 505. After the Parkland shooting, for example, Co-Director of Guidance Fitzgerald encouraged holding a "prayer service to honor kids who were killed," and Starkey stated support for holding that prayer service. App.328-31, 494-95. In one meeting, Starkey "inform[ed] the administrative council" about SAP efforts "to address suicide prevention"; in another, she contributed to a conversation on how Roncalli should present itself to potential applicant families. App.336-37, 339-40; App. 502, 504-05. And when Fitzgerald was put on administrative leave due to her same-sex union, Starkey discussed presenting a responsive statement for families and formulated a "logistical plan" for the counselors and chaplain to address this

15

issue with "upset" students. App.410-12 at 159:22-161:14; App.605-06.

As Administrative Council member, Starkey also delivered all-school prayers. App.406-09 at 155:5-158:1. Principal Weisenbach asked each member of the Council to deliver a personal reflection and prayer to all students "about once every nine weeks." App.20 at ¶18. In one reflection, Starkey said, "There is a tangible, obvious spirit at Roncalli, and I really believe it is God's Spirit working through the faculty and students here." App.601. She encouraged students to "include God in our own daily life," and concluded by thanking God for "all the ways in which your loving Spirit makes a difference," asking God "to open our hearts and minds so we can know, love, and understand you more and more," and asking "Saint John XXIII" to "pray for us!" *Id.* In another prayer, Starkey asked "Loving God … to renew our goals, sustain our energy, and encourage those around us." App.600.

Further, Starkey participated in a Council discussion group on a book called *Living as Mission Disciples: A Resource for Evangelization*. App.333-35 at 82:17-84:10. That book is a publication of the United States Conference of Catholic Bishops and is designed to assist "pastoral leaders" as they "develop, enhance, and review their own local strategies" to pursue evangelization. App.334-35 at 83:21-84:10 (agreeing with description); *see* App. 19-20 at ¶¶14-17. Starkey recalls participating in at least one additional book study as a Council member, which related to "the qualities of an effective Catholic high school." App.421 at 170:12-15; *see* App.19-20 at ¶¶14-17.

**F. Starkey's Non-Renewal**

In May 2018, Roncalli renewed Starkey's employment for another year, and Starkey signed the "School Guidance Counselor Ministry Contract." App.532-33. The contract stated: "The School Guidance Counselor shall be deemed to be in default under this contract in the event of … any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church." App.533. A default provision like this was included in Starkey's

16

annual employment contracts for over 30 years. *See, e.g.*, App. 650-51 (2007-08 contract), App.245 (1986-87 contract); App.431 at 180:16-17.

Starkey's contract also provided that she would "be in default under this contract" if she engaged in "any breach of duty," including "[r]elationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church." App.533. The Catholic Church defines marriage as a "covenant" "by which a man and a woman form with each other an intimate communion of life and love." Catechism § 1660; *accord* 1983 Code c.1055.

In August 2018, an Archdiocesan priest learned that Starkey's Co-Director of Guidance, Shelly Fitzgerald, had entered a same-sex civil union. Dkt. 1 ¶29.[3] Because this conduct violated Fitzgerald's contract and Church teaching, Fitzgerald was placed on paid administrative leave. Dkt. 1 ¶32. That same month, Starkey told Roncalli leadership that she was also in a same-sex civil union. Dkt. 1 ¶39. At the end of the school year, Starkey received a letter from the Principal of Roncalli explaining that because this conduct violated Starkey's contract and Church teaching, "we cannot offer you a contract for the 2019-2020 year." App.223; *see* App.26 at ¶47; App.209 at ¶¶15, 18.

After her separation from Roncalli, Starkey began working as a guidance counselor at a public school, where she makes "more than [her] previous salary at Roncalli." App.267 at 16:7-11.

## STANDARD OF REVIEW

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" only if it "might

---

[3] The Archdiocese stipulates to the facts in this paragraph "only for the purpose of the motion for summary judgment"; the stipulations "are not intended to be otherwise binding." S.D. Ind. L.R. 56-1(g).

affect the outcome of the suit under the governing law." *Hoffman-Dombrowski v. Arlington Int'l Racecourse*, 254 F.3d 644, 650 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)). And a dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "Facts must be viewed in the light most favorable to the nonmoving party only if" they are genuinely disputed. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). Thus, a claim must be dismissed if the complaint fails to "state a 'plausible' claim for relief" or "sets out all of the elements of an affirmative defense." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934-35 (7th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## ARGUMENT

### I. Starkey's claims are barred by the ministerial exception.

#### A. The ministerial exception bars claims by ministers suing over their employment.

The First Amendment protects religious organizations' "autonomy with respect to internal management decisions that are essential to [their] central mission." *Our Lady*, 140 S. Ct. at 2060. One "component" of this doctrine is the "ministerial exception." *Id.* at 2060-61; *see also Korte v. Sebelius*, 735 F.3d 654, 677-78 (7th Cir. 2013).

Under this exception, "courts are bound to stay out of employment disputes involving" religious institutions and "those holding certain important positions" within them. *Our Lady*, 140 S. Ct. at 2060. Intervention in such disputes amounts to "[r]equiring a church to accept or retain an unwanted minister." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). And doing so violates both Religion Clauses: the Free Exercise Clause, "which protects a religious group's right to shape its own faith and mission through its appointments"; and

18

the Establishment Clause, "which prohibits government involvement in such ecclesiastical decisions." *Id.* at 188-89.

The ministerial exception isn't limited to "ordained ministers." *Id.* at 203-04 (Alito, J., concurring); *see also id.* at 202 ("mere shorthand"). Rather, it covers any employee of a religious organization who "perform[s] religious functions." *Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019). Thus, the Seventh Circuit has applied the exception to a wide array of employees—from an organist (*Sterlinski*) to a rehabilitation-center administrator (*Schleicher v. Salvation Army*, 518 F.3d 472 (7th Cir. 2008)) to a press secretary (*Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698 (7th Cir. 2003)). *See also Sheliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 308-09 (4th Cir. 2004) (staff of Jewish nursing home; collecting cases).

Many of the leading cases—including both decided by the Supreme Court—have applied the exception to the same type of employee as at issue here: educators at religious schools. *See, e.g.*, *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017) (principal); *Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803 (D.S.C. 2018) (program director); *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655 (7th Cir. 2018) (teacher). That is because "educating young people in their faith, inculcating its teachings, and training them to live their faith" are "vital" religious functions. *Our Lady*, 140 S. Ct. at 2064. Thus, religious organizations "must be free to choose those" who perform these functions. *Hosanna-Tabor*, 565 U.S. at 196.

*Our Lady* demonstrates the point. There, the Supreme Court considered whether the Religion Clauses barred discrimination claims by two teachers at Catholic elementary schools. The Ninth Circuit had held that it didn't, pointing to the fact that the teachers lacked "clerical titles" and had limited "formal religious schooling." 140 S. Ct. at 2067. But the Supreme Court reversed.

The Court explained that for purposes of the ministerial exception, "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064. And on this understanding,

the plaintiffs were ministers. "Educating and forming students in the Catholic faith lay at the core of the mission of the schools where [the plaintiffs] taught," and the plaintiffs' "employment agreements and faculty handbooks specified in no uncertain terms that they were expected to help the schools carry out this mission." *Id.* at 2066. Moreover, the plaintiffs "prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities." *Id.* In short, since the plaintiffs' roles involved "educating young people in their faith" and "inculcating its teachings," entertaining their claims would "threaten[] the [defendant] school[s'] independence in a way that the First Amendment does not allow." *Id.* at 2064, 2069.

This aspect of *Our Lady* is sufficient to resolve this case, which likewise involves an educator at a Catholic school charged with helping to form students in the Catholic faith. *See also Alicea-Hernandez*, 320 F.3d at 703 ("[W]e … look to … the function of the position." (citing *Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 186 (7th Cir. 1994)). But *Our Lady* also made clear that while an educator's function alone can suffice to trigger the ministerial exception, certain "other … circumstances" may also "shed light on" the inquiry. *Our Lady*, 140 S. Ct. at 2063 (citing *Hosanna-Tabor*, 565 U.S. at 191). These other "considerations" include the plaintiff's "formal title," "the substance reflected in that title," and "her own use of that title." *Hosanna-Tabor*, 565 U.S. at 192*; but see Our Lady*, 140 S. Ct. at 2064 (these considerations are sometimes "instructive," but may have "less significance in some cases"). All of these considerations confirm that Starkey's claims are barred by the ministerial exception.

### B. Starkey was a minister.

To determine whether Starkey falls within the exception, "[w]hat matters, at bottom, is what [she] d[id]." *Our Lady*, 140 S. Ct. at 2064. And here, undisputed evidence shows that, in her role as Co-Director of Guidance and member of Roncalli's Administrative Council, the Archdiocese "entrust[ed Starkey] with the responsibility of

educating and forming [Roncalli] students in the [Catholic] faith." *Id.* at 2069.

### 1. Starkey performed the functions of a minister.

First, as with the schools in *Our Lady*, "[e]ducating and forming students in the Catholic faith lay at the core of [Roncalli's] mission." *Id.* at 2066. Roncalli exists to support and further "the mission and purposes" of the Archdiocese. App.51. That mission with respect to Roncalli—as with all Catholic schools—is to "form Christian leaders in body, mind, and spirit." App.63; *see also* App.18 ¶9 ("teaching the fullness of the faith and making students 'disciples of Jesus'"); *Our Lady*, 140 S. Ct. at 2065 ("In the Catholic tradition, religious education is 'intimately bound up with the whole of the Church's life.'" (quoting the Catechism—Prologue § 7)).

Next, as in *Our Lady*, Starkey's "employment agreements and faculty handbooks specified in no uncertain terms that [she was] expected to help [Roncalli] carry out this mission." 140 S. Ct. at 2066. Starkey's job description (which was incorporated into her employment agreement) identified the "guidance counselor" as "a minister of the faith," charged with "foster[ing] the spiritual … growth of the children entrusted in his/her care." App.9. And it listed as the top duties "communicat[ing] the Catholic faith to students and families through implementation of the school's guidance curriculum" and through "direct support"; "[p]ray[ing] with and for students"; and "[t]each[ing] and celebrat[ing] Catholic traditions and … observances." *Id.*; *see also* App.6-7 ¶¶38-40; App.21-22 ¶¶26-27.

Moreover, like the teachers in *Our Lady*, Starkey's work was "evaluated to ensure that [she was] fulfilling" these religious responsibilities. 140 S. Ct. at 2066; *see, e.g.*, App.537-38. Indeed, Starkey herself helped develop the relevant evaluations. According to performance criteria instituted by Starkey, a "Distinguished School Counselor" at Roncalli is one who "embodies the charisms of Saint John XXII and lives out his traits"; "encourages students' spiritual life and resources in counseling" by "encouraging prayer/reflection, sharing one's own spiritual experiences as appropriate; [and]

encouraging  retreat, parish, youth ministry, mission work"; and "consistently attends their Sunday liturgy or church service." App.563, 565. These criteria "confirm[] that the school expected her to play an important role in 'transmitting the [Catholic] faith to the next generation.'" *Grussgott*, 882 F.3d at 661 (quoting *Hosanna-Tabor*, 565 U.S. at 192); *see also* App.581-97 (evaluation of another guidance counselor according to these criteria); App.38-46 (same).

*Our Lady* also emphasized that the teachers there did not just "provide instruction about the Catholic faith" but "were also expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith." 140 S. Ct. at 2066. So too here. Starkey was expressly charged with "assist[ing] the students in … Christian development." App.514. An "essential component[]" of her job was thus to bring Catholic faith, prayer, and teaching to bear on students' aspirations and struggles, including those touching directly on their formation in and adherence to the faith. App.2-4, 6-7; *see also* App.22.

Moreover, in the course of her career, Starkey prayed with students in the classroom, App. 398-400; led prayers for the entire school, App.408 at 157:9-21, App. 600-01; prepared and performed music for monthly all-school Masses, App.21, 25, 238, 270-73; participated in the senior retreat (including by offering personal reflections and prayers), App.25 ¶42, App.422-23 at 171:20-172:12; and gave other staff religious guidance on how to incorporate students of different faiths into Catholic liturgy, App.652; *see Our Lady*, 140 S. Ct. at 2066 (plaintiffs "prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities"). And of course, Starkey's contract required her "personal conduct" itself to "convey and be supportive of the teachings of the Catholic Church," App.30, 533—the provision whose breach gave rise to this suit. *See Yin*, 335 F. Supp. 3d at 816 (school employee a minister where she was expected "to live, teach, and promote a life of godly choices"); *see also Hosanna-Tabor*, 565 U.S. at 201 (Alito, J.,

joined by Kagan, J., concurring) ("A religion cannot depend on someone to be an effective advocate … if that person's conduct fails to live up to the religious precepts that he or she espouses.").

Further, as a member of the Administrative Council and a Department Chair, Starkey held senior leadership positions that were "responsible for 95% of Roncalli's daily ministry, education, and operations." App.17-18 ¶¶3-8. "Nearly every week," these senior leadership roles required her to help address sensitive student crises—"mental, emotional, physical, spiritual, academic"—"in light of [the school's] Catholic faith." App.17-19 ¶¶3-12; *see* App. 211, 478, 481, 484-86, 494-95, 508, 605. She also was one of a select group of Roncalli leaders who, by virtue of her role, gave a "personal reflection and original prayer" to the entire school. App.20, 600-01; *see Fratello*, 863 F.3d at 209 (principal led "prayers for students over the loudspeaker"). And in just her Department Chair role alone, Starkey oversaw the entire Guidance Department, including formulating the guidance curriculum and working with the Principal in the hiring and supervision of all Guidance personnel. App. 113, 94, 391-92, 537-38. The counselors Starkey supervised are "often the first to identify when students are grappling with difficult social, mental, academic, emotional, family, or spiritual issues," App.22 ¶29—making their role in "showing the face of Christ to" counselees on these issues especially crucial for Roncalli's faith-formation mission, App.2 ¶¶4-9; *see* App.565 (Starkey's evaluation metric encouraging "sharing … spiritual experiences").

In the face of all this, Starkey's complaint denies that she "perform[ed] … important religious functions," which suggests she intends to dispute either that she performed these duties in a "religious" way or that they were "important." Dkt. 1 ¶18. But precedent forecloses both arguments. As the Seventh Circuit has repeatedly explained, it is the *employer's* understanding of the religious importance of the plaintiff's job duties that counts; to hold otherwise would be to impermissibly "second-guess[]" "a church's characterization of its own theology and internal organization."

*Sterlinski*, 934 F.3d at 570; *see also Grussgott*, 882 F.3d at 661 ("[I]t is the school's expectation—that Grussgott would convey religious teachings to her students—that matters."). *Our Lady* confirms this point. *See* 140 S. Ct. at 2066 ("[B]oth [plaintiffs'] schools expressly saw them as playing a vital part in carrying out the mission of the church, and the schools' definition and explanation of their roles is important.").

And indeed, this case is in many respects even easier than *Our Lady*. For one thing, the teachers in *Our Lady* were ministers even though they characterized their duties as primarily just teaching "religion from a book" in a classroom rather than exercising "close guidance and involvement" in "students' spiritual lives." 140 S. Ct. at 2068 (internal quotation marks omitted). Here, however, Starkey's role was precisely to exercise "close guidance and involvement" in "students' spiritual lives." Guidance counselors don't provide guidance *en masse*; they meet "one-on-one" with students—and in fact are the only part of the faculty who meets with every student one-on-one at least once a year. App.22 ¶29. And in counseling students, Roncalli guidance counselors were required (under Starkey's own performance criteria) to "encourage[] students' spiritual life," App.565—a task they often must undertake in the course of addressing students' personal "struggles" on matters of profound moral and spiritual consequence in the Catholic faith, and even on "the Catholic faith and its moral teachings" themselves. App.2-4 (also listing, *e.g.*, "depression," "thoughts of suicide," and sexuality). Thus, even if individualized spiritual guidance were required to trigger the exception—and *Our Lady* makes clear it is not—Starkey's role would nonetheless fit the bill.

This case is also far more straightforward than *Our Lady* because Starkey was not an ordinary school employee but one of a handful of Roncalli's "key, visible leader[s]." App.22. The *Our Lady* plaintiffs were teachers, and their central religious function was teaching a religion class (along with the rest of the curriculum). 140 S. Ct. at 2057, 2059. Starkey, too, formerly taught a religion class. App.222. But she

ultimately was *elevated* from her teacher role to one of the most senior leadership positions in the school. App.22. At the time she was nonrenewed, she co-directed the guidance department (thus also serving in Roncalli's Department Chairpersons group), *and* was one of nine members of Roncalli's core decisionmaking body, the Administrative Council, *and* held the only position (aside from the Principal and Assistant Principal) that served on *both* leadership bodies. App.17-18 (Administrative Council is "lifeblood of decision-making at the school").

Starkey's leadership role alone disposes of this case. As Justices Alito and Kagan explained in *Hosanna-Tabor*, the ministerial exception "should apply to any 'employee' who"—*inter alia*—"leads a religious organization." 565 U.S. at 199. And even the two *Our Lady* dissenters recognized that the exception applies to a religious organization's "leaders." *See* 140 S. Ct. at 2067 n.26. This makes good sense, since if an organization's very purpose is to pass along a religious faith, then its leaders by definition perform "important religious functions" in directing its operations to that end. *Hosanna-Tabor*, 565 U.S. at 192; *see also Petruska v. Gannon Univ.*, 462 F.3d 294, 307 n.10 (3d Cir. 2006) ("To the extent that [an employee] supervises spiritual functionaries, at least some of the functions he performs are, by definition, spiritual ones."). It is for this reason that the First Amendment "categorically prohibits federal and state governments from becoming involved in religious leadership disputes." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015).

Here, as Co-Director of Guidance and a member of the Administrative Council, Starkey had a leadership role "distinct from that of most" Roncalli employees, requiring her to "personify" its beliefs in an especially important way. *Hosanna-Tabor*, 565 U.S. at 188, 191, 195. The Second Circuit has for this reason found that a Catholic school principal was subject to the ministerial exception, explaining that the principal qualified because she "managed" and "evaluated" subordinate staff to "execute the School's religious education mission." *Fratello*, 863 F.3d at 209. Starkey—who served

in a role answerable directly to Roncalli's principal, who likewise "managed" and "evaluated" Roncalli's guidance department, and who helped steer the school as a whole through the Administrative Council—requires the same treatment.[4]

### 2. Other considerations confirm Starkey was a minister.

All the evidence above goes to religious function, which *Our Lady* establishes is alone enough to trigger the ministerial exception. 140 S. Ct. at 2063-66; *Alicea-Hernandez*, 320 F.3d at 703. But three other "considerations" identified in *Hosanna-Tabor* further confirm that Starkey qualifies as a minister.

***Title.*** First, the Court in *Hosanna-Tabor* looked to whether the plaintiff's school "held [her] out as a minister," which it evaluated by looking to her "title." 565 U.S. at 191. Here, while Starkey's job title was Co-Director of Guidance, Roncalli "held her out as a minister": the contract itself was called a "Ministry Contract." App.530, 532. And her job description expressly identified her as a "minister of the faith." App.27.

Moreover, even the Co-Director of Guidance title reflected her leadership "role[,] distinct from … most" other Roncalli employees. *Hosanna-Tabor*, 565 U.S. at 191. The same was true of her role as a member of the Administrative Council, which both on its own and by virtue of its allowing her to lead school-wide prayer in that capacity, showed that the school held her out in a ministerial role.

Further, Starkey sought and received the title of "certified catechist" from the Catholic Church. App.277 at 26:10-14; App.608-09. That title both distinguished her from other Roncalli faculty and staff and identified her as having authority to teach the Catholic faith. *Our Lady*, 140 S. Ct. at 2067 (noting "catechist" as religious title).

---

[4] Many other courts have likewise recognized that the ministerial exception applies to the unique leadership role of senior administrators at religious schools. *Dayner v. Archdiocese of Hartford*, 23 A.3d 1192 (Conn. 2011); *Pardue v. Ctr. City Consortium Schs. of Archdiocese of Wash.*, 875 A.2d 669 (D.C. 2005); *Archdiocese of Miami v. Minagorri*, 954 So.2d 640 (Fla. Dist. Ct. App. 2007); *Sabatino v. St. Aloysius Par.*, 672 A.2d 217 (N.J. Super. Ct. App. Div. 1996); *Black v. St. Bernadette Congregation of Appleton*, 360 N.W.2d 550 (Wis. Ct. App. 1984).

The title consideration, then, confirms that Starkey was a minister. *See also Conlon*, 777 F.3d at 835 (finding that an individual was "clearly" a minister where she performed religious functions and had a religious title).

***Substance reflected in title.*** This consideration asks whether "the substance of [the plaintiff's] title as conveyed to her and perceived by others entails" the passing on of faith. *Grussgott*, 882 F.3d at 660. In *Grussgott*, for example, the court concluded that this consideration cut in favor of ministerial status because Grussgott was "expected … to integrate religious teachings into [her] lessons" and had "significant religious teaching experience" when hired. *Id.* at 659.

The same is true here. Starkey's performance criteria and job description show she was expected to—and agreed to—"foster the integration of faith" in her students' lives and "communicat[e] the Catholic faith to students and families through" her "guidance curriculum." App.9-12, 517, 565. Moreover, she had significant religious training and experience before advancing to Co-Director of Guidance, having taught New Testament for seven years, listed over 300 hours of relevant coursework to become a certified catechist (including courses from two Catholic institutions), and prepared music for liturgies—all of which played a crucial role in her promotion. App.25.

Further, serving on the Administrative Council required Starkey to undertake continued religious education, which consisted of participating in book studies on the "principles of evangelization and missionary discipleship" and forming others in the Catholic faith. App.19-20 ¶¶13-17; 333-35. Finally, that Starkey's position would have been "perceived by others" to reflect a religious role, *Grussgott*, 882 F.3d at 660, is demonstrated by the Teacher Handbook, which identifies the Co-Director of Guidance as specifically responsible for "assist[ing] the students in … Christian development," App.351, and by the fact that "the Director or Co-Director of the Guidance Department is recognized by faculty and staff as a key, visible leader of the school" as a whole, App.22 ¶31.

***Employee's use of title.*** This consideration asks whether the employee "held herself out" as a minister. 565 U.S. at 191-92. The answer here is yes: Starkey "understood that she would be perceived as a religious leader." *Fratello*, 863 F.3d at 208.

For one thing, Starkey participated in an annual ceremony in which the assembled faculty publicly committed in prayer to serve as a "minister of the faith." App.20-21, 31-34, 421-22 (participation in Day of Reflection).

Moreover, just as the *Hosanna-Tabor* plaintiff identified as a minister to claim a "housing allowance on her taxes," 565 U.S. at 191-92, so Starkey identified Roncalli guidance counselors as ministers in seeking a financial benefit. In 2016, discussion arose within Roncalli about moving guidance counselors to hourly pay. Resisting this change, Starkey crafted a strongly worded letter to the rest of Roncalli leadership, arguing that "school counselors qualify for a salaried contract to the same degree as [Roncalli] teachers do," because they perform the same "Ministry" functions. App.517. The Principal agreed, stating that Starkey provided "very clear reasons why a guidance counselor qualifies for the same ministerial exception as the teachers." App.523.

Starkey has previously attempted to twist these events in *her* favor by noting that at one point in the hourly-pay discussions, an HR representative said an attorney told her that, for purposes of the Fair Labor Standards Act and under then-governing law, "school counselors … do not meet the definition for the ministerial exception." *E.g.*, [Dkt. 34](#) at 2. But unlike Starkey's letter—which, again, shows that she "held herself out" as a minister within the meaning of *Hosanna-Tabor*—this secondhand recounting of an internal legal assessment has no role in the analysis. Indeed, Seventh Circuit precedent dictates as much. *Grussgott* rejected the plaintiff's attempt to submit an expert "opinion as to whether the ministerial exception applied to" her, explaining that this was a "legal" question on which "*courts*" are the "experts." 882 F.3d at 661-62 (emphasis added). The same goes for the secondhand legal opinion on which Starkey has staked her case here—especially since that conclusion was about

28

the FLSA (not the First Amendment), predated much of the controlling law in this case (including *Our Lady*, *Grussgott*, and *Sterlinski*), and was rejected by the Principal (and ultimately the Archdiocese) after Starkey opposed it. App.523.

*      *      *

No religious organization is "truly 'free to choose those who will guide it on its way'" unless it has full control over the positions "through which religious communities transmit their received wisdom and heritage to the next generation of believers." *Ciurleo v. St. Regis Parish*, 214 F. Supp. 3d 647, 651-52 (E.D. Mich. 2016) (quoting *Hosanna-Tabor*, 565 U.S. at 196). That reasoning applies to guidance counselors at Roncalli as much as it does to the teachers in *Our Lady*. *Cf. Grossman v. S. Shore Pub. Sch. Dist.*, 507 F.3d 1097, 1099-1100 (7th Cir. 2007) (guidance counselors "play a role similar to teachers").

### C. All of Starkey's claims are barred.

Because Starkey was a "minister," all her claims are barred. The ministerial exception is an exception "to laws governing the employment relationship between a religious institution" and its ministers. *Our Lady*, 140 S. Ct. at 2055. Here, Starkey's lawsuit seeks to invoke such laws to penalize the Archdiocese for refusing to retain her in a ministerial role. Dkt. 1 ¶¶54, 61, 74, 82, 89; *see also id.* ¶IV.c (seeking back pay, front pay, and benefits). That she cannot do. *Hosanna-Tabor*, 565 U.S. at 188 (ministerial exception bars courts from "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so").

Starkey has never seriously contested that the ministerial exception would bar her discriminatory-discharge claims under Title VII (*i.e.*, Counts I and II of her complaint). *See Alicea-Hernandez*, 320 F.3d at 700 (dismissing sex discrimination claims under Title VII); *Young*, 21 F.3d at 185 (same). She has suggested, however, that certain of her claims would survive the exception—namely, (1) her Title VII hostile-work-environment claim (Count III); and (2) her two (essentially identical) claims

based on Indiana tort law (Counts V-VI). Starkey is wrong on both.

Starkey's argument as to the hostile-work-environment claim is based on the Seventh Circuit's now-vacated decision in *Demkovich v. St. Andrew the Apostle Parish*, 973 F.3d 718 (7th Cir. 2020), *reh'g en banc granted, opinion vacated* (Dec. 9, 2020). But even the *Demkovich* panel agreed that a hostile-work-environment claim like Starkey's—challenging "tangible employment actions like hiring and firing"—is "categorically bar[red]" by the exception. 973 F.3d at 720; Dkt. 1 ¶¶54, 74 (alleging "hostile work environment" arose solely out of "adverse employment actions").

Further, in *Alicea-Hernandez*, the Seventh Circuit held that the "ministerial exception" applies to Title VII "without regard to the type of claims being brought." 320 F.3d at 702-03. The court thus dismissed all the plaintiff's claims without "look[ing] to the[ir] nature"—including the plaintiff's hostile-work-environment claim. *Id.* at 703. *Alicea-Hernandez* thus requires dismissal of all Starkey's Title VII claims.

Finally, Starkey's claim fails since she did not plead "facts sufficient to create th[e] inference" that harassment occurred. *Kodl v. Bd. of Educ.*, 490 F.3d 558, 563 (7th Cir. 2007). Instead, she merely gives a "[t]hreadbare recital[] of the elements of" the claim, Dkt. 1 ¶¶65-70, which doesn't satisfy Rule 8. *Iqbal*, 556 U.S. at 678.

Nor can Starkey's state-law claims survive. For one thing, if the Court correctly concludes that all of Starkey's federal claims are barred by the ministerial exception, it should "relinquish jurisdiction" over these "supplemental state-law claims." *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479, 482 (7th Cir. 2012); *Rweyemamu v. Cote*, 520 F.3d 198, 210 (2d Cir. 2008) (declining supplemental jurisdiction after dismissing federal law claim under ministerial exception).

But Starkey is also wrong on the merits. Courts have already applied the exception to bar tortious-interference claims just like those Starkey attempts to press here. *See, e.g.*, *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330 (4th Cir. 1997); *Dayner*, 23 A.3d at 1210-11. And for good reason. The relevant question for purposes

of the ministerial exception isn't the *source* of the plaintiff's claim ("federal or state") but whether resolving it "would … impinge on the Church's prerogative to choose its ministers." *Werft v. Desert Sw. Ann. Conf.*, 377 F.3d 1099, 1100 n.1 (9th Cir. 2004); *see also, e.g.*, *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 119-20 (3d Cir. 2018) (barring common-law contract claim because the "exception precludes … application of state or federal law limiting a religious organization's choice of spiritual messenger"); *Natal v. Christian & Missionary All.*, 878 F.2d 1575, 1576-78 (1st Cir. 1989) (barring contract and tort claims that had the "substance and effect" of limiting church's freedom to select and control its leadership). Starkey's state claims here would have that effect. She asserts the Archdiocese committed a tort by "forcing Roncalli to not renew Starkey's contract" and "directing Roncalli to implement a 'morals clause' in Starkey's contract." [Dkt. 1](#) ¶¶82-83, 89-90. But this alleged wrongdoing consists solely of efforts by the Archdiocese to select and control its ministers. The claims are thus barred by the ministerial exception. *Hosanna-Tabor*, 565 U.S. at 188.

## II. Starkey's federal claims are barred by RFRA.

The Religious Freedom Restoration Act ("RFRA") provides "'very broad protection for religious liberty'" by exempting religious objectors from federal laws that substantially burden the exercise of their religious beliefs. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA "operates as a kind of super statute" that applies to all of federal law and "might supersede Title VII's commands in appropriate cases." *Bostock*, 140 S. Ct. at 1754. This is such a case.[5]

Starkey's Title VII claims substantially burden the Archdiocese's exercise of religion. A "substantial burden" occurs when application of federal law "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Korte*, 735

---

[5] A panel of the Seventh Circuit held that "RFRA does not apply when the 'government,' as defined in RFRA, is not a party to the action." *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015). This is now questionable in light of *Bostock* and contrary decisions of other circuits.

F.3d at 682. This includes significant financial pressure "undermin[ing]" religious organizations' "ability to give witness to the moral teaching of their church." *Id.* at 683. Here, accepting Starkey's Title VII claim would substantially burden the Archdiocese's beliefs. Indeed, there "can be no clearer example of an intrusion into the internal structure or affairs of a [religious] association than" forcing it either to "accept members it does not desire," *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861, 863 (7th Cir. 2006), or have its religious exercise declared "unlawful" and incur damages if it resists, *see Paul v. Watchtower Bible & Tract Soc'y*, 819 F.2d 875, 881-82 & n.6 (9th Cir. 1987); Dkt. 1 ¶¶12-13.

Courts have thus had "no difficulty" finding that such intrusions on the religious beliefs and expression of a religious group can constitute a "significant[] burden," as they "would cause the group as it currently identifies itself to cease to exist." *Walker*, 453 F.3d at 862-63 (quoting *Dale*). For instance, in *EEOC v. Catholic Univ. of Am.*, the D.C. Circuit found that imposing Title VII's "secular standards" on a religious school's selection of its religious faculty imposes a substantial burden (and violates RFRA). 83 F.3d 455, 467 (D.C. Cir. 1996).

Under RFRA, these substantial burdens are permissible only if Starkey can show they are the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The pleadings show Starkey cannot meet that standard. *Walker*, 453 F.3d at 863 (non-discrimination policy failed strict scrutiny).

## III.  Starkey's Title VII claims are barred by Title VII.

Starkey's claims are also foreclosed by Title VII. Although the Court initially rejected this argument on the pleadings (Dkt. 93), the Archdiocese requests reconsideration and incorporates its prior briefing by reference (Dkt. 59, Dkt. 69, Dkt. 78, Dkt. 95-1, Dkt. 105).

*First*, Starkey's claims are barred by Title VII's religious exemption. The exemption says Title VII "shall not apply" to a religious "educational institution" when it

employs "individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Title VII then defines "religion" to include "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e. Thus, when a religious organization hires based on an individual's particular religious belief, observation, or practice—as the Archdiocese did here—it is protected by Title VII. Dkt. 59 at 9-12.

In ruling otherwise, this Court expressed concern that this interpretation of the religious exemption would "swallow Title VII's rules," amounting to a "complete exemption" from claims based on "race, color, sex or national origin" discrimination. Dkt. 93 at 9-11. But that concern rests on a false dichotomy. The choice here is not between a "complete exemption" from all claims of race, sex, or national origin discrimination on the one hand, versus confining the exemption to claims of religious discrimination on the other. Rather, the text of Title VII offers a third way: religious employers are exempt when their hiring decision is based on an individual's particular religious belief, observance, or practice (regardless of what type of claim is brought); but they remain subject to all types of Title VII claims when it is not.

This interpretation is not only required by the exemption's plain text (Dkt. 69 at 9), but also supported by scholars and other courts (Dkt. 95-1 at 12-14). And it is supported by *Bostock*, in which the Supreme Court said that Title VII's "express statutory exception for religious organizations" may be relevant "in cases like ours"—*i.e.*, cases alleging sexual-orientation discrimination. 140 S. Ct. at 1753–54. This statement makes no sense unless Title VII's religious exemption can extend beyond claims of religious discrimination.

*Second*, Starkey was dismissed for a legitimate, nondiscriminatory reason: she violated her employment contract. Dkt. 59 at 13-14. This Court reserved deciding this matter, stating that it should await summary judgment. Dkt. 93 at 15-16. But there has never been any dispute that Starkey violated her contract. Dkt. 59 at 13. Thus, the Archdiocese had nondiscriminatory grounds for nonrenewal.

*Third*, the Archdiocese's decision was based on Starkey's conduct—not status. *Id.* at 14-16. As previously explained, there is no factual dispute that "the Archdiocese declined to renew Starkey's contract not because of her 'sexual *orientation*' but because of her '*conduct*' in entering into a same-sex union and rejecting Church teaching." *Id.* at 15 (quoting *Walker*, 453 F.3d at 860-61). When an employment decision is based on "any reason other than" a protected characteristic, "no federal claim is implicated." *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994). Thus, judgment for the Archdiocese is warranted.

## IV. Starkey's claims are barred by the First Amendment.

Starkey's claims are also foreclosed by several more First Amendment defenses. Dkt. 59 at 19-32. Although the Court previously said it was "premature" to resolve these defenses absent information on Starkey's "job duties" (Dkt. 93 at 16, 18), those duties are now clear. Accordingly, the Archdiocese renews its request for judgment and incorporates its prior briefing by reference (Dkt. 59, 69, 78, 95-1, 105).[6]

*First*, Starkey's claims are barred by religious autonomy, which protects religious organizations' right to "govern themselves in accordance with their own doctrines." *Korte*, 735 F.3d at 677. This includes the right to select not only "ministers" under the ministerial exception, but also *non-ministers* "based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656-60, 658 n.2 (10th Cir. 2002). Dkt. 59 at 20-24. Here, the Archdiocese's decision was indisputably based on religious doctrine—Starkey's rejection of Church teaching on marriage, Dkt. 1 ¶45— so her claims are barred even if she isn't a minister.

In finding this argument premature, this Court said that applying religious-autonomy doctrine to non-ministers "would render the ministerial exception superfluous." Dkt. 93 at 18. But the ministerial exception is limited to *ministers* and allows

---

[6] In rejecting the Archdiocese's First Amendment defenses, this Court invoked *Demkovich*, 973 F.3d at 723. Dkt. 93 at 17. As noted above, that opinion has been vacated. *See* Dkt. 113.

dismissal for *any* reason—including *non-religious* reasons. *See, e.g.*, *Our Lady*, 140 S. Ct. at 2059; *Hosanna-Tabor*, 565 U.S. at 178-79. By contrast, religious autonomy also protects decisions regarding a *broader* range of employees for *narrower* reasons— namely, *non-ministers* dismissed for *religious* reasons. This doesn't render the ministerial exception "superfluous"; it provides a different (and more limited) type of protection for different employees. Many courts have so recognized. Dkt. 95-1 at 15-18.

*Second*, adjudicating Starkey's claim would impermissibly entangle the Court in religious questions. Dkt. 59, 27-28. Starkey says she was treated worse than heterosexual employees in relationships violating Catholic teaching. *Id.* But for Starkey to prevail, the Court (or jury) would have to decide whether Catholic theology sees all violations of sexual morality as equivalent. This is something a court cannot do. *Id.*

*Third*, Starkey's claim is barred by freedom of association, which protects the freedom of the Archdiocese and Roncalli to disassociate from someone who would undermine their ability to communicate their views. *Id.* at 29-32; *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Here, forcing the Archdiocese to retain Starkey, especially given her senior leadership role, would undermine its ability to communicate the Church's teaching on marriage. And although this Court rejected the expressive-association defense on the ground that it doesn't apply in the "employment context" (Dkt. 93 at 23), multiple courts have held the opposite. Dkt 95-1 at 20-21.

*Finally*, even if it weren't clear that Starkey's claims are barred by the First Amendment, they at least present "serious constitutional questions"—meaning that constitutional avoidance requires the Court to interpret Title VII to avoid reaching them. *NLRB v. Catholic Bishop*, 440 U.S. 490, 501 (1979); Dkt. 59 at 32-33.

## CONCLUSION

Judgment should be rendered for the Archdiocese.

Respectfully submitted.

John S. (Jay) Mercer, #11260-49          /s/ Luke W. Goodrich
FIZTWATER MERCER                          Luke W. Goodrich (DC # 977736)
One Indiana Square, Suite 1500            Daniel H. Blomberg (DC # 1032624)
Indianapolis, IN 46204                    Joseph C. Davis (DC # 1047629)
(317) 636-3551                            Christopher C. Pagliarella (DC # 273493)
(317) 636-6680 fax                        The Becket Fund for Religious Liberty
                                          1919 Pennsylvania Ave. NW, Suite 400
                                          Washington, DC 20006
                                          (202) 955-0095
                                          (202) 955-0090 fax

                                          *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following on December 23, 2020 by this Court's electronic filing system:

Kathleen A. DeLaney
Christopher S. Stake
DeLaney & DeLaney LLC
3646 N. Washington Boulevard
Indianapolis, IN 46205

By: /s/ Luke W. Goodrich
Luke W. Goodrich
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
(202) 955-0095
(202) 955-0090 fax