UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LYNN STARKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CAUSE NO.: 1:19-cv-03153-RLY-TAB |
| ROMAN CATHOLIC ARCHDIOCESE | ) | |
| OF INDIANAPOLIS, INC. AND | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF LYNN STARKEY'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR
<u>ALTERNATIVE MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

Plaintiff Lynn Starkey ("Starkey"), by counsel, Responds in Opposition to Defendants the Roman Catholic Archdiocese of Indianapolis, Inc. and Roncalli High School, Inc.'s (collectively referred to as "Roncalli") Motion for Summary Judgment or, in the Alternative, Motion for Judgment on the Pleadings (Dkt. 114), identifying genuine issues of material fact warranting a jury trial on each of Starkey's claims.

## I.  INTRODUCTION

For her entire adult life, Starkey worked at Roncalli, an Archdiocesan high school. Of her 39 years of employment, the most recent 21 years were spent as a guidance counselor and/or Co-Director of Guidance. She has been in a same-sex civil union since 2015. Roncalli's Principal and other Roncalli administrators knew about Starkey's sexual orientation and female partner for many years, but continued to renew her annual contract each spring. After Starkey filed an EEOC Charge, that changed in May 2019, when Defendants informed Starkey that they would not renew her employment contract because of her same-sex civil union. Starkey filed this

1

lawsuit on July 29, 2019, alleging gender discrimination, retaliation, and hostile work environment under Title VII, and tortious interference with contract and tortious interference with employment relationship under Indiana law.

Because the Defendants' discrimination is open and obvious (and confirmed in their termination letter), they seek to avoid liability by arguing that Starkey was a minister, relying primarily on the U.S. Supreme Court's recent opinion in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). Less than five years ago, in an email message, the Archdiocese admitted that, according to their lawyers, "[s]chool counselors…do not meet the definition for the ministerial exemption [*sic*]." Nevertheless, Defendants now argue that the ministerial exception should bar Starkey's claims. The Supreme Court has repeatedly emphasized no "rigid formula" exists for determining when the ministerial exception applies. *Our Lady*, 140 S. Ct. at 2055 (*citing Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 190-191 (2012)). "What matters, at bottom, is what an employee does." *Our Lady*, 140 S. Ct. at 2064.

And what Starkey did was almost exclusively secular. For the final 21 years of her work at Roncalli, Starkey's guidance counselor job duties and responsibilities included class scheduling, college applications/planning, testing administration and career guidance. In addition, as Co-Director of Guidance, for the final 12 years of her employment, Starkey served as a liaison between the guidance department and the administration, developed and supervised the departmental budget, and participated in employee performance evaluations. Starkey's duties in these roles contained no religious component at all, or only a scant one. To the extent that Starkey performed occasional "religious" duties, these occurrences were very rare, and not part of her day-to-day, regular, routine duties.

Even if the ministerial exception applies (it does not), it would not bar all of Starkey's claims. The Seventh Circuit is currently considering *en banc* whether the ministerial exception bars a Title VII hostile work environment claim. *See Demkovich v. St. Andrew the Apostle Par.*, 973 F.3d 718 (7th Cir. 2020) (*vacated and rehearing en banc granted*, No. 19-2142, 2020 U.S. App. LEXIS 38613 (7th Cir. Dec. 9, 2020)). If the Seventh Circuit rules that the ministerial exception does not bar such a claim, Starkey's hostile work environment claim will survive. Furthermore, the ministerial exception does not apply to Starkey's state law business tort claims, arising from intentional interference into her employment and contractual relationships with her employer.

Defendants move for summary judgment solely on the ministerial exception. Defendants alternatively moved for judgment on the pleadings, pursuant to Rule 12(c) which asserts other defenses. This Court already denied Defendants' Motion for Judgment on the Pleadings on October 21, 2020, and should not reconsider its prior correct ruling (which is currently the subject of an improvident appeal). With the exception of a RFRA argument, Defendants recycle losing arguments that this Court has already rejected. Defendants' RFRA argument fails because the government is not a party to this case. *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015). The Court should deny Defendants' Motion in full.

## II.    STATEMENT OF MATERIAL FACTS IN DISPUTE

Pursuant to Local Rule 56-1 (b), Plaintiff identifies the following disputes of material facts that preclude summary judgment: (1) whether the Archdiocese admitted that  the ministerial exception does not apply to guidance counselors; (2) whether Starkey, as Co-Director of Guidance, performed important religious functions for Roncalli; (3) whether Starkey, as a guidance counselor, performed important religious functions for Roncalli; (4) whether Starkey,

as a guidance counselor and/or guidance director, ever held herself out as a minister; (5) whether Roncalli expected Starkey to perform ministerial duties or functions as guidance counselor and/or director; (6) whether guidance counselors were expected to pray with students and incorporate religious teachings into their meetings with students; and (7) whether Starkey's job duties and/or responsibilities changed after Roncalli introduced a "ministry" job description and contract to guidance counselors in 2018.

Specific disputed and undisputed facts are identified in Section III, which Starkey incorporates by reference here.

### III. STATEMENT OF FACTS[1]

### A. Starkey's Early Employment with the Archdiocese and Roncalli.

Starkey began working at Roncalli during the 1978-79 school year. Ex. A, Starkey Dep., 16:12-15. Except for the 1981-82 school year, Starkey worked at Roncalli each year from her start date through the 2018-19 school year (a total of 39 years). Ex. A, Starkey Dep., 16:16-17:4. In the early years, Starkey held a variety of positions, including Assistant Band Director, Choral Director, New Testament teacher, and Fine Arts Chair. Ex. B, List of Positions held by Starkey (DD-STARKEY-000001). Starkey started as a guidance counselor in the fall of 1997 and held that position for 10 years. *Id*. She became Co-Director of Guidance in 2007 and held that position for 12 years. *Id*. Shelly Fitzgerald was the other Co-Director of Guidance. Ex. A, Starkey Dep., 32:5-20. Since 1998, Starkey's work at Roncalli has been limited to guidance counselor and Co-Director of Guidance. *Id*. Starkey never taught religion after 1997. Ex. A, Starkey Dep., 189:12-16. Starkey attended one Senior retreat, in 1981, during her entire career at Roncalli. Ex. A, Starkey Dep., 171:20-172:19.

---

[1] This Statement of Facts is limited to facts related to the ministerial exception because the Court granted a stay over non-ministerial discovery issues on Defendants' request and over Plaintiff's objections. *See* Dkt. 52, Dkt. 106.

In 1985, Starkey received a catechist certificate, which was in effect for five years, and expired in 1990. Ex. A, Starkey Dep., 187:7-9; Dep. Ex. 48. Starkey did not renew it. Ex. A, Starkey Dep., 187:10-11. Starkey did not have any training to get the catechist certificate. Ex. A, Starkey Dep., 186:21-22. Starkey did not introduce herself as a catechist, and no one called her a catechist. Ex. A, Starkey Dep., 186:23-187:3. Nothing related to her work at Roncalli changed because of receiving the certificate. Ex. A, Starkey Dep., 187:4-6.

**B.      Starkey's Job Duties and Responsibilities as Co-Director of Guidance and Counselor.**

The job duties of a guidance counselor at Roncalli include scheduling students for classes, assisting students with college applications/planning, providing SAT and ACT test prep tools, administering AP exams, and career guidance. Ex. C, Affidavit of Autumn Currens, ¶ 5; *see also* Dkt. 114-2 at 102-103[2] (Guidance Counselor description in Faculty Handbook). In addition, the Director of Guidance coordinates with the Assistant Principal for Academic Affairs the administration of student standardized testing programs, determines and publishes a yearly academic counseling program calendar, develops and maintains a public relations program, serves as a liaison between the guidance department and the administration, develops and supervises the guidance department budget, participates in the performance appraisal of members of the guidance department, and serves as a member of the Administrative Council and Student Assistance Program. Dep. Ex. 18.

Starkey's job as guidance counselor was "to provide academic, college, and career guidance to students and to provide resources and referrals as needed." Ex. A, Starkey Dep., 191:14-19. Each student met with a guidance counselor at least once a year. Ex. A, Starkey Dep., 58:19-21. The annual one-on-one meetings addressed academics – class scheduling

---

[2] All citations to page numbers in Defendants' Appendix of Supporting Evidence refer to the page number at the top of the page in the blue ECF header, rather than the page number at the bottom of each page.

appointments for freshmen and sophomores, college and career planning for seniors, and a combination of both for juniors. Ex. A, Starkey Dep., 57:13-58:11. Autumn Currens, a Roncalli guidance counselor from 2007 to 2019, does not recall a time where she ever prayed with a student during a one-on-one meeting. Ex. C, Currens Aff. ¶ 8. Likewise, Starkey did not lead prayer or pray with students as part of her regular job duties as guidance counselor or director. Ex. A, Starkey Dep., 178:6-18, 189:17-22; Dep. Ex. 49 at 5; Ex. D, Affidavit of Kelley Fisher, ¶ 4. At the request of the principal, Starkey led a morning prayer over the PA system "less than a handful of times" over her 39-year career at Roncalli, including one time each in 2014 and 2016. Ex. A, Starkey Dep., 155:5-157:21; 189:17-25; Dep. Ex. 42; Dep. Ex. 43. The morning prayer was led by the principal or other members of the Roncalli community (including students). Ex. A, Starkey Dep., 155:25-156:12, 190:1-13, 190:20-191:7; Dkt. 114-2 at 25.

As Co-Director of Guidance, Starkey served on the Administrative Council. Ex. A, Starkey Dep., 33:10-12, 34:9-20. The Administrative Council offered thoughts and input to the Principal on the "nuts and bolts, day-to-day" operations of the school. Ex. A, Starkey Dep., 34:21-35:18. Administrative Council meetings generally covered logistical matters, most of which contained little to no religious component (e.g., logistics concerning: upcoming school calendar events, emergency procedures and preparedness, faculty/student recognitions, annual school calendar and exam schedules, school rules and policies, and student/family concerns). Dkt. 114-2 at 483-518. Starkey did not serve on the President's Council, which focuses on mission, financial planning, and strategic planning. Dkt. 114-2 at 23. The Faculty Handbook identifies the President, Principal, Assistant Principal for Academic Affairs, Assistant Principal for Student Activities, and Athletic Director as leaders of the "Faith Community," but does not

include the same description for Director of Guidance. Dkt. 114-2 at 80-81, 83-84, 87, 90-91, 93, 98-100.

The Student Assistance Program ("SAP") is designed to help identify and support at risk students. Ex. A, Starkey Dep., 47:24-48:11. It consists of the Assistant Principal for Student Activities, the Dean of Students, the Chaplain, the Campus Minister, the Social Worker, the Guidance Counselors, and two teachers. Ex. A, Starkey Dep., 48:17-23. Starkey did not personally refer many students to the SAP. Ex. A, Starkey Dep., 51:8-18. When she had non-academic concerns about a student, she would refer the student to the Social Worker or Chaplain instead of the full SAP. Ex. A, Starkey Dep., 51:19-52:9, 53:22-54:9.

Starkey does not recall participating in a "Commissioning" or "call and response" during Faculty Day of Reflection. Ex. A, Starkey Dep., 184:5-17; Dep. Ex. 54; Dkt. 114-2 at 26. Attendance was not mandatory. Ex. E, Affidavit of Kelly Meyer, ¶ 8. Starkey and other guidance counselors were excused from attending Faculty Day of Reflection when it conflicted with appointments with senior and transfer students and their parents. Dep. Ex. 50 at 6; Ex. C, Currens Aff., ¶ 21. Other teachers and counselors similarly do not recall being "Commissioned" as "Minister[s] of the Faith" at these events. Ex. C, Currens Aff., ¶ 20; Ex. E, Meyer Aff., ¶ 9; Ex. F, Affidavit of Charisse Phillips, ¶¶ 7-8; Ex. G, Affidavit of Emily Dunham, ¶¶ 5-9.

In November 2015, Roncalli developed a Catholic Educator Advancement Program ("CEAP") for counselors for purposes of salary advancement according to the pay scale. Ex. A, Starkey Dep., 137:10-138:19; Dep. Ex. 29. Starkey did not seek to advance her salary through CEAP because she was already near the top of the pay scale due to her long tenure at Roncalli and multiple master's degrees. Ex. A, Starkey Dep., 194:12-195:20; Dep. Ex. 31, p 9.

Starkey had input on the development of the CEAP. Ex. A, Starkey Dep., 138:13-15. The CEAP evaluated counselors based on seven "domains," the first six of which were secular: (1) Professional Development; (2) Individual Student Guidance; (3) Counseling and Responsive Services; (4) Guidance Programming: Presentations; (5) Standardized Testing; (6) Professional Responsibilities; and (7) Spirit of Roncalli Formation. Dep. Ex. 29. Within the last domain, a school counselor seeking pay advancement: (a) "embraces the charisms of Saint John XXIII and lives out his traits"; (b) "is aware of the many different extracurricular activities available to students"; (c) "offers support to a wide range of students who are involved in extracurricular activities"; (d) "supports extracurricular activities by moderating a club or participating in a student-centered school activity"; (e) "encourages students' spiritual life and resources in counseling conversation *as appropriate*" and (f) "consistently attends their Sunday liturgy or church service." Dep. Ex. 29 at 25-27 (emphasis added).

Starkey held no formal title within the Catholic Church. Ex. A, Starkey Dep., 187:19-22. Roncalli did not send Starkey anywhere to receive training or education on the Catholic faith at any time during her 39 years of employment. Ex. A, Starkey Dep., 187:23-188:7. No one at Roncalli or the Archdiocese informed her that she was a minister of the Catholic faith. Ex. A, Starkey Dep., 188:8-11. Starkey never held herself out as a minister or religious leader or claimed any tax deductions for being a minister on her tax returns. Ex. A, Starkey Dep., 188:12-17. No one in Roncalli's administration ever asked her whether she was attending Catholic Mass or donating to the Catholic Church. Ex. A, Starkey Dep., 188:18-189:1.

### C. The Archdiocese and its Lawyers Decided that Counselors were Not Ministers.

On May 10, 2016, Ginger Thomas, a Human Resources Field Representative employed by the Archdiocese, sent an email to Wendy Lawrie, Human Resources Director at Roncalli,

which stated, in part: "We heard from the attorney today. School counselors and social workers do not meet the definition for the ministerial exemption." Ex. H, Email string re: Decision on Social Workers and Counselors, DD-STARKEY-000256-263, p. 2. Lawrie forwarded the email to Roncalli Principal Chuck Weisenbach. *Id*. Weisenbach asked why a licensed guidance counselor was treated differently than a licensed teacher, and Lawrie responded that the "decisions are coming from attorney's [sic] at the Archdiocese." *Id*. Starkey, as Co-Director of her department, was concerned that Roncalli would move counselors from being salaried workers with an annual contract, to being hourly workers with no contract. Ex. A, Starkey Dep., 107:3-108:5. This was related to changes in FLSA regulations that increased the minimum salary for employees who were exempt from receiving overtime pay. Ex. A, Starkey Dep., 113:12-114:8. Starkey did not understand why the Archdiocese was "trying to pursue the ministerial exception" instead of other FLSA exemptions, such as the professional exemption (which covers teachers). Ex. I, Email from Lynn Starkey to Shelly Fitzgerald, May 31, 2016, DD-STARKEY-000229; Ex. A, Starkey Dep., 123:1-19. Starkey earned more than the proposed minimum salary threshold for the FLSA's administrative and/or professional exemptions, but other counselors did not. Ex. A, Starkey Dep., 113:2-11. Therefore, Starkey raised questions for the benefit of other counselors, not herself. Ex. A, Starkey Dep, 111:19-114:8.

D. **Roncalli's "Ministry" Descriptions and Contracts Had No Impact on the Day-to-Day Work of Teachers and Counselors.**

In February 2016, Roncalli introduced a "Ministry Description" for teachers. Dkt. 114-2 at 524-527. In 2016 or 2017, Roncalli put a contract addendum in all the teachers' mailboxes that intended to designate them as ministers. Ex. F, Phillips Aff., ¶ 9. One teacher, Charisse Phillips (who is not Catholic) expressed discomfort at signing the addendum but signed it as a condition of keeping her job. *Id*. at ¶¶ 3-4, 10. Shortly before the current Archbishop of Indianapolis's

appointment,[3] Roncalli required Starkey to sign a "Teaching Ministry Contract" for the 2017-18 school year. Dep. Ex. 25. Her prior contracts from 2007-2017 had been titled, "School Teacher Contract." Ex. J, Starkey Teacher Contracts, 2007-08 through 2016-17, DD-STARKEY-000018-19, 195-212.

In May 2018, Roncalli introduced new contracts for guidance counselors that included "Ministry" in the title. Ex. C, Currens Aff., ¶ 18; Dep. Ex. 26. The guidance counselors were required to sign the new contracts as a condition of keeping their jobs, without any opportunity to negotiate their terms. Ex. A, Starkey Dep., 192:23-193:9; Ex. C, Currens Aff., ¶ 18. The guidance counselors' job duties and responsibilities did not change following the introduction of the ministry contracts. Ex. A, Starkey Dep., 193:10-16, Ex. C, Currens Aff., ¶ 18. After her contracts changed, no one held her accountable to new language, or asked at renewal meetings whether she was following the Church's teachings. Ex. A, Starkey Dep., 193:17-20, 193:25-194:3. Starkey received no religious education or training in connection with the changes to her contract. Ex. A, Starkey Dep., 193:21-24.

### E. Roncalli Notifies Starkey of Her Non-Renewal and Tries to Replace Her.

After not renewing Starkey's contract in May 2019, the Archdiocese posted an opening for a guidance counselor position at Roncalli for 2019-2020. Ex. K, DD-STARKEY-000382 (Non-Renewal Letter); Ex. L, DD-STARKEY-000389 (Job Posting). The Archdiocese's Office of Catholic Schools' online teacher application included the following notice:

> In compliance with federal and state equal opportunity laws, qualified applicants are considered for all positions without race, color, sex, national origin, age, marital status, ancestry, or the presence of a disability, which with or without reasonable accommodation does not impair performance of essential job duties. Employment is dependent on the results of a background check.

---

[3] Archbishop Charles C. Thompson was appointed as the Archbishop of Indianapolis on June 13, 2017. *See* https://www.archindy.org/archbishop/bio-thompson.html (last visited Feb. 10, 2021).

Ex. M, DD-STARKEY-000383-388 (Teacher Application).

Starkey now works as a guidance counselor at a public high school. Ex. A, Starkey Dep., 191:20-22. Starkey's job duties at her current job are little different from her job duties at Roncalli (other than the administrative responsibilities she had to perform as Co-Director of Guidance). Ex. A, Starkey Dep., 191:23-192:22.

## IV.    STANDARDS OF REVIEW

### A.    Summary Judgment

Summary judgment is appropriate when there is "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The disputed facts and evidence, and all justifiable inferences that can be drawn from them, must be viewed in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Liberty Lobby*, 477 U.S. at 255. On summary judgment, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself[.]" *Ortiz v. Werner Enters.*, 834 F.3d 760, 765 (7th Cir. 2016).

### B.    Motion for Judgment on the Pleadings

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727-28 (7th Cir. 2014). "To survive a motion to dismiss, a complaint must 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "To analyze the sufficiency of a complaint we must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014).

## V.     ARGUMENT

Roncalli moves for summary judgment based entirely on the ministerial exception. Dkt. 114. Roncalli's alternative motion for judgment on the pleadings under Rule 12(c) asserts arguments "based on statutory and constitutional defenses," but cites no new law or facts. Dkt. 114 at 2; Dkt. 114-1 at 38-41.[4]   This Court has already denied Defendants' first Rule 12(c) motion with respect to its Title VII religious exemption and First Amendment defenses, a decision which is currently on appeal. Dkt. 93; No. 20-3265, Dkt. 16 (7th Cir. Jan. 13, 2021). Roncalli's only new argument in its repetitive Rule 12(c) motion is based on the Religious Freedom Restoration Act ("RFRA"), a statute that only applies to claims against governmental entities, according to current Seventh Circuit law. Dkt. 114 at 2-3. The Court should decline to revisit the motion for judgment on the pleadings and should deny both motions in their entirety.

### A.     Starkey Worked as a High School Guidance Counselor and Co-Director – Not a "Minister."

Roncalli overreaches by arguing that the ministerial exception applies to bar all of Starkey's claims. First, the ministerial exception does not apply to Starkey. Second, even if it did apply, it would only bar some of Starkey's employment discrimination claims and none of her state law claims.

---

[4]All page number citations to Roncalli's brief refer to the page number at the top of the page in the blue ECF header, rather than the page number at the bottom of each page.

### 1. Starkey Performed No Important Religious Functions for More than Two Decades as a Guidance Director or Guidance Counselor.

The ministerial exception arises out of *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, where the U.S. Supreme Court held that the ministerial exception bars "an employment discrimination suit brought on behalf of a minister, challenging the church's decision to fire her." 565 U.S. 171, 196 (2012). In *Hosanna-Tabor*, the Court held that the determination of whether a particular employee qualifies as a minister should be made on a case-by-case basis, stating "[w]e are reluctant, however, to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id*. at 190. The Court relied on the following factors in its analysis: "the formal title…the substance reflected in that title, her own use of that title, and the important religious functions...performed for the Church." *Id*. at 192. The ministerial exception is an "affirmative defense…, not a jurisdictional bar." *Id*. at 195 n.4. It is "subject to a fact-intensive analysis" and "usually such questions are left for a jury." *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 658 (7th Cir. 2018).

The Supreme Court revisited the ministerial exception recently in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020). In *Our Lady*, the Court held that the disability discrimination and age discrimination claims of two fifth grade Catholic elementary school teachers were barred by the "ministerial exception." *Id*. The Court again emphasized that there was no rigid test or formula to determine whether the ministerial exception applies. *Id*. at 2069. The Court emphasized that both teachers taught religion to their students in addition to secular class subjects. *Id*. at 2059 ("Like Morrissey-Berru, Biel instructed her students in the tenets of Catholicism"); *Id*. at 2066 ("As elementary school teachers responsible for providing instruction in all subjects, *including religion*, they were members of the school staff who were entrusted most directly with the responsibility of educating their students *in the*

*faith*.") (emphasis added); *Id*. at 2067 ("[T]hey were their students' primary teachers of religion. The concept of a teacher *of religion* is loaded with religious significance.") (emphasis added).

As the Court previously noted in its Order on Defendants' Motion for Judgment on the Pleadings, "whether Starkey in fact held one of these key roles is sharply disputed." Dkt. 93 at 17; *see also* Order on Defendants' Motion to Bifurcate, Dkt. 40 at 6-7 (noting that the ministerial exception was "hotly disputed" and that it was "hard to conclude at this juncture that the applicability of the ministerial exception can be resolved at the summary judgment stage.").

> **a. Starkey Performed No Important Religious Functions as a Guidance Counselor.**

Starkey's regular and normal day-to-day job responsibilities confirm that she was not a minister. *Our Lady*, 140 S. Ct. at 2064 ("What matters, at bottom, is what an employee does."). The job duties and responsibilities of a guidance counselor and guidance director are overwhelmingly secular and, as Starkey has testified, vary minimally from what she now does at a public school, except that she longer holds a director title. The job duties of a guidance counselor at Roncalli include scheduling students for classes, assisting students with college applications/planning, providing SAT and ACT test prep tools, administering AP exams, and career guidance. Ex. C, Affidavit of Autumn Currens, ¶ 5; *see also* Dkt. 114-2 at 102-103 (Guidance Counselor description in Faculty Handbook). With respect to personal, non-academic issues that a student was having, such as depression, suicide, or self-harm, Starkey would refer the student to the Social Worker most of the time. Ex. A, Starkey Dep., 51:19-52:9, 53:22-54:3.

Roncalli identifies no specific or unique important religious functions performed by Starkey as guidance counselor or Co-Director of Guidance. Instead, Roncalli relies on a combination of written (but not necessarily enforced) expectations generally applicable to all educators, Starkey's duties during the early years of her employment (more than two decades

14

before she was fired), two confirmed readings of prayers over the PA system, and her "leadership."

Roncalli grasps at straws to point to religious functions that Starkey performed in the early years of her employment, before she became a guidance counselor – the position she held for the final twenty-one years of her employment. Any religious functions or duties (e.g., teaching religion, preparing music, or classroom prayers) performed during the early years of Starkey's employment have no relevance to whether she was a "minister" at the time of her discharge. *See* Defendants' Motion to Bifurcate Discovery, Dkt. 25 (requesting "that the Court limit initial discovery to determine whether Plaintiff was performing, *at the time her contract was not renewed*, ministerial duties within the scope of the ministerial exception) (emphasis added). Starkey never taught a religion class after 1997. Ex. A, Starkey Dep., 189:12-16. Her involvement in the preparation and playing of music during liturgies occurred before 1998, while she was choral director. Ex. A, Starkey Dep., 18:11-22; Ex. B, DD-STARKEY-000001. Starkey attended Senior retreat once, in 1981. Ex. A, Starkey Dep., 171:20-172:19.

Starkey did not pray with students or lead prayers with students as a guidance counselor or director. Ex. A, Starkey Dep., 178:6-18, 189:17-22; Dep. Ex. 49 at 5. The sole exception to this is when the principal asked her to give the morning prayer over the PA system. Ex. A, Starkey Dep., 155:5-157:21, 189:17-25. Starkey identified two occasions where she did this (once in 2014, and once in 2016), but did not do so more than a "handful" of times during her entire career at Roncalli. *Id*. The morning prayer could be led by anyone in the Roncalli school community (including students), so leading this prayer a small number of times does not suffice to turn that person into a minister. Ex. A, Starkey Dep., 155:25-156:12, 190:1-13, 190:20-191:7; Dep. Ex. 42; Dep. Ex. 43; Dkt. 114-2 at 25.

Roncalli bends over backwards to liken Starkey's role of helping high school students with their class schedules or get into college to homeroom teachers in *Our Lady* who instructed elementary students in Catholic faith formation. The positions of elementary school teacher and high school guidance counselor (or director) are too different from each other to draw any meaningful comparison between the two positions. In *Our Lady*, the Supreme Court concluded that the teachers were ministers primarily because they were their students' "*primary* teachers of religion." 140 S. Ct. at 2067 (emphasis added). Even if Starkey taught religion as a guidance counselor (she didn't), she never acted as a Roncalli student's *primary* religion teacher in this role. The Supreme Court has not stretched the exception to the limits that Roncalli asks this Court to do now. Elementary teachers at religious schools teach religion – along with most or all other subjects – to their students. By contrast, high school teachers specialize in subject areas and students move from classroom to classroom and teacher to teacher throughout the day. Applying *Our Lady*'s reasoning here would be even more attenuated because guidance counselors meet with their assigned students once per year, but are unlikely to spend significant additional time with most students at the school outside of the annual one-on-one academic meetings.

Roncalli also points to language in employment agreements, job descriptions, and faculty handbooks. Dkt. 114-1 at 27. But this language (including "assist[ing] the students in strengthening and developing their social emotional, intellectual and Christian development," and/or "foster[ing] the spiritual, academic, social, and emotional growth of the children entrusted in [their] care") applied to all counselors and teachers, and did not reflect what Starkey actually did in her job. *See* Dkt. 114-2 at 14, 98, 102, 519, 524. If creating such documents were sufficient to trigger the ministerial exception, that would give religious employers wide

discretion to designate broad swaths of their employees as ministers. This is inconsistent with *Our Lady*, which focuses on "what an employee does." 140 S. Ct. at 2064.[5] A ruling in Roncalli's favor would permit religious schools to designate all of their teachers and counselors as ministers by simply stating so in their contracts or job descriptions, thus immunizing themselves from employment discrimination claims. In doing so, it would allow religious schools to completely rewrite the test, from one about what an employee actually does to one based on what the school says. That can't be.

Taken to its logical conclusion (since all "educators"[6] sign the same or similar contracts), Roncalli's argument would extend the ministerial exception all teachers and counselors at religious schools. If accepted, this would greatly expand the scope of the ministerial exception, and result in severe consequences for a large group of employees of religious employers. In 2017-18, private religious schools employed over 335,000 full-time teachers in the United States. *See* National Center for Education Statistics, Private School Universe Survey, 2017-18, *available at* https://nces.ed.gov/surveys/pss/tables/TABLE02fl1718.asp (last visited Feb. 11, 2021). The Archdiocese has 68 Catholic schools, and 2,283 staff described as "lay professionals." Catholic Schools, Office of Catholic Schools, Archdiocese of Indianapolis, *available at* https://www.archindy.org/ocs/schools.html (last visited Feb. 11, 2021). The Archdiocese would be immune from all employment discrimination claims relating to hiring and firing (whether based on Title VII, ADEA, or ADA or any other federal employment discrimination law) filed by "educators" at Catholic schools. Applying the ministerial exception in such broad categorical fashion would be inconsistent with the Supreme Court's prior rulings that rejected rigid formulas

---

[5] Two of the nine Supreme Court justices in *Our Lady* would have given deference to the employer in the determination of the ministerial exception's applicability, but the majority did not adopt this view. *Our Lady*, 140 S. Ct. at 2069-71 (Thomas, J., with Gorsuch, J., concurring).

[6] Roncalli identifies "both teachers and guidance counselors" as "educators," but does not say whether other school employees, such as coaches or administrators would fall within this definition. Dkt. 114-1 at 18.

and analyzed each case individually according to its facts. *Hosanna-Tabor*, 565 U.S. at 190; *Our Lady*, 140 S. Ct. at 2069. These opinions say nothing about counselors and stop well short of expanding the ministerial exception to all *teachers*, let alone all teachers and counselors.[7] Roncalli cites not a single case holding that a guidance counselor or guidance director at a religious school qualifies as a "minister." As far as Plaintiff is aware, no other court has considered this issue, and it appears to be a matter of first impression. Roncalli asks this Court to break new ground and hold, for the first time, that a guidance counselor or director is (or can be) a minister. The Court should decline to do so.

> **b.     Starkey Did Not Perform Important Religious Functions as Co-Director of Guidance.**

According to Roncalli's job description, the Director of Guidance: (1) coordinates with the Assistant Principal for Academic Affairs the administration of student standardized testing; (2) determines and publishes a yearly counseling program calendar; (3) develops and maintains a public relations program; (4) serves as a liaison between the guidance department and the administration; (5) develops and supervises the departmental budget; (6) participates in the performance appraisal of department members; and (7) serves as a member of the Administrative Council and Student Assistance Program. Dep. Ex. 18. None of these duties express or imply that the Director of Guidance (or Co-Director) performs "important religious functions" for Roncalli.

Roncalli claims that Starkey was "not an ordinary school employee," but one of its "leaders." Dkt. 114-1 at 30-31. The *Our Lady* dissent agreed that the ministerial exception applied to "religious leaders," but clarified that examples would be "rabbis, priests, nuns, imams,

---

[7] *Our Lady* involved elementary school teachers who teach all subjects, including religion. 140 S. Ct. at 2056, 2058. *Our Lady* does not address whether high school teachers, or teachers who do not teach religion, fall within the ministerial exception.

ministers." 140 S. Ct. at 2072-73 (Sotomayor, J., dissenting). Once again, Roncalli asks this Court to stretch to read this and other references to religious leaders as applying to all employees in secular administrative roles. *See* Dkt. 114-1 at 31 (citing *Our Lady*, 140 S. Ct. at 2067 n.26; and *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)). Although Roncalli cites to cases applying the ministerial exception to school principals, it has no authority for applying the ministerial exception to other senior administrators or department heads at a school. *See* Dkt. 114-1 at 32 n.4 (citing cases). These cases (which are all from other jurisdictions) fall well short of supporting expansion of the ministerial exception to all secular administrative positions at religious schools.

Starkey's role on the Administrative Council did not make her a minister. The Administrative Council includes personnel who hold formal religious titles (Vice President for Mission and Ministry, Director of Campus Ministry, and Chaplain) and personnel who do not (Assistant Principals, Dean of Students, Athletic Director, and Director of Guidance). Ex. A, Starkey Dep., 34:9-20; Dkt. 114-2 at 22. Roncalli cherry-picks items from the agendas of weekly Administrative Council meetings in a misleading attempt to demonstrate that it regularly or routinely discussed matters of religious significance, or that Starkey contributed significantly to such matters. *See* Dkt. 114-1 at 21-22.[8] Reviewed in totality, and in context, the Administrative Council agendas show that the Council covered a variety of matters involving the day-to-day operations of the school. Dkt. 114-2 at 483-518. Even where discussion occurred on a matter with a religious component, there were other members of the Administrative Council (such as the Director of Campus Ministry or Chaplain) who were better able and more qualified to

---

[8] For example, Roncalli cited Starkey's expression of "support" for holding a prayer service to honor victims of a school shooting at Parkland High School in Florida. *Id.* This expression of support, intended to show solidarity with victims of a horrible tragedy that resonated with Roncalli's own student population, is not an "important religious function" performed by Starkey (or even Fitzgerald).

address them than Starkey. Starkey did not serve on the President's Council, which has direct responsibility for Roncalli's "mission." Dkt. 114-2 at 23. The Guidance Director is not listed as a "Faith Community" leader in the Faculty Handbook, unlike other positions who serve on the Administrative Council. Dkt. 114-2 at 80-81, 83-84, 87, 93, 98-100.

Similarly, Starkey's status as a Department Chair (or Co-Department Chair) of the Guidance Department did not make her a minister. Roncalli makes much of the fact that guidance counselors meet with students "one-on-one," ignoring the academic purposes of the annual meetings between a student and counselor. Ex. A, Starkey Dep., 57:13-58:21. When a student had a non-academic concern, Starkey referred them to the Social Worker or Chaplain. Ex. A, Starkey Dep., 51:19-52:9, 53:22-54:5. Although Roncalli relies on an affidavit from Angela Maly who claims to pray with students and provide them with spiritual assistance, Maly's employment began in August 2018 (the last year of Starkey's employment and concurrent with Shelly Fitzgerald's removal). Dkt. 114-2 at 6-8. By contrast, Autumn Currens, who worked as a counselor for many more years (and which overlapped significantly with Starkey's time as Co-Director) did not pray one-on-one with students, and "rarely" incorporated religious beliefs or teachings into her duties. Ex. C, Currens Aff., ¶¶ 3-4, 7-8, 16. Furthermore, Currens was never told she wasn't including religion enough, or that she needed to do it more, undermining Roncalli's claim that it expected counselors to perform this role. Ex. C, Currens Aff., ¶ 17. The conflicting affidavits between Maly and Currens (as well as Starkey's own testimony) confirm that the nature of a guidance counselor's duties is disputed and requires resolution by a factfinder.

Starkey's role in the development of CEAP standards for counselors for pay raises primarily focused on secular responsibilities of guidance counselors. Ex. A, Starkey Dep.,

137:10-138:19: Dep. Ex. 29. Only one of the seven "domains" ("Spirit of Roncalli Formation") suggests a religious component. Dep. Ex. 29 at 25-27. More importantly, the counselors were not required to follow CEAP – it only affected the level of their compensation on the pay scale. Ex. A, Starkey Dep., 137:10-138:19. Starkey was already on the top of the pay scale and did not seek to utilize CEAP to advance further. Ex. A, Starkey Dep., 194:12-195:20; Dep. Ex. 31, p 9.

Starkey did not perform important religious functions as Co-Director of Guidance, or as a guidance counselor. The Court should decline to apply the ministerial exception to her.

### 2. Starkey Meets None of the Other Ministerial Exception Criteria.

Starkey does not meet any of the other *Hosanna-Tabor* or *Our Lady* factors for the ministerial exception. *Hosanna-Tabor*, 565 U.S. at 192 ("the formal title…the substance reflected in that title, [and] her own use of that title"). First, Starkey did not hold a formal title within the Catholic Church while she was Co-Director of Guidance. Ex. A, Starkey Dep., 187:19-22. While Starkey received a catechist certificate early in her employment (in 1985, well before becoming a guidance counselor), it was only in effect for five years, expired in 1990, and was never renewed. Ex. A, Starkey Dep., 187:7-11; Dep. Ex. 48. The expiration of her certificate preceded her becoming a guidance counselor by 7 years, and her promotion to Co-Director of Guidance by 17 years. This has no relevance to whether she was a minister at the time of her termination or non-renewal.

Second, the substance reflected in her title and role of Co-Director of Guidance demonstrate that her role and position was primarily academic and secular. Dep Ex. 18. She did not receive any additional religious education or training to be Co-Director of Guidance. Ex. A, Starkey Dep., 187:23-188:7. Unlike in *Grussgott*, where the Court found that "the substance of Grussgott's title…entails the teaching of the Jewish religion to students," Starkey did not

"teach…religion to students" at Roncalli as a guidance counselor or Co-Director of Guidance. 882 F.3d at 660; Ex. A, Starkey Dep., 189:12-16. Starkey only taught religion very early in her career, decades before this dispute arose, and it is not relevant to the "substance" of her title as Co-Director of Guidance.

Third, Starkey never held herself out as a minister. Ex. A, Starkey Dep., 188:12-17. Unlike in *Hosanna-Tabor*, she did not claim a tax allowances or deductions for being a minister. 565 U.S. at 192; Ex. A, Starkey Dep., 188:12-17. There is no evidence that Starkey ever participated in a "Commissioning" or "call and response" during Faculty Day of Reflection. She does not recall doing so, and Roncalli has no evidence that she attended. Ex. A, Starkey Dep., 184:5-17; Dep. Ex. 54; Dkt. 114-2 at 26. Other counselors and teachers did not recall a Commissioning happening, either. Ex. C, Currens Aff., ¶ 20; Ex. E, Meyer Aff., ¶ 9; Ex. F, Phillips Aff., ¶¶ 7-8; Ex. G, ¶¶ 5-9. Although Roncalli claims that attendance was "required" for teaching and guidance staff, counselors were often excused, because they had appointments with seniors, transfer students, and parents that conflicted with the events. Dep. Ex. 50 at 6; Ex. C, Currens Aff., ¶ 21; Ex. E, Meyer Aff., ¶ 8; Dkt. 114-2 at 26.

Roncalli's reliance on a single formal document – the "Ministry" contract she was required to sign – doesn't change any of that. Starkey only signed "Ministry" contracts during her final two years of employment. Dep. Ex. 25, Dep. Ex. 26. Before that, her contracts did not use the word, "minister". Ex. J, Starkey Teacher Contracts, 2007-08 through 2016-17, DD-STARKEY-000018-19, 195-212. Starkey was required to sign the new contract as a condition of keeping her job. Ex. A, Starkey Dep., 192:23-193:9. Her duties and responsibilities did not change after the introduction of the new contracts. Ex. A, Starkey Dep., 193:10-16. No one held her accountable for the new language, and she did not receive additional religious education or

training from them. Ex. A, Starkey Dep., 193:17-194:3. Other teachers and counselors agreed that they were required to sign the new contracts, but it did not alter their duties and responsibilities. Ex. C, Currens Aff., ¶ 18; Ex. F, Phillips Aff., ¶¶ 9-10.

### 3. In 2016, the Archdiocese's Legal Team Determined and Advised Roncalli that Guidance Counselors Are Not Ministers.

In May 2016, the Archdiocese, acting on the advice of legal counsel, determined that school counselors did not qualify as ministers. Ex. H, Email string re: Decision on Social Workers and Counselors, DD-STARKEY-000256-263, p. 2. This is sufficient, by itself, to allow Starkey's claims to survive summary judgment.

The May 2016 email discussion regarding guidance counselors and the ministerial "exemption" was in the context of the Fair Labor Standards Act ("FLSA"), not Title VII, but this does not impact the analysis. The ministerial exceptions under both Title VII and FLSA were judicially created, and do not expressly appear in either statute. *Hosanna-Tabor*, 565 U.S. at 188; *Schleicher v. Salvation Army*, 518 F.3d 472, 475 (7th Cir. 2008). Courts applying the ministerial exception in FLSA cases have looked to Title VII ministerial exception cases for guidance. *See, e.g.*, *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 306 (4th Cir. 2004).[9] Therefore, the fact that the Archdiocese was reviewing its obligations under FLSA, as opposed to Title VII, makes no difference here. The Archdiocese and its lawyers were certainly aware of the broader implications of the applicability of the ministerial exception beyond the FLSA, while the affected employees (who likely did not have legal counsel) did not.

Nor can this be considered improper "expert" evidence on an ultimate legal issue. *See Grussgott*, 882 F.3d at 661-662 (affirming district court's refusal to consider declaration from expert witness conveying legal opinion as to whether ministerial exception applied). In

---

[9] Roncalli cited both *Schleicher and Shaliehsabou* favorably in its brief, without clarifying that either case was an FLSA case, rather than an employment discrimination case. Dkt. 114-1 at 25.

*Grussgott*, the plaintiff submitted a declaration from an expert witness. *Id.* at 657. Starkey is not relying on an independent expert's interpretation of the ministerial exception, but the Archdiocese's own interpretation of the ministerial exception, as conveyed by the Archdiocese's agent or employee within the scope of that relationship or employment. This is also relevant evidence of pretext because the Archdiocese has now changed its position on this issue. *See Sterlinski v. Catholic Bishop of Chicago*, 934 F.3d 568, 571 (7th Cir. 2019) (explaining that "separating pretextual justifications from honest ones" may be used to assess a religious employer's ministerial designation of an employee); *Silva v. Wisconsin*, 917 F.3d 546, 563 (7th Cir. 2019) ("As a general rule, a reasonable trier of fact can infer pretext from an employer's shifting or inconsistent explanations.") (quoting *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015)). Roncalli disingenuously claims that the law is more favorable now than it was then, but not a single case it relies upon (*Our Lady*, *Grussgott*, or *Sterlinski*) involved a guidance counselor.

Roncalli attempts to "twist these events in [its] favor" by arguing that Starkey opposed this conclusion and advocated against it. Dkt. 114-1 at 34. But the undisputed facts are that Starkey did not seek to be recognized as a minister, or hold herself out as one, but instead sought to ensure on behalf of her departmental employees, in the context of changing FLSA requirements,[10] that counselors would remain salaried employees with annual contracts. Ex. A, Starkey Dep., 107:3-108:5, 113:12-114:8.

---

[10] The FLSA includes exemptions to its minimum wage and overtime requirements for executive, administrative, and professional employees. 29 U.S.C. § 213; 29 C.F.R. § 541.0 *et seq.* "Academic counselors" qualify for the administrative exemption, but are subject to a minimum weekly salary requirement. 29 C.F.R. § 541.204(a)(1), (c)(1). Teachers qualify under the professional exemption, but do not have any minimum weekly salary requirement. 29 C.F.R. § 541.303(a)-(b), (d). In May 2016, the Department of Labor issued proposed regulations that would have raised the minimum salary requirement to $913.00 per week (or approximately $47,000 annually). This all later became moot, because the final regulations ended up raising the minimum weekly salary to only $684.00 (about $35,000 annually). 29 C.F.R. § 541.600(a).

Starkey's salary exceeded the new proposed minimum salary so she would not be affected individually, but the salaries of other counselors (including Fitzgerald) were not. Ex. A, Starkey Dep., 113:2-114:8. The proposed regulation was intended to benefit workers who would now be eligible for overtime pay, but counselors were concerned about the change. Ex. A, Starkey Dep., 107:3-108:5. Counselors did not want to lose their contracts, become hourly workers, track their hours worked, or complete all of their work within 40 hours a week. *Id*. Counselors must have master's degrees, while teachers are not required to have them. *Id.* Counselors saw the prospective loss of contracts (while teachers would continue to have them) as a reduction in stature. *Id*. Although the change should not have affected Starkey individually, in her role as co-director, she advocated for the interests of others in the department. Ex. A, Starkey Dep., 108:6-11, 111:19-114:8.

In context, Starkey merely argued that counselors should not be treated differently from teachers when it comes to their salaried status. *See* Dkt. 114-2 at 522 ("RHS school counselors qualify for a salaried contract to the same degree as RHS teachers do."). Starkey expressed to Fitzgerald that she could not "figure out why the Arch[diocese] is trying to pursue the ministerial exception instead" of other FLSA exemptions that applied to teachers. Ex. I, Email from Lynn Starkey to Shelly Fitzgerald, May 31, 2016, DD-STARKEY-000229. Starkey was essentially misled into using the ministerial exception to support her argument because she believed that the Archdiocese would be more receptive to that argument. Defendants now try to pull a bait-and-switch. Defendants had lawyers and understood of the full scope of the ministerial exception and its legal consequences. Starkey did not know that it could be used against her to shield Defendants from discrimination claims. Ex. A, Starkey Dep., 112:4-10.

Even if Starkey's actions here are interpreted in Roncalli's favor, this still must be weighed against the Archdiocese's admission that she was *not* a minister. This task is for the factfinder and will require the jury to weigh the testimony and evidence at trial and make credibility assessments of the witnesses. The Court should deny the motion for summary judgment.

### 4.     Even if the Ministerial Exception Would Apply, Not to All Claims.

Even if the Court were to decide that the ministerial exception applies (it should not), Roncalli would not be entitled to summary judgment on all of Starkey's claims. In *Hosanna-Tabor*, the Court held that the ministerial exception barred "an employment discrimination suit." 565 U.S. at 196. It "express[ed] no view on whether the exception bars other types of suits." *Id*. Starkey pursues the following claims: (1) Title VII Discrimination; (2) Title VII Retaliation; (3) Title VII Hostile Work Environment; (4) Intentional Interference with Contractual Relationship; and (5) Intentional Interference with Employment Relationship. Dkt. 1 at 7-12.[11] The ministerial exception does not apply to hostile work environment claims under Title VII which do not challenge tangible employment actions, or intentional interference claims arising under state law.

A Seventh Circuit panel recently held that the ministerial exception does not bar a claim for hostile work environment which is unrelated to tangible employment actions. *Demkovich v. St. Andrew the Apostle Par.*, 973 F.3d 718 (7th Cir. 2020) (*vacated and petition for rehearing en banc granted by* No. 19-2142, 2020 U.S. App. LEXIS 38613 (7th Cir. Dec. 9, 2020)); *see also* Dkt. 87 (Starkey's Notice of Supplemental Authority). The Seventh Circuit held *en banc* argument on February 9, 2021, and no decision has issued. *See* Public Access to Oral Argument recordings, Seventh Circuit Court of Appeals, Feb. 9, 2021 (*available at*

---

[11] Starkey also asserted a Title IX retaliation claim, but the Court granted Roncalli's Motion for Judgment on the Pleadings with respect to that claim only. Dkt. 93 at 23-26.

http://media.ca7.uscourts.gov/oralArguments/oar.jsp?caseyear=&casenumber=&period=Past+week (last visited Feb. 11, 2021)). If the Seventh Circuit affirms the earlier panel opinion in *Demkovich*, the ministerial exception would likewise not bar Starkey's hostile work environment claim. As in *Demkovich*, Starkey's hostile work environment claim is not based on "tangible employment actions." 973 F.3d at 720. Starkey's hostile work environment claim is not based on her separation of employment, or non-renewal, but on other events that occurred during her last year of employment at Roncalli that created a hostile work environment and caused her severe emotional distress. Dkt. 1 at 5-6, 9; Dkt. 93 at 16.[12] Starkey reserves the right to file a supplemental brief on this issue after issuance of the *en banc* opinion in *Demkovich*.

Starkey's state law claims are not barred by the ministerial exception. *See Kirby v. Lexington Theol. Seminary*, 426 S.W.3d 597, 621 (Ky. 2014) ("Kirby's status as a ministerial employee does not…bar the claims in contract from proceeding."). Starkey's intentional interference claims are against the Archdiocese only (not Roncalli). Dkt. 1 at 11-12. The Archdiocese has denied that it was Starkey's employer at any time after 2009. Dkt. 20 at 1-2. If the Archdiocese is not Starkey's employer, then the ministerial exception is not a bar to Starkey's claims against the Archdiocese. *See McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 304 F. Supp. 3d 514, 519-520 (N.D. Miss. 2018) ("Accordingly…because McRaney was indisputably not employed by NAMB, this is not a claim between employer and employee…and thus the ministerial exception does not apply to mandate dismissal of any of McRaney's claims.").

The inapplicability of the ministerial exception to state law contract and tort claims was conceded by all sides in the panel decision in *Demkovich*. The Court noted that the Parish and

---

[12] Starkey has not yet been permitted to engage in discovery on her hostile work environment claim, since discovery has been limited to the ministerial exception to this point in the case, so she has had no opportunity to further develop her hostile work environment claim to this point.

Archdiocese "acknowledge[d] that the First Amendment does not bar those same ministerial employees from bringing contract and tort claims against their employers and supervisors," and "that a religious employer can be held civilly liable for a supervisor's criminal or tortious conduct towards a ministerial employee." *Demkovich*, 973 F.3d at 720, 731.[13] The dissenting judge also agreed that "[t]he ministerial exception does not confer general immunity from a minister's tort claims[.]" *Id*. at 742 (Flaum, J., dissenting) (citing *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1040 (7th Cir. 2006)). Starkey again reserves the right to file a supplemental brief on this point after *Demkovich* is decided *en banc*.

**B.    The Court Should Summarily Deny Roncalli's Alternative Motion for Judgment on the Pleadings.**

For purposes of its Motion for Judgment on the Pleadings, Roncalli makes the following arguments: (1) Starkey's federal claims are barred by RFRA; (2) Starkey's Title VII claims are barred for statutory reasons; and (3) Starkey's claims are barred by the First Amendment. Dkt. 114-1 at 37-41. The second and third arguments are wholly repetitive of Roncalli's unpersuasive arguments on its prior motion for judgment on the pleadings, which the Court denied on October 21, 2020. Dkt. 93. All three arguments fail.

**1.    RFRA Does Not Apply Because the Government Is Not a Party.**

The Religious Freedom Restoration Act ("RFRA") states, in part: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability...[unless] it demonstrates that application of the burden to that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). In *Listecki v.*

---

[13] Roncalli's counsel in this case is also co-counsel for the Defendants in *Demkovich*, and "was extensively involved with assisting co-counsel in preparing for...*en banc* oral argument." *See* No. 20-3265, Dkt. 25 at 3 (7th Cir. Feb. 10, 2021).

*Official Comm. of Unsecured Creditors*, the Seventh Circuit held that "RFRA is not applicable in cases where the government is not a party." 780 F.3d 731, 736 (7th Cir. 2015). The government is not a party to this case, and it only involves private parties. Therefore, RFRA is inapplicable.

Roncalli argues that *Listecki* is "now questionable" because of dicta from *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020). *Bostock* involved whether sexual orientation and gender identity discrimination are covered by Title VII's prohibition of sex discrimination. *Id*. at 1737. A RFRA defense was not before the Supreme Court in *Bostock*, and the Court expressly withheld judgment, acknowledging it was a "question[] for future cases." *Id*. at 1754. Again, Roncalli overreaches, inviting this Court to revisit *Listecki* based on a single sentence of dicta from a Supreme Court opinion involving an unrelated issue.

Even if RFRA applies, Starkey's claims meet both prongs of its test. "Courts have repeatedly recognized that Title VII serves a compelling interest in eradicating all forms of invidious discrimination performed by statute." *EEOC v. R.G.*, 884 F.3d 560, 591 n.12 (6th Cir. 2018), *affirmed by Bostock*, 140 S. Ct. 1731. This includes sexual orientation discrimination. *Bostock*, 140 S. Ct. at 1737. Title VII is designed to permit equal opportunities in employment, regardless of race, sex, national origin, etc. Although Title VII could be construed as suppressing pro-discrimination viewpoints, such a reading would effectively nullify the government's ability to enforce this law. Furthermore, the goals of Title VII to prohibit discrimination could not be achieved through less restrictive means. Title VII includes exemptions for religious employers from religious discrimination claims. *See* 42 U.S.C. §§ 2000e-1(a), 2000e-2(e)(2). Courts have carved out an additional exception to Title VII and other employment discrimination laws through the judicially created ministerial exception. *Hosanna-Tabor*, 565 U.S. at 196; *Our Lady*, 140 S. Ct. at 2055.

### 2. The Court Should Not Reconsider its Prior, Correct Ruling Denying Roncalli's Motion for Judgment on the Pleadings.

The Court has previously denied Roncalli's remaining arguments with respect to Title VII statutory exemptions and First Amendment defenses. Dkt. 93. Roncalli is effectively filing a motion to reconsider, and the Court should decline to reconsider its ruling. "Motions to reconsider 'are not replays of the main event[.]'" *Dominguez v. Lynch*, 612 Fed. Appx. 388, 390 (7th Cir. 2015) (*quoting Khan v. Holder*, 766 F.3d 689, 696 (7th Cir. 2014)). "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (internal citations omitted). "Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Id*. at 1270. Motions to reconsider "should be…rare." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). Roncalli identifies no newly discovered evidence (no discovery has taken place beyond the ministerial exception), nor any "manifest errors of law" that would warrant reconsideration of its rejected arguments.[14]

The Court thoroughly reviewed and discussed each of Roncalli's Title VII and First Amendment arguments, and reached a detailed, well-reasoned, and ultimately correct decision. Dkt. 93 at 6-23. There has been no change in the law since October 2020 which would cause the Court to revisit its earlier decision, nor has any discovery taken place relevant to the legal issues

---

[14] Roncalli has sought to appeal the Court's ruling in multiple ways, and an appeal is currently pending. First, Roncalli requested permission from this Court for an Interlocutory Appeal of the Order denying the Motion for Judgment on the Pleadings. Dkt. 95. Starkey opposed the motion, and it remains pending. Dkt. 102. Then, Roncalli filed a Notice of Appeal anyway, purportedly under the collateral order doctrine. Dkt. 108. Starkey contests appellate jurisdiction of Roncalli's appeal, but the Seventh Circuit has ordered that the appeal proceed to briefing (including on the issue of appellate jurisdiction). *See* Appellate Case No. 20-3265, Dkt. No. 16 (7th Cir. Jan. 13, 2021).

raised. Starkey incorporates by reference her prior Response to Motion for Judgment on the Pleadings, and the Court's Order denying the Motion, on Roncalli's statutory and First Amendment arguments. Dkt. 67 at 7-16, 19-35; Dkt. 93 at 6-23.

The Court should summarily deny Roncalli's alternative request for judgment on the pleadings.

## VI. CONCLUSION

For the foregoing reasons, Starkey respectfully requests that the Court deny the Defendants' Motion for Summary Judgment, and alternative Motion for Judgment on the Pleadings, in all respects.


Dated: February 16, 2021                    Respectfully submitted,

                                            */s/ Kathleen A. DeLaney*
                                            Kathleen A. DeLaney (#18604-49)
                                            Christopher S. Stake (#27356-53)
                                            DELANEY & DELANEY LLC
                                            3646 Washington Blvd.
                                            Indianapolis, IN 46205

                                            *Attorneys for Plaintiff Lynn Starkey*