**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| LYNN STARKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-03153-RLY-TAB |
| | ) | |
| ROMAN CATHOLIC ARCHDIOCESE | ) | |
| OF INDIANAPOLIS, INC. and | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION ............................................................................................. 1

ARGUMENT ..................................................................................................... 2

I.  Starkey's claims are barred by the ministerial exception ....................................... 2

    A.  Whether Starkey is a minister is a question of law for the Court. .................. 2

    B.  Starkey was a minister ................................................................................. 3

        1.  Starkey performed important religious duties as a guidance
            counselor and leader of the school. ................................................. 4

        2.  Starkey's attempts to contest her ministerial status fail. ......................... 7

        3.  Other considerations confirm Starkey was a minister. ............................ 11

    C.  All of Starkey's claims are barred ............................................................... 15

II.  Starkey's federal claims are barred by RFRA........................................................ 18

III.  Starkey's Title VII claims are barred by Title VII ............................................... 19

IV.  Starkey's claims are barred by the First Amendment.......................................... 20

CONCLUSION................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alicea-Hernandez v. Catholic Bishop of Chi.*,
320 F.3d 698 (7th Cir. 2003) ............................................................... 3, 11

*Bell v. Presbyterian Church (U.S.A.)*,
126 F.3d 328 (4th Cir. 1997) ...................................................................... 17

*Bohnert v. Roman Catholic Archbishop of S.F.*,
136 F. Supp. 3d 1094 (N.D. Cal. 2015) ...................................................... 3

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) ......................................................................... 18, 19

*Cannata v. Catholic Diocese of Austin*,
700 F.3d 169 (5th Cir. 2012) ...................................................... 3, 13, 17

*Ciurleo v. St. Regis Par.*,
214 F. Supp. 3d 647 (E.D. Mich. 2016) ..................................................... 3

*Clapper v. Chesapeake Conf.*,
166 F.3d 1208 (4th Cir. 1998) ................................................................... 8

*Collette v. Archdiocese of Chi.*,
200 F. Supp. 3d 730 (N.D. Ill. 2016) ......................................................... 3

*Conlon v. InterVarsity Christian Fellowship*,
777 F.3d 829 (6th Cir. 2015) ................................................................ 2, 3

*Davis v. Balt. Hebrew Congregation*,
985 F. Supp. 2d 701 (D. Md. 2013) ........................................................... 3

*Dayner v. Archdiocese of Hartford*,
23 A.3d 1192 (Conn. 2011) ...................................................................... 17

*Demkovich v. St. Andrew the Apostle Par.*,
343 F. Supp. 3d 772 (N.D. Ill. 2018) .................................................. 3, 16

*Demkovich v. St. Andrew the Apostle Par.*,
973 F.3d 718 (7th Cir. 2020) ........................................................... 16, 18

ii

*Doe v. Corp. of Catholic Bishop of Yakima,*
    957 F. Supp. 2d 1225 (E.D. Wash. 2013) ................................................................. 3

*Edley Worford v. Va. Conf. of United Methodist Church,*
    430 F. Supp. 3d 132 (E.D. Va. 2019) ....................................................................... 3

*EEOC v. Catholic Univ. of Am.,*
    83 F.3d 455 (D.C. Cir. 1996) ................................................................................. 19

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
    884 F.3d 560 (6th Cir. 2018) .................................................................................. 3

*Fratello v. Archdiocese of N.Y.,*
    863 F.3d 190 (2d Cir. 2017) ..........................................................................*passim*

*Galvan v. Norberg,*
    678 F.3d 581 (7th Cir. 2012) ................................................................................ 20

*Garrick v. Moody Bible Inst.,*
    412 F. Supp. 3d 859 (N.D. Ill. 2019) ...................................................................... 3

*Gregorio v. Hoover,*
    238 F. Supp. 3d 37 (D.D.C. 2017)........................................................................... 3

*Grossman v. S. Shore Pub. Sch. Dist.,*
    507 F.3d 1097 (7th Cir. 2007) .............................................................................. 11

*Grussgott v. Milwaukee Jewish Day Sch., Inc.,*
    882 F.3d 655 (7th Cir. 2018) ..........................................................................*passim*

*Hankins v. Lyght,*
    441 F.3d 96 (2d Cir. 2006)..................................................................................... 18

*Herx v. Diocese of Ft. Wayne-S. Bend Inc.,*
    48 F. Supp. 3d 1168 (N.D. Ind. 2014) ..................................................................... 3

*Herzog v. St. Peter Lutheran Church,*
    884 F. Supp. 2d 668 (N.D. Ill. 2012) ....................................................................... 3

*HK Sys., Inc. v. Eaton Corp.,*
    553 F.3d 1086 (7th Cir. 2009) .............................................................................. 20

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
    565 U.S. 171 (2012) ......................................................................................*passim*

*Kirby v. Lexington Theological Seminary,*
    426 S.W.3d 597 (Ky. 2014) .................................................................................. 16

*Koenke v. Saint Joseph's Univ.*,
    No. 19-4731, 2021 WL 75778 (E.D. Pa. Jan. 8, 2021) .................................... 15, 16

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ................................................................ 19

*Lee v. Sixth Mount Zion Baptist Church*,
    903 F.3d 113 (3d Cir. 2018)................................................................. 17

*Listecki v. Official Comm. of Unsecured Creditors*,
    780 F.3d 731 (7th Cir. 2015) ................................................................ 18

*McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*,
    304 F. Supp. 3d 514 (N.D. Miss. 2018) ............................................... 3, 17

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) ................................................................*passim*

*Penn v. N.Y. Methodist Hosp.*,
    884 F.3d 416 (2d Cir. 2018) ................................................................. 3

*Petruska v. Gannon Univ.*,
    462 F.3d 294 (3d Cir. 2006)......................................................... 7, 9, 10

*Puri v. Khalsa*,
    321 F. Supp. 3d 1233 (D. Or. 2018)......................................................... 3

*Richardson v. Nw. Christian Univ.*,
    242 F. Supp. 3d 1132 (D. Or. 2017)........................................................ 3

*Schleicher v. Salvation Army*,
    518 F.3d 472 (7th Cir. 2008) ................................................................. 3

*Starkman v. Evans*,
    198 F.3d 173 (5th Cir. 1999) ................................................................. 2

*Sterlinski v. Catholic Bishop of Chi.*,
    934 F.3d 568 (7th Cir. 2019) ................................................... 3, 7, 9, 15

*Tinder v. Pinkerton Sec.*,
    305 F.3d 728 (7th Cir. 2002) ............................................................... 14

*Tomic v. Catholic Diocese of Peoria*,
    442 F.3d 1036 (7th Cir. 2006) ............................................................... 3

*Woodring v. Jackson Cnty.*,
    986 F.3d 979 (7th Cir. 2021) ............................................................... 18

*Yin v. Columbia Int'l Univ.*,
  335 F. Supp. 3d 803 (D.S.C. 2018) ................................................................ 3, 8, 11

*Young v. N. Ill. Conf. of United Methodist Church*,
  21 F.3d 184 (7th Cir. 1994) .............................................................................. 3

**Statutes**

42 U.S.C. § 2000bb.......................................................................................... 18

42 U.S.C. § 2000e............................................................................................ 19

**Other Authorities**

Oral Argument Audio, *Demkovich v. St. Andrew the Apostle Par.*,
  No. 19-2142 (7th Cir. Feb. 9, 2021)................................................................ 18

**INTRODUCTION**

This case is controlled by a basic principle: The First Amendment protects the freedom of the Catholic Church to run Catholic schools based on Catholic principles. This includes the freedom to choose employees who fully embrace Catholic beliefs and practices. At bare minimum, under the ministerial exception, it includes the freedom to part ways with an employee who not only rejects Catholic beliefs and practices, but also agreed to form children in the faith, supervised others who did so, and helped lead the school.

The facts showing that Starkey fell within the ministerial exception are undisputed. She was designated in her contract as a minister. She agreed in her contract to communicate the Catholic faith to students, pray with them, and form their faith. She developed evaluation criteria for fellow guidance counselors based on these religious duties. She told the Principal that guidance counselors perform these duties. She guided students in counseling sessions addressing some of the most sensitive issues of their lives. And she occupied unique leadership roles overseeing the guidance department and shaping the religious mission of the entire school.

Unable to dispute these facts, Starkey tries to downplay them. But her efforts run headlong into controlling precedent. She tries to play up her "secular" duties, while calling her undisputed religious duties "scant," "occasional," or "rare" (Dkt. 126 ("Opp.") at 2)—but the same move was rejected in *Hosanna-Tabor* and *Our Lady*. She says her "employment agreements" and "job descriptions" are unimportant (Opp.16)—but *Our Lady* expressly relied on them as "important." She says the school's "written … expectations" are not enough (Opp.14)—but *Grussgott* says "it is the school's expectation … that matters." She claims the ministerial exception must go to a "jury" (Opp.26)—but every Seventh Circuit case that has ever resolved the ministerial exception, both Supreme Court cases, and every reported federal case since *Hosanna-Tabor*, have done so on summary judgment or earlier.

1

Starkey's remaining arguments fare no better. She tries to salvage part of her case by saying her hostile-work-environment and tort claims survive the ministerial exception. But her main authority for this proposition—*Demkovich*—has been vacated by the en banc Seventh Circuit and would not apply to her anyway. Nor can she distinguish the many cases barring such claims. On RFRA, she ignores *Bostock*'s statement that religious organizations may be protected from Title VII claims like hers. And on the Archdiocese's other Title VII and First Amendment defenses, she offers only boilerplate about the standard for reconsideration motions. But this Court has "sweeping authority" to reconsider interlocutory orders. It should do so here.

**ARGUMENT**

**I. Starkey's claims are barred by the ministerial exception.**

**A. Whether Starkey is a minister is a question of law for the Court.**

A central theme of Starkey's response is that application of the ministerial exception here is a factual question for the "jury." Opp.1, 11, 13, 26. Starkey is wrong. The Seventh Circuit has held that "the ultimate question of whether [plaintiff] was a ministerial employee" is a "legal" question which "[c]ourts" must resolve. *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 661-62 (7th Cir. 2018). Other courts agree: "whether the exception attaches" "is a pure question of law which this court must determine for itself." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 833 (6th Cir. 2015); *Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999) ("The status of employees as ministers [is] a legal conclusion for this court.").

Starkey tries to twist *Grussgott* (at 13) by invoking its truism that "fact-intensive" questions are "usually … are left for a jury." 882 F.3d at 657. But *Grussgott* didn't say that *applicability of the ministerial exception* is left for a jury. It held the opposite. The court *affirmed* the district court's grant of summary judgment to the school, explaining that the plaintiff "f[ell] under the ministerial exception as a matter of law," even though "[s]ome factual disputes exist." *Id.* at 657, 662.

2

Nor could *Grussgott* have said otherwise. Every Seventh Circuit case that has ever resolved applicability of the ministerial exception has done so on summary judgment or earlier—and always in favor of the religious defendant.[1] Likewise, both Supreme Court cases addressing the ministerial exception resolved it on summary judgment. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2056 n.1, 2058-59, 2069 (2020); *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 180-81, 196 (2012). And *every* reported federal case since *Hosanna-Tabor* to address ministerial status has decided it on summary judgment at the latest; *none* has left it to a jury.[2] Starkey hasn't cited a single case to the contrary. Thus, there is no basis for sending the matter to a jury.

## B. Starkey was a minister.

Based on the undisputed facts, Starkey is a minister. Her contract designated her as a "minister of the faith." [Dkt. 114-2](Dkt. 114-2) ("App.") at 9. She agreed to form students in

---

[1] *See Sterlinski v. Catholic Bishop of Chi.*, 934 F.3d 568, 570-71 (7th Cir. 2019) (summary judgment); *Grussgott*, 882 F.3d at 658-61 (summary judgment); *Schleicher v. Salvation Army*, 518 F.3d 472, 475-77 (7th Cir. 2008) (motion to dismiss); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039-43 (7th Cir. 2006) (motion to dismiss); *Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 703-04 (7th Cir. 2003) (motion to dismiss); *Young v. N. Ill. Conf. of United Methodist Church*, 21 F.3d 184, 185-88 (7th Cir. 1994) (motion to dismiss).

[2] *See Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 428 (2d Cir. 2018) (summary judgment); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 582-83 (6th Cir. 2018) (same); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 198, 206 (2d Cir. 2017) (same); *Conlon*, 777 F.3d at 832, 836-37 (motion to dismiss); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172, 177 (5th Cir. 2012) (same); *McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 304 F. Supp. 3d 514, 519-20 (N.D. Miss. 2018) (same); *Demkovich v. St. Andrew the Apostle Par.*, 343 F. Supp. 3d 772, 776 (N.D. Ill. 2018) (same); *Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803, 816-18 (D.S.C. 2018) (summary judgment); *Puri v. Khalsa*, 321 F. Supp. 3d 1233, 1247-51 (D. Or. 2018) (same); *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 47 n.3 (D.D.C. 2017) (motion to dismiss); *Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132, 1145-46 (D. Or. 2017) (summary judgment); *Ciurleo v. St. Regis Par.*, 214 F. Supp. 3d 647, 650 (E.D. Mich. 2016) (same); *Bohnert v. Roman Catholic Archbishop of S.F.*, 136 F. Supp. 3d 1094, 1115 (N.D. Cal. 2015) (same); *Herx v. Diocese of Ft. Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1177 (N.D. Ind. 2014) (same); *Davis v. Balt. Hebrew Congregation*, 985 F. Supp. 2d 701, 711 (D. Md. 2013) (motion to dismiss); *Doe v. Corp. of Catholic Bishop of Yakima*, 957 F. Supp. 2d 1225, 1232 (E.D. Wash. 2013) (summary judgment); *Herzog v. St. Peter Lutheran Church*, 884 F. Supp. 2d 668, 674-75 (N.D. Ill. 2012) (motion to dismiss); *cf. Edley Worford v. Va. Conf. of United Methodist Church*, 430 F. Supp. 3d 132, 141 (E.D. Va. 2019) (declining to resolve question on motion to dismiss, deferring to summary judgment, case later settled); *Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 870-72 (N.D. Ill. 2019) (declining to resolve question on motion to dismiss, dismissing on other grounds); *Collette v. Archdiocese of Chi.*, 200 F. Supp. 3d 730, 735 (N.D. Ill. 2016) (declining to resolve on motion to dismiss, summary judgment later granted for defendant).

the faith by teaching, praying, and practicing the Catholic faith with them. *Id.*; App.93, 97. She was assigned these duties not in an impersonal classroom setting, but in one-on-one counseling sessions touching on some of the most sensitive issues of students' lives. App.563-65. And she held key leadership roles overseeing the guidance department and shaping the religious mission of the entire school.

Starkey doesn't dispute the documentary evidence establishing these religious duties. Instead, she tries to downplay them—calling them "occasional," not "important," or outweighed by "primarily academic and secular" duties. Opp.2, 14, 21. But, as explained below, courts have repeatedly held that downplaying religious duties doesn't create a material factual dispute or defeat a ministerial-exception defense.

### 1. Starkey performed important religious duties as a guidance counselor and leader of the school.

*Our Lady* held that two Catholic elementary school teachers were ministers "even though [they] taught primarily secular subjects, lacked substantial religious titles and training, and were not even required to be Catholic." 140 S. Ct. at 2072 (Sotomayor, J., dissenting). What mattered, the Court said, was that in addition to their many secular duties, they also "performed vital religious duties": "forming students in the Catholic faith," "pray[ing] with their students, attend[ing] Mass with the students," and "guid[ing] their students, by word and deed, toward the goal of living their lives in accordance with the faith." *Id.* at 2066 (majority). These duties were evident from "the schools' definition and explanation of their roles" as reflected in "their employment agreements and faculty handbooks." *Id.* The same is true here. The undisputed evidence shows that Starkey not only had important religious duties like the teachers in *Our Lady*, but also served as a key leader over the entire school.

We briefly summarize that still-undisputed evidence before turning to Starkey's attempted rebuttals. First, Starkey's contract designated her as "a minister of the faith" and expressly charged her with "foster[ing] the spiritual … growth" of her

students, "[c]ommunicat[ing] the Catholic faith to students," "[p]ray[ing] with and for students," participating in "liturgies and prayer services" with students, "[t]each[ing] and celebrat[ing] Catholic traditions," "[m]odel[ing] the example of Jesus," and participating in "religious instruction and Catholic formation." App.9-12. She signed a contract agreeing to these duties. App.532-33. And when guidance counselors faced losing their salaried contracts, she argued that guidance counselors should keep them because they were "Ministerial" employees who performed these specific "Ministry" duties. App.517, 519-22.

Starkey also helped develop criteria to evaluate guidance counselors based on these religious duties. App.366-67 at 115:13-116:8; *see* Opp.8. Under these criteria, a counselor cannot advance to the highest pay level unless she "embodies the charisms" (*i.e.*, graces of the Holy Spirit) of "Saint John XXIII," "consistently attends their Sunday liturgy or church service," "encourages students' spiritual life," "encourage[s] prayer/reflection," "shar[es] one's own spiritual experiences as appropriate," and "encourag[es] retreat, parish, youth ministry, mission work." App.563-65.

Multiple counselors explained in performance reviews how they carried out these religious duties. Starkey's Co-Director, Shelly Fitzgerald, emphasized that she "consistently use[s] spiritual life and resources in my counseling conversations," "shar[es] my own spiritual experiences," "consistently attend[s] Sunday church service, all masses at Roncalli, and morning communion services," and "meet[s] with students regularly" to address "specific needs" including "faith formation." App.41-42, 45. Autumn Currens explained that she seeks to live out the "charisms of St. John XXIII," attends Mass "often," and is growing "confident in my own prayer life and encouraging faith with my students." App.595. Angela Maly said she "regularly pray[s]" with students as an "essential component[]" of her job. App.2-3 ¶¶10, 13. All three attested to their participation in spiritual retreats designed to "help students understand how Christ is present in their daily life." App.6 ¶35; *see* App.45, 595.

Starkey and other guidance counselors also served on the Student Assistance Program (SAP or STAND UP), which provides confidential care for at-risk students struggling with depression, anxiety, bullying, substance abuse, or self-harm. App.3, 299. Since guidance counselors are the only employees who meet with each student one-on-one, they are often the first to identify these issues. App.22, 310. Starkey met with students struggling with substance abuse, depression, suicide, and self-harm, and told the principal she "want[ed] students to continue to trust" counselors with their "most sensitive" and "personal issues." App.302, 305-08, 598.

Starkey also held multiple roles in Roncalli's leadership. She led the Guidance Department, overseeing all counselors and the social worker, and served on the Department Chairpersons board. App.22 ¶31; App.97; App.348 at 97:11-18. She helped lead SAP. App.300 at 49:4-5. She served on the Administrative Council, where she helped oversee all aspects of school operations, including religious matters like all-school liturgies, students' sexual choices, prayer services, and suicide prevention. App.22 ¶31; *see* App.293, 323-24, 343, 314-16, 294-96, 481. Aside from the Principal and Assistant Principal for Academic Affairs, Starkey was the only employee to serve on both the Administrative Council and Department Chairpersons board. App.18 ¶7.

*Not one* of these facts is disputed. They were conceded in Starkey's deposition and confirmed by her own documents. And they place Starkey's role in the heartland of the ministerial exception. As in *Our Lady*, her "employment agreements and faculty handbooks specified in no uncertain terms that [Starkey] w[as] expected to help [Roncalli] carry out [its] mission" by "forming students in the Catholic faith," "pray[ing and] attend[ing] Mass with the students," and "guid[ing] … students, by word and deed, toward the goal of living their lives in accordance with the faith." 140 S. Ct. at 2066. Even beyond the teachers in *Our Lady*, Starkey performed the vital religious function of "lead[ing] a religious organization," *id.* at 2064—by overseeing the guidance department, leading a team of professionals (including the chaplain and campus

minister) in addressing students' most sensitive personal issues, and guiding the overall work and mission of the school through the Administrative Council. *Fratello*, 863 F.3d at 208-210 (leadership role qualified employee as a minister); *Petruska v. Gannon Univ.*, 462 F.3d 294, 307 n.10 (3d Cir. 2006) ("supervis[ing] spiritual functionaries" is spiritual function).

### 2. Starkey's attempts to contest her ministerial status fail.

In response, Starkey tries to downplay unfavorable facts, quibble over immaterial facts, or make broad generalizations about factual disputes without offering contrary evidence. But each attempt runs into precedent or conceded facts, only underscoring why her role falls within the ministerial exception.

*First*, she complains that the Archdiocese relies on "language in employment agreements, job descriptions, and faculty handbooks" to show that guidance counselors had religious duties; she says these documents "did not reflect what Starkey actually did." Opp.16. But Starkey never denies these duties were assigned to her. She signed a contract accepting them. App.532-33. She developed criteria to evaluate guidance counselors based on them. App.366-67; *see* Opp.8. And when guidance counselors risked demotion to hourly wages, she argued that they should remain salaried precisely because they performed these "Ministry" duties. App.517, App.519-22.

Plaintiffs in ministerial exception cases routinely offer post-hoc, self-serving arguments that they didn't perform their assigned duties. But that is precisely why *Our Lady* held that the religious organization's "definition and explanation of their roles," as reflected in "their employment agreements and faculty handbooks," is crucial. 140 S.Ct. at 2066. Other binding cases agree. *Sterlinski*, 934 F.3d at 569 (document showed the religious "importance of organ playing," notwithstanding plaintiff's claim that he "was just 'robotically playing the music that he was given'"); *Grussgott*, 882 F.3d at 660-61 (school's written description of curriculum showed it "clearly intended for [plaintiff's] role to be connected to the school's Jewish mission," notwithstanding

plaintiff's claim that her teaching "was historical, cultural, and secular, rather than religious"); *see Yin*, 335 F. Supp. 3d at 816 (relying on "substantive religious duties" "as indicated by the job description").

*Second*, Starkey tries to downplay her religious duties by calling them "occasional," "scant," or "rare." Opp.2. She claims her role was "almost exclusively secular," with the majority of time spent on academic matters—just like "what she now does at a public school." Opp.2, 14. But the Supreme Court rejected the same argument in *Our Lady*, where the teachers likewise claimed that their role was "almost exclusively secular," with the "vast majority" of time spent on academic subjects—just like "any public school teacher." 140 S. Ct. at 2080-81 (Sotomayor, J., dissenting). The Court also rejected this argument in *Hosanna-Tabor*, explaining that it "place[s] too much emphasis on [the teacher's] performance of secular duties." 565 U.S. at 193-94. Even if the vast majority of "her day was devoted to teaching secular subjects," what mattered was "the nature of the religious functions performed." *Id.*; *Fratello*, 863 F.3d at 209 n.34 (not "material" that principal "performed many secular administrative duties"); *Clapper v. Chesapeake Conf.*, 166 F.3d 1208, at *4 (4th Cir. 1998) (table) (teacher with "only 10.6 percent of his work week" on religion was minister). There is no denying that Starkey's role "entailed many functions that simply would not be part of a secular teacher's job at a secular institution." *Grussgott*, 882 F.3d at 661.

*Third*, Starkey claims she "did not pray with students or lead prayers with students as a guidance counselor." Opp.15. But a sentence later, she backtracks, admitting that on multiple occasions she was asked to, and did, lead the entire school in prayer. *Id.*; *see* App.600-01; *Fratello*, 863 F.3d at 209 (plaintiff led "prayers for students over the loudspeaker"); *Grussgott*, 882 F.3d at 661 (plaintiff "was tasked with specific religious duties on occasion"). She also doesn't dispute that her job description tasked her with "[p]ray[ing] with and for students" (App.9), that she affirmed in 2016 that guidance counselors did so (App.517, 519-22), and that other guidance counselors

in practice did so (App.2-3). So Starkey's claim at bottom is just an assertion that she didn't fulfill one of her duties—which doesn't undermine applicability of the ministerial exception. *Cf. Sterlinski*, 934 F.3d at 571 ("[A] church may decide that any organist who plays like a robot *ought* to be fired.").[3]

*Fourth*, Starkey downplays her personal counseling of students, saying she "most of the time" referred students to the "Social Worker" when they brought up "personal, non-academic issues" that implicated Catholic teaching. Opp.14. But again, this doesn't dispute she was *tasked* with addressing these issues (both as a counselor and SAP member), or even that she sometimes did so. App.299-311. After all, Starkey confirmed in 2018 that her work on SAP required her "to track our students' most sensitive," "concerning," and "personal issues," and that she "want[ed] students to continue to trust" counselors with those issues. App.598-99. More importantly, Starkey *supervised* the Social Worker. App.348 at 97:11-18. And "[t]o the extent that [Starkey] supervises spiritual functionaries, at least some of the functions [s]he performs are, by definition, spiritual ones." *Petruska*, 462 F.3d at 307 n.10.

*Fifth*, Starkey acknowledges the "religious component[s]" of her Administrative Council role, but says "other members" of the Council "were better able and more qualified to address them." Opp.19-20. But this isn't a denial that she was *expected* to participate in those components and *did* so—as the record shows. Br. 15-16; App.17-20 ¶¶4-17. In any event, the point of the ministerial exception is that it is the *Archdiocese's* prerogative—not Starkey's or a court's—"to determine who is qualified to serve in positions of substantial religious importance." Dkt. 93 at 17 (quoting *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring)).

---

[3] Starkey also doesn't dispute that she led students in prayer as a choir teacher (App.578, 580), prayed weekly with the Administrative Council (App.316-17), advised staff on how to help students adapt to Catholic prayers (App.652), and participated regularly with students in Mass, which includes collective prayer. App.332 at 81:4-21; App.21 ¶25; *see* Opp.4-11 (no dispute).

*Sixth*, Starkey states that counselors "were not required" to undergo evaluations; they "only affected the level of their compensation." Opp.21. But an evaluation that affects "pay" obviously shows the employer's "expectations[s]." *Grussgott*, 882 F.3d at 661. And Starkey does not dispute that the evaluation criteria, which she helped create, included religious elements like "encourag[ing] students' spiritual life" and "shar[ing] one's own spiritual experiences as appropriate." App.563-65; *see* App.24 ¶38. Thus, if counselors wanted a raise, Starkey's own metric required them to provide evidence of fostering students' faith. These are "'performance objectives'" demonstrating their "functions … were ministerial in nature." *Petruska*, 462 F.3d at 307 n.10; *see* App.38-46 (Fitzgerald's evaluation); App.581-97 (Currens's); *see also Fratello*, 863 F.3d at 209 (religious evaluations show religious function).

*Seventh*, Starkey says the "conflicting affidavits" of Maly and Currens require "resolution by a factfinder." Opp.20. But there is no dispute over guidance counselors' assigned duties. These affidavits simply show that, as in any workplace, some employees fulfill more duties than others. Currens's litigation affidavit must also be read in light of her pre-litigation self-evaluation (subject to Starkey's evaluation criteria), where she highlighted how she "highly encourage[d]" students to attend spiritual retreat, helped lead the retreat, and was growing more "confident in my own prayer life and encouraging faith with my students." App.595.

*Eighth*, Starkey falls back on the claim that "Roncalli's argument would extend the ministerial exception [to] all teachers and counselors at religious schools." Opp.17. So did the respondents in *Our Lady*—unsuccessfully. The Court need not address any case beyond this one, in which an educator was expressly designated as a minister, accepted responsibility to form students in the faith, supervised others tasked with the same spiritual formation, had responsibility for one-on-one counseling on sensitive life issues, engaged in religious ritual alongside students, and was one of the most significant, visible leaders of the school. Holding that role to fall

within the ministerial exception would do nothing to prejudge the case of a math teacher or a college counselor with other responsibilities at another school.

Starkey's focus on whether prior cases have addressed "a guidance counselor or director" evinces the same confusion. Opp.18. "What matters, at bottom, is what an employee does," *Our Lady*, 140 S. Ct. at 2064, not whether her title is one previously found ministerial. In *Alicea-Hernandez*, for example, the Seventh Circuit readily applied the ministerial exception to an administrative role never addressed by any court before or since ("Hispanic Communications Manager"). 320 F.3d at 700; *accord Yin*, 335 F. Supp. 3d at 815 ("Director of the TESOL Program").

In any event, numerous cases (*e.g.*, *Our Lady*, *Hosanna-Tabor*, *Grussgott*) have addressed whether a religious school's *teachers* are subject to the exception—repeatedly finding that they are. Numerous cases (*e.g.*, *Fratello*, *Petruska*, *Yin*) have addressed whether a school's *leaders* are subject to the exception—reaching the same conclusion. Here, Starkey herself affirmed that guidance counselors performed the same "Ministry" duties as teachers. App.517; *see Grossman v. S. Shore Pub. Sch. Dist.*, 507 F.3d 1097, 1099-1100 (7th Cir. 2007) (guidance counselors "play a role similar to teachers"). And it's undisputed she was one of Roncalli's senior leaders. So even under Starkey's approach to precedent, her position qualifies.

### 3. Other considerations confirm Starkey was a minister.

The other *Hosanna-Tabor* considerations confirm Starkey was subject to the exception. At the outset, Starkey refers to these considerations as "factors"—"[b]ut even referring to them as 'factors' denotes the kind of formulaic inquiry that the Supreme Court has rejected." *Grussgott*, 882 F.3d at 661. The considerations aren't "checklist items to be assessed and weighed against each other in every case"; but when met, they can make a case "especially easy." *Our Lady*, 140 S. Ct. at 2067. Just so here.

***Title.*** First, the "title" consideration points toward ministerial status, for three reasons: (1) Starkey was expressly designated as a "minister" in her contract; (2) her

"Co-Director" and "Administrative Council" titles reflected her leadership authority; and (3) she was a "certified catechist" earlier in her Roncalli career—a religious title recognized as significant in *Our Lady* itself, 140 S. Ct. at 2067; Br.26-27.

Starkey's only response to any of this is to say her catechist certification expired before she was elevated to her latest leadership roles. Opp.21. But she does not dispute the Principal's testimony that the catechist certification contributed to her being elevated to those leadership roles. App.25 ¶44. So the catechist title remains relevant—and, along with her other titles, supports application of the exception.

***Substance reflected in title.*** The substance reflected in Starkey's titles likewise supports ministerial status, because: (1) Starkey's performance criteria and job description show she was expected (and agreed) to convey the Catholic faith to her students; (2) she was elevated to her final roles based on her significant experience teaching the faith as a catechist and providing liturgical music for Mass; (3) her Administrative Council role required continued religious education in the form of book studies on evangelization and faith formation; and (4) her Co-Director of Guidance role was "recognized by faculty and staff as a key, visible leader of the school." Br.27.

In response, Starkey first says she "did not receive any *additional* religious education or training to be Co-Director of Guidance." Opp.21 (emphasis added). But she doesn't dispute that the training she already had—as catechist and religion teacher— was important to her promotion. That suffices for purposes of the "substance" consideration. *Grussgott*, 882 F.3d at 659-60 ("Grussgott's resume … touts significant religious teaching experience, which … was a critical factor in the school hiring her[.]").

Second, Starkey says this case is "[u]nlike … *Grussgott*" because "Starkey did not 'teach … religion to students'" as a guidance counselor or Co-Director of Guidance. Opp.21-22. But under *Grussgott*, the "substance" consideration asks whether she was "*expected* … to integrate religious teachings into" her work. 882 F.3d at 659 (emphasis added). As already explained, Starkey's job description and performance criteria—

which Starkey has not controverted, and which she told the Principal that guidance counselors fulfill (App.517, 519)—unambiguously required her to "foster the integration of faith" in her students' lives and "[c]ommunicat[e] the Catholic faith … through" her "guidance curriculum." App.9-12, 517, 565. That Starkey now says she didn't meet this expectation doesn't erase its existence. *See Grussgott*, 882 F.3d at 661 ("[I]t is the school's expectation—that Grussgott would convey religious teachings to her students—that matters." (citing *Cannata*, 700 F.3d at 177)); *Fratello*, 863 F.3d at 207-08 & n.33 ("requirements" in "Manual" and "Job Summary" were "evidence in favor" of ministerial exception, even if "not enforced").

Third, Starkey doesn't dispute that her Administrative Council role included mandatory religious book studies, or that her role led other faculty and staff to perceive her as a school leader. To the contrary, her affidavits *support* the latter point. *See* Dkt. 127-3 at ¶4 (Starkey was Currens's "direct supervisor[]"). And the former demonstrates that even if Starkey's elevation to Co-Director of Guidance didn't require new religious training, her elevation to the Administrative Council *did*—further supporting that the "substance" reflected in the title was religious.

***Employee's use of title.*** Finally, the use-of-title consideration supports ministerial status, because Starkey: (1) signed a contract expressly designating her as a "minister," App.9; (2) participated in annual Days of Reflection in which the assembled faculty were publicly commissioned as "ministers of faith," App.20-21, 31-34, 421-22; and (3) expressly asserted in 2016 that she (along with Roncalli's other guidance counselors) performed "Ministry" functions. App.517.

In response, Starkey says she "was required to sign" the ministry contract to "keep[] her job," and her "duties and responsibilities did not change after" its introduction. Opp.22. But the first point merely restates the nature of an employment contract. And the second only confirms that the contract reflected the underlying reality: Guidance counselors had "Ministry" duties even before the Archdiocese

13

formalized them by contract—as Starkey herself argued to the Principal in 2016. App.517; *accord* App.523 (Principal agreeing that "[a] guidance counselor fulfills 65 of the 67" "items listed on the archdiocesan ministry description for a teacher").

Next, Starkey says she "does not recall" participating in the Day of Reflection commissioning ceremony. Opp.22. But Starkey has admitted that she "generally attended" the Days of Reflection. App.421-22 at 170:18-171:14. Principal Weisenbach testified that at the Days of Reflection, he "lead[s] a call-and-response Commissioning Prayer with" the gathered educators. App.21 ¶22. He authenticated a written copy of the prayer. App.31-34. And another counselor *does* recall it. App.8 ¶45. Given the firsthand and documentary evidence of the commissioning ceremony, Starkey's claim that "she does not remember" it "does not raise a genuine issue whether" it happened. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 736 (7th Cir. 2002). In any event, any dispute over this ceremony is immaterial, as she is still a minister without it.

Finally, Starkey spills pages of ink trying to explain away her own written affirmation to Roncalli leadership in 2016 that "school counselors" like herself perform the same "Ministry" functions as teachers. Opp.22-27; *see* App.517, 519. But her alleged *motive* for affirming her ministerial duties is irrelevant, *cf.* Opp.24, just as the Supreme Court didn't find it relevant in *Hosanna-Tabor* to ask *why* the plaintiff there claimed the ministerial housing allowance on her taxes, 565 U.S. at 191-92. The relevant (and undisputed) fact is that it happened—demonstrating that Starkey indeed "held herself out as a minister" within the Roncalli community. *Id.*

Starkey's claim that she didn't "underst[and]" the "legal consequences" of her actions likewise confuses the issues. *Cf.* Opp.25. The important point is not Starkey's opinion on whether guidance counselors are ministers. *See* App.517. That's as irrelevant as the HR representative's contrary hearsay on the same topic—hearsay that was ultimately rejected by Starkey, the Principal, and the Archdiocese. Opp.23. Courts decide ministerial status, not parties. *Grussgott*, 882 at 661-62; Br.28-29.

Instead, what's important is that Starkey affirmed as a factual matter that the duties listed in the "Ministry" contract *were indeed her duties*. App.517 ("If school counselors had a Ministry Description, it would be identical to that of teachers[.]"); *see* App.519 (Ministry Description for teachers). Under *Our Lady*, the fact that Starkey had those duties—which included praying with and for students, communicating "the Catholic faith to students by direct teaching of Religion" or "integration of moral values in all curriculum areas," and participating in "religious instruction and Catholic formation," App.519—makes her a minister. Thus, far from being "sufficient … to allow Starkey's claims to survive summary judgment," Opp.23, the May 2016 email discussion confirms that the exception applies.

For the same reasons, Starkey's theory (at 24) that the 2016 events are "evidence of pretext" has things exactly backwards. Those events—a lawyer's alleged conclusion that counselors weren't ministers, followed by *rejection* of that conclusion by Starkey, the Principal, and the Archdiocese itself—show that far from being "hoked up for the occasion," the Archdiocese's "belie[f] that" guidance counselors are "vital" to Roncalli's religious mission has been consistent since "well before" this litigation began. *Sterlinski*, 934 F.3d at 570-71. It therefore cannot be "second-guess[ed]." *Id.* at 570.

**C. All of Starkey's claims are barred.**

Starkey's status as a minister forecloses all her claims. The ministerial exception bars any claim that would interfere with the "selection and supervision" of ministerial employees. *Our Lady*, 140 S. Ct. at 2055. All of Starkey's claims do just that. Br.29-31. And her assertion that her hostile-work-environment and state-tort claims survive the exception, Opp.26-28, is mistaken.

First, the hostile-work-environment theory is based entirely on the panel decision in *Demkovich v. St. Andrew the Apostle Parish*. Opp.26. But *Demkovich* has been vacated by the en banc Seventh Circuit. And for good reason: "[t]he distinction made in *Demkovich* … is not supported by Supreme Court precedent." *Koenke v. Saint*

*Joseph's Univ.*, No. 19-4731, 2021 WL 75778, at *3 (E.D. Pa. Jan. 8, 2021). As *Our Lady*, explains, the ministerial exception protects both the "selection" and "*supervision*" of ministers. 140 S. Ct. at 2055, 2060 (emphasis added). And "hostile work environment claims," just like other Title VII claims, "clearly fall within" those categories. *Koenke*, 2021 WL 75778, at *3; *see also id.* at *4 (collecting cases).

Even the withdrawn *Demkovich* opinion doesn't help Starkey. That opinion allowed hostile-work-environment claims only if the claims were unrelated to "tangible employment actions like hiring and firing." 973 F.3d 718, 740 (7th Cir. 2020), *vacated* (Dec. 9, 2020). The plaintiff there didn't challenge his firing, instead basing his claims on allegations that his supervisor "repeatedly and often subjected him to comments and epithets showing hostility to his sexual orientation" and weight. *Demkovich*, 973 F.3d at 721; *see Demkovich*, 343 F. Supp. 3d at 776-77 ("bitches," "fag wedding").

Here, however, Starkey *does* challenge her nonrenewal. Her hostile-work-environment claim doesn't allege any slurs or epithets, but instead arises solely out of the same challenged actions as her discriminatory-discharge claims—namely, Defendants' refusal to retain school leaders who violated their contracts and Church teaching. Dkt. 1 ¶¶32, 42, 45. Indeed, her complaint is forthright, stating that the purported "hostile work environment" arose from "adverse employment actions." *Id.* ¶¶54, 74. That's fatal even under *Demkovich*.[4]

As for tort claims, Starkey offers no response to the Archdiocese's cases applying the ministerial exception to bar tort claims like hers. *See* Br.30-31. Instead, she invokes *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597 (Ky. 2014), which permitted a *contract* claim to go forward. But the Archdiocese's position has never been that *all* state-law claims are barred by the ministerial exception; it is that all

---

[4] Starkey's asserted need for discovery on this claim (Opp.27 n.12) is odd. If Starkey was in fact subjected to hostile workplace conditions, she wouldn't need discovery to allege as much. That she's never done so only shows that this case is not about on-the-job "express[ion]," but about how Defendants "cho[se their] representatives." *Demkovich*, 973 F.3d at 726, 735 (cleaned up).

claims (state or federal) *that result in government interference with a church's selection and supervision of its ministers* are. Thus, a slip-and-fall on the church steps, or a contract claim for unpaid salary, might not be barred. But claims like Starkey's—which seek to punish the Archdiocese for its policies on who can represent it—*are*, because they seek to "appl[y] state law" to "limit[] a religious organization's choice of" minister." *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 119-20 (3d Cir. 2018) ("courts have repeatedly dismissed breach of contract claims by" ministers); *see Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330 (4th Cir. 1997) (barring tortious-interference claims); *Dayner v. Archdiocese of Hartford*, 23 A.3d 1192, 1210-11 (Conn. 2011) (same).

Pivoting, Starkey says her tort claims aren't barred because the Archdiocese has denied it was her statutory "employer." Opp.27. But courts regularly hold that the ministerial exception bars claims by Catholic-school employees against *both* the school *and* the school's diocese. *See, e.g.*, *Fratello*, 863 F.3d 190; *Cannata*, 700 F.3d 169; *see also Bell*, 126 F.3d at 332-33 (dismissing claims against non-employers). The situation is no different just because Starkey's presses state-law claims only against the Archdiocese. If the court is barred from interfering with how *Roncalli* selects or supervises ministerial roles, it necessarily must also be barred from interfering with how the *Archdiocese* supervises Roncalli's selection and supervision of ministerial roles. The ministerial exception is about church autonomy; it is not an invitation to keep suing higher until you reach the Pope.

Starkey's sole case is not to the contrary. *Cf.* Opp.27. There, the party asserting the ministerial exception not only wasn't the plaintiff's employer, it was allegedly a "separate and autonomous" organization entirely, and thus the challenged decisions were not "internal decisions within the hierarchy of a single organization." *McRaney*, 304 F. Supp. 3d at 517, 521. That situation bears no resemblance to this one, where Roncalli and the Archdiocese are both within the hierarchy of the Catholic Church,

where (as Starkey herself alleges) Roncalli was "operated … under the direction of the Archdiocese," Dkt. 1 ¶13, and where (as Starkey herself alleges) the Archdiocese "directed" the very actions leading to her nonrenewal, *id.* ¶24.

Finally, Starkey says "[t]he inapplicability of the ministerial exception to state law contract and tort claims was conceded by all sides" in *Demkovich*. Opp.27-28. Not so. What was "conceded" there is the same point argued here: *some* torts can survive the ministerial exception, depending on "the elements of the claim." *See* Oral Argument Audio at 7:15-8:09, *Demkovich*, No. 19-2142 (7th Cir. Feb. 9, 2021); Dkt. 87 at 3 (citing "battery" example from panel argument). The problem for Starkey is that tortious-interference claims challenging nonrenewal are on the wrong side of the line.

## II. Starkey's federal claims are barred by RFRA.

Starkey's federal claims are also barred by RFRA. RFRA exempts objectors from any "application" of any "Federal law" that substantially burdens their religious exercise, unless the application is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. §§ 2000bb-1(a)-(b), 3(a). Here, applying Title VII to punish the Archdiocese for requiring its leaders to reflect its beliefs imposes a substantial burden and cannot satisfy strict scrutiny. Br.31-32.

Citing *Listecki*, Starkey first claims RFRA doesn't apply at all to suits between private parties. Opp.28-29 (citing *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015)). But *Listecki* doesn't govern if it has been "undermined by" a decision of the Supreme Court. *Woodring v. Jackson Cnty.*, 986 F.3d 979, 993 (7th Cir. 2021) (cleaned up). And the very decision that gave Starkey her cause of action in the first place—*Bostock*—specifically identified RFRA as a "super statute" that "might supersede Title VII's commands in appropriate cases." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020). Starkey cannot explain why this Court should follow what *Bostock* said about her Title VII claim but ignore what *Bostock* said about

the Archdiocese's RFRA defense. *See, e.g.*, *Hankins v. Lyght*, 441 F.3d 96, 103-04 (2d Cir. 2006) (applying RFRA to private antidiscrimination lawsuit).

Next, Starkey asserts that even if RFRA applies, punishing the Archdiocese is permissible because Title VII serves the important end of "permit[ting] equal opportunities in employment." Opp.29. But under RFRA, courts "look beyond broadly formulated interests justifying the general applicability of government mandates," asking whether there is "a compelling and specific justification for burdening" *the objector. Korte v. Sebelius*, 735 F.3d 654, 685 (7th Cir. 2013) (cleaned up). Applying that test, "the state's interest in eliminating employment discrimination"—however important in general—"is out-weighed by a church's constitutional right of autonomy in its own domain." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996). And that's especially so here, where Title VII expressly protects the right of religious organizations to choose employees based on "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §§ 2000e(j), 2000e-1(a).

For the same reasons, Starkey's claim (at 29) that applying RFRA would "nullify" Title VII is mistaken. Most Title VII suits don't implicate sincerely held religious beliefs. In the rare case that does, applying RFRA doesn't undermine "our pluralistic society" but protects it, by "preserving the promise of the free exercise of religion" that "lies at [its] heart." *Bostock*, 140 S. Ct. at 1753-54.

### III.  Starkey's Title VII claims are barred by Title VII.

Starkey's Title VII claims also fail as a matter of law because: (1) the claims are barred by Title VII's religious exemption; (2) Starkey was dismissed for the legitimate, nondiscriminatory reason that she violated her contract; and (3) the Archdiocese's actions were based on Starkey's conduct (entering a same-sex union and rejecting Church teaching), not her sexual orientation. Br.32-34.

Starkey responds only with boilerplate about the standard for reconsideration motions. Opp.30. But the cases Starkey cites are either about petitions for review from

the Board of Immigration Appeals (*Dominguez*) or motions to reconsider *after judgment*, which are governed by Rule 59 or 60 (*Caisse Nationale*; *Bank of Waunakee*). Here, the Archdiocese is asking the Court to reconsider an interlocutory order—and "Rule 54(b) ... bestow[s] sweeping authority" to do so "at any time." *Galvan v. Norberg*, 678 F.3d 581, 587 n.3 (7th Cir. 2012); *see HK Sys., Inc. v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009) (appropriate where district court thought it "had erred").

In any event, Starkey agrees reconsideration is appropriate if the prior order rested on an error of law, Opp.30, and the Archdiocese argues exactly that. For example, the Court rejected application of the Title VII exemption based on the concern that construing it to apply here would "swallow Title VII's rules," amounting to a complete exemption for religious employers. Dkt. 93 at 9-11. But this was error. Under a plaint-text reading of the exemption, religious employers are exempt when their hiring decision is based on an individual's particular religious belief, observance, or practice (regardless of what type of claim is brought); but they remain subject to Title VII claims (of all types) when it is not. Br.33. The Court's prior order didn't address this point, and Starkey offers no response.

**IV. Starkey's claims are barred by the First Amendment.**

The same goes for the Archdiocese's other First Amendment defenses—(1) religious autonomy; (2) non-entanglement; (3) freedom of association; and (4) constitutional avoidance. Br.34-35. Again, Starkey offers no substantive response, invoking only the reconsideration standard. But again, this Court "has the power to reconsider an interlocutory order at any time." *Galvan*, 678 F.3d at 587. And in any event, the Court's prior order said it was "premature" to resolve these defenses absent evidence on Starkey's "job duties," Dkt. 93 at 16, 18—which the Court now has.

**CONCLUSION**

Judgment should be rendered for the Archdiocese.

Respectfully submitted.

John S. (Jay) Mercer, #11260-49

Wooton Hoy, LLC

13 North State Street, #2A

Greenfield, IN 46140

(317) 439-0541

/s/ Luke W. Goodrich

Luke W. Goodrich (DC # 977736)

Daniel H. Blomberg (DC # 1032624)

Joseph C. Davis (DC # 1047629)

Christopher C. Pagliarella (DC # 273493)

The Becket Fund for Religious Liberty

1919 Pennsylvania Ave. NW, Suite 400

Washington, DC 20006

(202) 955-0095

(202) 955-0090 fax

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following on

March 12, 2021 by this Court's electronic filing system:

Kathleen A. DeLaney
Christopher S. Stake
DeLaney & DeLaney LLC
3646 N. Washington Boulevard
Indianapolis, IN 46205

By: /s/ Luke W. Goodrich
Luke W. Goodrich
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
(202) 955-0095
(202) 955-0090 fax