UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LYNN STARKEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-03153-RLY-TAB |
| | ) | |
| ROMAN CATHOLIC ARCHDIOCESE OF | ) | |
| INDIANAPOLIS, INC., and | ) | |
| RONCALLI HIGH SCHOOL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, IN
THE ALTERNATIVE, MOTION FOR JUDGMENT ON THE PLEADINGS**

Lynn Starkey worked for Roncalli High School, a private Catholic school in

Indianapolis, Indiana, for nearly forty years.  After Roncalli learned of Starkey's same sex

marriage, it declined to renew her employment contract on the grounds that her marriage

violated Catholic teachings.  At the time of her termination, Starkey worked as Co-

Director of Guidance.

Starkey sued Roncalli and the Roman Catholic Archdiocese of Indianapolis

alleging discrimination, retaliation, and hostile work environment under Title VII, and

tortious interference with contractual relationship and tortious interference with

employment relationship under Indiana state law.[1]  Roncalli now moves for summary

judgment on all of Starkey's claims by arguing that Starkey was a minister for purposes

---

[1] Starkey also asserted a Title VII retaliation claim, but the court granted Roncalli's Motion for Judgment on the Pleadings with respect to that claim.

of the First Amendment's ministerial exception.  For the reasons that follow, the court

concludes that Starkey qualified as a minister, and that the ministerial exception bars all

of Starkey's claims.  Therefore, Defendants' Motion for Summary Judgment is

**GRANTED**.

## I.      Factual Background

The general facts of this case were outlined in this court's entry on Defendants'

Motion for Judgment on the Pleadings.  (Filing No. 93).  The court recounts only those

facts relevant to deciding the present motion.

### A.      Roncalli's Mission

Roncalli High School is a Catholic school operating "under the auspices of the

Roman Catholic Archdiocese of Indianapolis."  (Filing No. 114-2, Appendix of

Supporting Evidence ("App.") at 63-64).  According to the school's mission statement,

Roncalli pledges to "provide . . . an educational opportunity which seeks to form

Christian leaders in body, mind, and spirit."  (*Id.* at 18 ¶ 8, 63).  The school's purpose is

to "support[] and otherwise further[] the mission and purposes of" the Archdiocese.  (*Id.*

at 51).

### B.      Starkey's Employment at Roncalli

Starkey began working at Roncalli during the 1978-1979 school year, and, with

the exception of the 1981-1982 school year when she completed a master's degree in

music education, she worked there continuously until her termination in 2019.  (*Id.* at

267-68).  Starkey held several positions during her time at Roncalli, including New

Testament teacher, Choral Director, Fine Arts Chair, Guidance Counselor, and Co-

Director of Guidance. (Filing No. 127-2, List of Positions). Starkey taught New Testament from 1982 to 1989. (*Id.*). In 1985, Roncalli's chaplain told Starkey that she must apply for catechesis certification in order to continue teaching religion, so Starkey applied to become a catechist. (App. at 277). Her application was approved, but it expired in 1990. (*Id.*, 187). Starkey never renewed it. (*Id.*). From 1988 to 1998, Starkey served as Choral Director, a role which required her to prepare students for the music used during the school's monthly Mass. (List of Positions; App. at 269).

In 1997, Starkey became a guidance counselor, a position she held for ten years until she assumed the role of Co-Director of Guidance in 2007. (List of Positions). Starkey served as Co-Director of Guidance for twelve years until her termination in 2019. (*Id.*). For the final twenty-one years of Starkey's tenure at Roncalli, her role was limited to that of guidance counselor and Co-Director of Guidance. (*Id.*).

### C.   Guidance Counselor's Role at Roncalli

Teachers and guidance counselors at Roncalli are generally employed pursuant to one-year contracts. When this dispute arose, Starkey was employed under a "School Guidance Counselor Ministry Contract" and accompanying "Archdiocese of Indianapolis Ministry Description."[2] (App. at 532-33, 526). According to the contract, Starkey agreed that she would be in default if she breached any duty, which included "relationships that are contrary to a valid marriage as seen through the eyes of the Catholic Church." (*Id.* at

---

[2] From 2007 to 2017, Starkey's contract was titled, "School Teacher Contract." (Filing No. 127-10, School Teacher Contract). Roncalli then instituted a "Teaching Ministry Contract" for the 2017-2018 school year. (App. at 530).

533).  The Catholic Church defines marriage as a "covenant" "by which a man and a woman form with each other an intimate communion of life and love."  Catechism of the Catholic Church § 1660.

The contract also provided that Starkey "acknowledge[d] receipt of the ministry description that is attached to this contract and agree[d] to fulfill the duties and responsibilities listed in the ministry description."  (*Id.* at 532).  The ministry description identifies a guidance counselor as a "minister of the faith" who will "collaborate with parents and fellow professional educators to foster the spiritual, academic, social, and emotional growth of the children entrusted in his/her care."  (*Id.* at 526).  The ministry description further specified: "As role models for students, the personal conduct of every school guidance counselor, teacher, administrator, and staff member, both at school and away from school, must convey and be supportive of the teachings of the Catholic Church."  (*Id.*).

The first "Role" identified in the ministry description is that the guidance counselor "Facilitates Faith Formation," which included the following responsibilities:

- "Communicates the Catholic faith to students and families through implementation of the school's guidance curriculum, academic course planning, college and career planning, administration of the school's academic programs, and by offering direct support to individual students and families in efforts to foster the integration of faith, culture, and life."

- "Prays with and for students, families, and colleagues and their intentions. Participates in and celebrates liturgies and prayer services as appropriate"

- "Teaches and celebrates Catholic traditions and all observances in the Liturgical Year."

- "Models the example of Jesus, the Master Teacher, in what He taught, how He lived, and how He treated others."

- "Conveys the Church's message and carries out its mission by modeling a Christ-centered life."

- "Participates in religious instruction and Catholic formation, including Christian services, offered at the school."

(*Id.*).  Guidance counselors were also expected to "use[] techniques and methods that foster a Christ-centered atmosphere"; "participate[] in spiritual retreats, days of reflection, and spiritual formation programs"; "proactively identif[y] and address[] physical, social, emotional, and spiritual needs of individuals and of the community of learners"; and "display [] Gospel values."  (*Id.* at 527-29).  The guidance department is also the only department whose staff members meet with every student individually throughout the year.  (*Id.* at 22 ¶ 29).

### D.    Starkey as Co-Director of Guidance

In her role as a guidance counselor and Co-Director of Guidance, Starkey attended monthly Masses, where she received communion and sang with the congregation.  (*Id.* at 332).  She also communicated guidance to other staff members regarding how to prepare students of different faiths for the school's Catholic liturgy.  (*Id.* at 652).  In addition to attending monthly Masses at Roncalli, Starkey attended "Days of Reflection."  (*Id.* at 421).  Principal Charles Weisenbach explained that these events, which occur before each school year, are "designed specifically for [Roncalli's] faculty and have a very direct, intentional focus on [the] Catholic mission and how each [faculty member] is called to live out that mission in [their] specific roles."  (*Id.* at 20 ¶ 19).  Weisenbach further

explained that these gatherings are required only for the small group of faculty members "who are impacting kids in their spiritual life on a day-to-day basis." (*Id.* ¶ 23). This included guidance counselors. (*Id.*). At these Days of Reflection, Weisenbach testified that he delivers a "call-and-response Commissioning Prayer" which "exhorts" the faculty members to embrace the Catholic ministry at the school. (*Id.*). In that prayer, the faculty state that they "accept the responsibilities of [their] ministry"; "promise to share [their] faith with others"; and "promise to form youth and support families in the faith by following the example of our Master Teacher, Jesus Christ." (*Id.* at 31). At the end of the prayer, the leader states: "I hereby commission you to faithfully and joyfully serve as ministers of the faith in the Catholic schools of the Archdiocese of Indianapolis." (*Id.*). Starkey does not recall participating in such a "call and response" during these Days of Reflection. (*Id.* at 435).

One of Starkey's responsibilities as Co-Director of Guidance was to serve on Roncalli's Administrative Council. (*Id.* at 93-95). Considered the "main leadership body" at Roncalli, the Administrative Council meets weekly and addresses the "day-to-day operations and spiritual life of the school." (*Id.* at 17-18 ¶¶ 4-5). According to Principal Weisenbach, "[m]ost faculty and staff recognize the Administrative Council as the lifeblood of decision-making at the school" and "the Administrative Council and the Department Chairs are responsible for 95% of Roncalli's daily ministry, education, and operations." (*Id.* at 18 ¶¶ 5, 7). While the Administrative Council handled the "nuts and bolts, day-to-day" operations of the school, (App. at 285-86), it also dealt with issues more closely related to Roncalli's religious mission, including logistics for all-school

liturgies and the qualifications for students to serve as Eucharistic ministers.  (*Id.* at 293, 323-24).

Prayer is a regular occurrence at Roncalli.  Administrative Council meetings generally opened with a prayer, (*see generally id.* at 483-518), and every morning different members of the Roncalli community would deliver a morning prayer over the school PA system.  (*Id.* at 406-07, 440-41).  Starkey delivered the morning prayer on more than one occasion, as did several other individuals, including the principal, the chaplain, the campus minister, and students.  (*Id.* at 406-07).  While Starkey did not otherwise lead prayer or pray with students as part of her regular duties as guidance counselor or Co-Director of Guidance, (*id.* at 440-41), other guidance counselors testified that prayer with students is a regular part of their job.  Angela Maly described her daily work as a guidance counselor as "specifically geared toward modeling and teaching not just a generic 'Christian' faith but the Catholic faith specifically."  (*Id.* at 7 ¶ 40).  To that end, Maly "pray[s] with and for [the students].  [She] join[s] with them in liturgies and prayer services. . . . And [she] tr[ies] to help them understand and be formed in the Catholic faith."  (*Id.*).  Maly explained that prayer is an "essential component[]" of her work, including the academic and career counseling aspects of her job.  (*Id.* at 2 ¶ 10).

Any additional facts necessary to resolve the motion will be addressed below.

## II.  Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'"  *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court views the facts, and draws all reasonable inferences from those facts, in the light most favorable to Starkey, the non-moving party.  *Skiba*, 884 F.3d at 717.

## III.    Discussion

Roncalli moves for summary judgment on the grounds that Starkey was a minister and her claims are therefore barred by the ministerial exception.  Roncalli next argues that Starkey's federal claims are barred by the Religious Freedom Restoration Act ("RFRA").  Finally, Roncalli requests that the court reconsider its denial of Roncalli's motion for judgment on the pleadings.  Because the court concludes that the ministerial exception applies and bars all of Starkey's claims, the court declines to reach Roncalli's other arguments.

### A.    The Ministerial Exception

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  The Religion Clauses ensure that, among other things, religious institutions are free "to decide matters of 'faith and doctrine' without government interference."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 194-95 (2012)).  "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to

the institution's central mission.  And a component of this autonomy is the selection of the individuals who play certain key roles." *Id.*

The ministerial exception arose from this understanding of the First Amendment: "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions within churches and other religious institutions." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.  *See also Hosanna-Tabor*, 565 U.S. at 188 ("Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.").  When the state interferes with these types of employment decisions, it violates both the Free Exercise and Establishment Clauses of the First Amendment.  First, "[b]y imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Id.*  Second, "[a]ccording the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 188-89.

The ministerial exception is not limited to claims of religious discrimination; it bars all claims of discrimination under Title VII, including discrimination on the basis of sexual orientation. *Id.* at 188.  *See also Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) (concluding discrimination on the basis of sexual orientation is a form of sex discrimination under Title VII).  The exception also applies regardless of whether the

reason given for the employment decision was religious in nature.  *Hosanna-Tabor*, 565

U.S. at 194-95 ("The exception instead ensures that the authority to select and control

who will minister to the faithful—a matter 'strictly ecclesiastical,'—is the church's alone."

*Id.* (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,

344 U.S. 94, 119 (1952)).  Nor is the exception limited to ordained ministers; courts have

applied the exception to an organist, *Sterlinski v. Cath. Bishop of Chicago*, 934 F.3d 568

(7th Cir. 2019), a press secretary, *Alicea-Hernandez v. Cath. Bishop of Chicago*, 320 F.3d

698 (7th Cir. 2003), and a school principal, *Fratello v. Archdiocese of New York*, 863

F.3d 190 (2d Cir. 2017).

When the Supreme Court initially recognized the ministerial exception in

*Hosanna-Tabor*—a case involving a "called" kindergarten and fourth grade teacher at an

Evangelical Lutheran school—the Court declined to announce "a rigid formula" for

determining whether an employee falls within the exception.  565 U.S. at 190.  The court

instead identified four relevant circumstances, but did not assign any one circumstance

particular weight: (1) "the formal title" given by the church; (2) "the substance reflected

in that title"; (3) "[the teacher's] own use of that title"; and (4) "the important religious

functions she performed for the Church.  *Id.* at 192.  In light of those considerations, the

court concluded the teacher was a ministerial employee.  *Id.* at 192.

The Supreme Court revisited the scope of the ministerial exception in *Our Lady of

Guadalupe*—a case involving discrimination claims brought by two elementary school

teachers at Catholic schools.  The Court clarified that its "recognition of the significance"

of the four factors in *Hosanna-Tabor* "did not mean that they must be met—or even that

10

they are necessarily important—in all other cases."  140 S. Ct. at 2063.  Instead, courts

must "take all relevant circumstances into account" when determining "whether each

particular position implicated the fundamental purpose of the exception."  *Id.* at 2067.

"What matters, at bottom, is what an employee does."  *Id.*

> **B.**     **Starkey's Position as Co-Director of Guidance Falls Within the Ministerial Exception.**

With this framework in mind, it is apparent that the ministerial exception covers

Starkey's role as Co-Director of Guidance.  To begin, religious instruction and formation

are central to Roncalli's philosophy and mission, and Starkey's employment documents

"specified in no uncertain terms" that Roncalli expected her to perform a variety of

religious duties and to help carry out the school's mission.  *Our Lady of Guadalupe*, 140

S. Ct. at 2066.  While Roncalli's characterization of the role is not dispositive, "the

school['s] definition and explanation of the[] role[] is important."  *Id.  See also Grussgott*

*v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 660 (7th Cir. 2018) ("Thus, it is the

school's expectation—that Grussgott would convey religious teachings to her students—

that matters).

The School Guidance Counselor Ministry Description designated a guidance

counselor as a "minister of the faith" and charged her with "foster[ing] the spiritual . . .

growth" of her students.  (App. at 526).  The ministry description stated that "Catholic

schools are ministries of the Catholic Church, and school guidance counselors are vital

ministers sharing the mission of the Church.  School guidance counselors are expected to

be role models and are expressly charged with leading students toward Christian maturity

and with teaching the Word of God." (*Id.* at 529). The ministry description also identified "Facilitates Faith Formation" as the guidance counselor's first "Role," which required communicating the Catholic faith to students, praying with and for members of the Roncalli community, teaching and celebrating Catholic traditions, modeling the example of Jesus, conveying the Church's message, and participating in religious instruction and Catholic formation. (*Id.*). Like the employee in *Hosanna-Tabor*, Starkey was "expressly charged", 565 U.S. at 192, with "leading students toward Christian maturity and with teaching the Word of God." (App. at 529).

Angela Maly, a current guidance counselor at Roncalli, confirmed that the ministry description "is a fair description of the day-to-day expectations of guidance counselors at Roncalli." (*Id.* at 7 ¶ 39). In fact, Shelly Fitzgerald, Starkey's Co-Director of Guidance, explained that she met with students individually "at least once a year, but often times, much more" and discussed "personal and social issues . . . and faith formation." (*Id.* at 41-42). Fitzgerald also "consistently use[d] spiritual life and resources in [her] counseling conversations as well as sharing [her] own spiritual experiences." (*Id.* at 45). She explained that "in a faith-based school," her willingness to share her beliefs and love of God "is a strength when working with young people who are seeking direction." (*Id.*).

One of the other ways in which Roncalli's guidance counselors worked with students was through the Student Assistance Program (now named STAND UP) ("SAP"). (*Id.* at 298-99; *id.* at 3 ¶ 14). SAP helps guidance counselors identify and support "at risk" students who may be struggling with issues such as dysfunction at home, the death

12

of a loved one, or substance abuse.  (*Id.* at 299).  Angela Maly, who serves in a leadership

role within SAP, explained that students are encouraged to reach out to SAP/STAND UP

if they are struggling with "anything that may negatively affect [their] physical, social,

emotional, or spiritual health."  (*Id.* at 3 ¶ 16).  Starkey confirmed that her work with SAP

required her to help students with their "most sensitive" and "personal issues."  (*Id.* at

598).  In line with the expectations laid out in her employment documents and the

school's mission, Roncalli plainly anticipated that matters of faith and doctrine would

inform a guidance counselor's approach to working with students struggling with

sensitive personal issues.

Not only did her employment documents outline the religious duties for the Co-

Director of Guidance, but others perceived the position as having a religious component.

*See Grussgott*, 882 F.3d 659-60 ("Thus, the substance of Grussgott's title as conveyed to

her and as perceived by others entails the teaching of the Jewish religion to students,

which supports the application of the ministerial exception here.").  Given the

expectations and responsibilities of guidance counselors at Roncalli, it is perhaps not

surprising that Principal Weisenbach explained that Starkey's "track record of . . .

commitment to and leadership in these areas of faith formation was a part of what made

[him] comfortable elevating [Starkey] to the Co-Director role."  (App. at 25 ¶ 44) (citing

her experience as a New Testament teacher, Choir Director, and previous certification as

a catechist).  *See Grussgott*, 882 F.3d at 659 (noting the school's reliance on an

employee's religious teaching experience when deciding to hire her).

Starkey also performed "important religious functions" for the school.  *Hosanna-Tabor*, 565 U.S. at 192.  For example, Starkey's role on the Administrative Council is an important consideration and underscores the ministerial nature of her position.  The Administrative Council and the Department Chairs handled 95% of Roncalli's daily ministry, education, and operations.  (App. at 18 ¶ 7).  Generally seen by the faculty as the "lifeblood of decision-making" at Roncalli, the Administrative Council was responsible for making the "big decisions" "relating to the school's mission, specific student needs, and most other day-to-day operations."  (*Id.* at 18 ¶ 5).  Aside from the Principal and the Assistant Principal for Academic Affairs, the Director of Guidance is the only staff member that serves on the Administrative Council and as a Department Chair.  (*Id.* at 18 ¶ 7).  Thus, Starkey was one of a select group of school leaders responsible for guiding Roncalli in its mission.

While the Council was responsible for some secular duties, the Council also addressed issues more closely related to the school's mission to "form Christian leaders in body, mind, and spirit."  (*Id.* at 18 ¶ 8, 63).  To help focus on this faith formation aspect of the school's mission, the Administrative Council held book discussions to better understand their faith and develop ways to transmit the faith to others.  (*Id.* at 19 ¶ 13-15, 84, 333-35).  The Council also discussed the ways in which Roncalli can differentiate itself from the local public schools, the biggest difference being that Roncalli serves the students' spiritual, academic, and personal needs and seeks to form them in the Catholic faith.  (*Id.* at 19 ¶ 10).  To that end, the Council continually worked to strengthen the spiritual, social, and emotional elements of the Catholic educational environment.  (*Id.*).

For example, the Council discussed how to infuse faith formation into the athletic program.  (*Id.* at 19 ¶ 11).  The Council also planned all-school liturgies, determined the qualifications for who could serve as Eucharistic ministers, and discussed a student "morality survey" that asked students about drug and alcohol use, bullying, and sexual activity.  (*Id.* at 293, 314-16, 323-24, 343).

In addition to the more general work related to Roncalli's religious mission, the Council also identified ways to provide direct support to students and staff.  For example, the Council addressed issues related to students in crisis and distress, as well as how to address the personal and spiritual struggles of faculty members.  (*Id.* at 18 ¶ 8). Following the Parkland school shooting, the Council discussed how best to respond to the concerns and emotions of the student body.  (*Id.* at 19 ¶ 12).  Starkey was an active participant in these discussions.  (*Id.* at 19 ¶¶ 11-12).  Overall, Starkey's role on the Council and her work in helping shape Roncalli's educational and spiritual environment weigh heavily in favor of applying the ministerial exception.

Starkey downplays the religious nature of her role, and highlights her secular duties, such as scheduling students for classes, helping students with college applications, providing SAT and ACT test prep tools, administering AP exams, and offering career guidance.  (Filing No. 127-3, Affidavit of Autumn Currens ("Currens Aff.") ¶ 5; App. at 93-95).  Starkey also testified that she did not pray with her students as part of her regular duties as guidance counselor or Co-Director of Guidance, though she did deliver the morning prayer on more than one occasion.  (App. at 406-07, 440-41).  She goes so far as to say that in her current position as a guidance counselor at a local public school, her

duties are virtually identical to those at Roncalli (save the administrative responsibilities of being a director).  (*Id.* at 442-43).[3]  But this disregards that the school "clearly intended for [Starkey's] role to be connected to the school's [Catholic] mission," *Grussgott*, 882 F.3d at 660, and there is sufficient evidence that Starkey in fact performed many functions that would not be required of a guidance counselor at a secular school: she helped plan all-school liturgies, she delivered the morning prayer on at least a few occasions, she worked with other Administrative Council members to identify ways in which Roncalli can differentiate itself from the local public schools, and she participated in discussion groups about books aimed at enhancing faith formation.  *Cf. Hosanna-Tabor*, 565 U.S. at 708-09 (rejecting argument that a teacher with only 45 minutes of religious duties a day should not qualify as a minister because that argument "place[s] too much emphasis on [the teacher's] performance of secular duties").

Moreover, that Starkey characterizes her work as a guidance counselor in purely secular terms does not change the result because it would be inappropriate for this court to draw a distinction between secular and religious guidance offered by a guidance counselor at a Catholic school.  *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 343 (1987) (Brennan, J., concurring in

---

[3] Starkey also relies on a determination by the Archdiocese's legal counsel that school counselors do not qualify as ministers.  (*See* Filing No. 127-8, Email Regarding Ministerial Exception).  But whether Starkey was a ministerial employee is up to the court to determine as a matter of law. *See Grussgott*, 882 F.3d at 661-62 (declining to consider an expert's opinion on the "ultimate question" of whether the employee was a minister); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 833 (6th Cir. 2015) ("[W]hether the exception attaches at all is a pure question of law which this court must determine for itself.").

judgment) ("What makes the application of a religious-secular distinction difficult is that the character of an activity is not self-evident. As a result, determining whether an activity is religious or secular requires a searching case-by-case analysis.  This results in considerable ongoing government entanglement in religious affairs.").  *See also Sterlinski*, 934 F.3d at 570 ("If the Roman Catholic Church believes that organ music is vital to its religious services, and that to advance its faith it needs the ability to select organists, who are we judges to disagree?").  Here, what qualifies as secular or religious guidance in the context of a Catholic high school is exceedingly difficult to identify, and "the purpose of the ministerial exception is to allow religious employers the freedom to hire and fire those with the ability to shape the practice of their faith." *Grussgott*, 882 F.3d at 661.

To be sure, the court does not mean to say that divergent understandings of the religious nature of an employee's role should always be resolved in the religious employer's favor.  For example, it would be difficult to credit a religious employer's claim that a custodian or school bus driver qualifies as a minister simply because the employer said so.  *See Sterlinski*, 934 F.3d at 572 ("A church claiming 'minister' status for bus drivers would invite a finding of pretext, but a church claiming that persons who chant, sing, or play music during a service perform religious functions is on solid ground.").  But this case concerns the Co-Director of Guidance, and the record shows that the Co-Director of Guidance performed "vital religious duties" at Roncalli. *Our Lady of Guadalupe*, 140 S. Ct. at 2066.  Employees in that position met with every student throughout the year and discussed some of the most sensitive issues in a young person's

17

life.  Indeed, the term itself—Director of *Guidance*—suggests that those who fill that role are tasked with guiding students as they mature and grow into adulthood.  One may reasonably presume that a religious school would expect faith to play a role in that work, and Roncalli expressly entrusted Starkey with the responsibility of communicating the Catholic faith to students and fostering spiritual growth.  Starkey also served in a senior leadership role in which she helped shape the religious and spiritual environment at the school and guided the school on its religious mission.  For these reasons, the court concludes that the Co-Director of Guidance at Roncalli falls within the ministerial exception.

## C.     The Ministerial Exception Bars All of Starkey's Claims

Having concluded that the ministerial exception applies, the court turns to considering which of Starkey's claims are barred.  Starkey brings the following claims: (1) Title VII discrimination; (2) Title VII retaliation; (3) Title VII hostile work environment; (4) intentional interference with contractual relationship; and (5) intentional interference with employment relationship.[4]  Starkey appears to concede that the ministerial exception bars her discrimination and retaliation claims under Title VII, but she argues her Title VII hostile work environment claim and her two state law claims may proceed.  The court disagrees.

Whether the ministerial exception bars hostile work environment claims was, until recently, an unsettled question within this Circuit.  That question was answered

---

[4] Starkey brings the state law claims against the Archdiocese only.

18

conclusively in the affirmative in *Demkovich v. St. Andrew the Apostle Parish*, No. 19-

2142, 2021 WL 2880232 (7th Cir. July 9, 2021).  "It would be incongruous if the

independence of religious organizations mattered only at the beginning (hiring) and the

end (firing) of the ministerial relationship, and not in between (work environment)."  *Id.*

at * 6.  In light of *Demkovich*, the ministerial exception bars Starkey's hostile work

environment claim.

Starkey's state law claims are also barred because those claims implicate the same

concerns animating the ministerial exception's application to Starkey's Title VII claims.

While it is certainly not the case that the ministerial exception bars *all* state law claims—

battery or breach of contract for failure to pay could surely proceed—those claims that

result in the government's interference with a church's selection or supervision of its

ministers or the government's intrusion into doctrinal or ecclesiastical territory are barred.

*See Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 123 (3d Cir.

2018) ("The ministerial exception does not apply to, and courts may decide, disputes that

do not implicate ecclesiastical matters.").  Here, the decision to not renew Starkey's

employment contract goes to the heart of the church's right to "select and control who

will minister to the faithful."  *Hosanna-Tabor*, 565 U.S. at 194-95.  Accordingly, the

ministerial exception bars Starkey's state law claims for intentional interference with

contractual relationship and intentional interference with employment relationship.

Because the court concludes the ministerial exception bars all of Starkey's claims,

it declines to address Defendants' alternative argument that her claims are barred by

RFRA.  The court also declines to reconsider its denial of Defendants' motion for judgment on the pleadings.

## IV.     Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Filing No. 114) is **GRANTED**.  All other pending motions (Filing Nos. 115 and 124) are **DENIED as MOOT**.  Final judgment shall issue accordingly.


**SO ORDERED** this 11th day of August 2021.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.